**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

FILED BY _____ D.C.

08 MAR -6  PM 2: 31

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA - MIA

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

v.

**W. ANTHONY HUFF,**
**DANNY L. PIXLER,**
**ANTHONY R. RUSSO,**
**OTHA RAY MCCARTHA, and**
**CHARLES J. SPINELLI,**

**Defendants,**

**SHERI HUFF, ROXANN PIXLER,**
**MIDWEST MERGER MANAGEMENT, LLC, and**
**BRENTWOOD CAPITAL CORPORATION,**

**Relief Defendants.**

CASE NO.**08 - 60315**
**CIV-ZLOCH**
MAGISTRATE JUDGE
SNOW

_____/

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Securities and Exchange Commission alleges and states as follows:

**I.      INTRODUCTION**

1.      From approximately 2001 through 2004, Defendants:  Danny L. Pixler, the former

chief executive officer of Certified Services, Inc., ("Certified") a professional employee leasing

organization; W. Anthony Huff, a convicted felon and undisclosed control person of Certified;

Anthony R. Russo, Certified's former chief financial officer; Otha Ray McCartha, a Certified

board member; and Charles J. Spinelli, a Certified consultant (collectively "Defendants")

siphoned tens of millions of dollars of Certified's funds through an elaborate scheme conducted in flagrant disregard of the federal securities laws.

2.      Defendants' scheme consisted of artificially inflating Certified's financial condition and failing to disclose related party transactions that benefited Defendants. Defendants pumped up the amount of assets Certified reported to the Commission and the investing public by recording, at the high point, almost $47 million in bogus Letters of Credit as an asset on its balance sheet while simultaneously artificially reducing its reported liabilities by not recording, at the high point, approximately $65 million relating to workers compensation. As a result of Defendants' misconduct, Certified overstated its assets by approximately 35% and understated its liabilities by about 38% for fiscal year-end 2002, and understated its liabilities by more than 50% for fiscal year-end 2003.

3.      In addition, Defendants Pixler and Huff used their control over Midwest Merger Management, LLC ("Midwest"), Certified's controlling shareholder, to improperly divert money out of Certified's coffers and into their own pockets by having Midwest enter into bogus agreements with Certified. Defendants' misconduct caused Certified to materially misrepresent its assets, liabilities, and related party descriptions and transactions in its filings with the Commission and allowed them to reap millions of dollars in ill-gotten gains.

4.      Defendants' conduct violated, or caused violations of, the antifraud and issuer reporting provisions of the federal securities laws. Unless enjoined, they will continue to violate those laws.

## II.   DEFENDANTS AND RELIEF DEFENDANTS

### A.   Defendants

5.      Huff, age 46, resides in Louisville, Kentucky. Huff exerted undisclosed financial and managerial control over Certified and Midwest. In 1998, the State of Kentucky revoked

Huff's insurance license in connection with a $113,000 insurance premium theft. In 2004, Huff pled guilty to three counts of mail fraud in federal court for his involvement in a multi-million dollar fraud and was ordered to pay approximately $180,000 of restitution.

6.   Pixler, age 59, resided in Fort Lauderdale, Florida through at least August 2006. From approximately August 2002 through May 2006, Pixler was at various times Certified's CEO, president, chief operating officer, and on its board of directors. Pixler is an indirect owner and co-manager of Midwest and a consultant for Brentwood Capital Corporation ("Brentwood").

7.   Russo, age 65, resides in Rye Brook, New York. From at least August 2002 through approximately November 2003, Russo was Certified's CEO, and from April through September 2005, he was the company's CFO. He also served on the board of directors. While employed at Certified, Russo was also Brentwood's CFO, vice-president and COO. During the time Russo was with Certified, he was licensed as a certified public accountant in New York. His license lapsed in November 2006.

8.   McCartha, age 58, resides in Winter Park, Florida. At various times, McCartha was a consultant to Midwest, a Brentwood executive vice-president, Certified's chief risk officer, and on Certified's board. Due to his involvement in a fraudulent insurance scheme, on October 12, 2007, McCartha pled guilty in federal court to one count of conspiracy to commit wire and one count of mail fraud. The court sentenced him to 24 months in prison and ordered him to pay approximately $3.6 million in restitution.

9.   Spinelli, age 44, resides in Chatham, New Jersey. He was the CEO and sole shareholder of Brentwood from 2000 through at least 2002. Beginning in June 30, 2003, Spinelli was also a consultant to Midwest and Certified. Spinelli is licensed to practice law by the New York Bar. Due to his involvement with Brentwood, on October 3, 2007, Spinelli pled guilty to

conspiracy to commit wire fraud and misprision of a felony, and the court sentenced him to 21 months in prison and ordered him to pay millions of dollars in restitution.

**B.    Relief Defendants**

10.    Midwest, a Kentucky limited liability company, is headquartered in Louisville, Kentucky.    In July 2001, Pixler and Huff created Midwest.    In November 2001, Midwest purchased a majority stake in Certified, an inactive shell company.    Midwest controlled Certified as its principal shareholder.    Certified stated in its Form 10-K for year-end 2002 that Midwest could be deemed to own and control 80% of Certified.

11.    Brentwood is a New York corporation headquartered in Summit, New Jersey and was managed by Spinelli.    Certified paid Brentwood millions of dollars from 2002 through at least 2003.

12.    Sheri Huff resides in Louisville, Kentucky.    In 1993, Sheri Huff and Huff were divorced, but they have lived together since 1995.    Sheri Huff has a majority ownership stake in Midwest, but did not perform meaningful services for it.    Sheri Huff also received approximately $200,000 per year from Brentwood for purported consultant work, but also did not perform meaningful services for Brentwood.

13.    Roxann Pixler resided in Fort Lauderdale, Florida through at least August 2006. She is Pixler's wife and owns 40% of Midwest.    She did not provide meaningful services to Midwest.

**C.    The Issuer**

14.    Certified is a Nevada corporation formed in 1999 and formerly headquartered in Fort Lauderdale, Florida.    Its principal business was operating a professional employee leasing organization.    During the relevant time period, Certified's common stock was registered with the

4

Commission and its stock was publicly traded. Certified failed to file its 2004 Form 10-K and subsequent quarterly Form 10-Qs and 10-Ks. Since May 2006, Certified has been in bankruptcy under Chapter 11, and its assets and affairs are now under the control of a Chapter 11 trustee and supervision of the bankruptcy court.

## III.    JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a), and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

16.    This Court has personal jurisdiction over the Defendants and Relief Defendants and venue is proper in the Southern District of Florida, because, among other reasons, Certified's principal place of business was in the Southern District of Florida. In addition, Defendants' acts and transactions constituting violations of the Securities Act and Exchange Act occurred in the Southern District of Florida.

17.    Defendants and Relief Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, and the mails, in connection with the acts, practices and courses of business set forth in this Complaint.

## IV.    FACTUAL BACKGROUND

### A.    Certified and the Employee Leasing Industry

18.    Certified and its subsidiaries operated an employee leasing business. Typically, this kind of company provides small and medium-size businesses with a variety of human resource services by acting as a co-employer of those businesses' employees. Among other things, the employee leasing company may assume some or all of its clients' responsibilities and

risks related to health and workers' compensation insurance coverage. In 2003, Certified served 1,900 business clients and acted as a co-employer to its clients' approximately 53,000 employees in 32 states.

19.     Certified's business model was to bundle together smaller companies' payroll processing, employment tax withholding, and workers' compensation insurance so they could achieve the same economies of scale as large corporations.

**B.     Background and Control of Companies**

**1.     Midwest and Brentwood**

20.     In or around July 2001, Pixler and Huff formed Midwest as a holding company, capitalized it with $500, and listed Pixler's wife and Huff's ex-wife as the primary shareholders. In or around November 2001, Midwest acquired a majority ownership interest in Certified, an inactive public shell company, and aggressively grew the company. Almost immediately, Pixler and Huff caused Certified to enter into several non-arms-length agreements with Midwest and Brentwood. Pixler and Huff each exercised substantial control over the business decisions and management of both Certified and Midwest.

21.     Huff also exercised significant influence over Brentwood, including authorizing payments to obtain the Letters of Credit. As early as 2001, Huff devised the organizational structure of Certified, Midwest and Brentwood so the three entities worked together under Huff's ultimate control by using Certified to develop the employee leasing business; Brentwood to develop the insurance carriers; and Midwest to coordinate the financing transactions. In addition, Huff exercised substantial control over nearly all negotiations and transactions among these three entities.

### 2. **Common Control of Midwest and Certified**

22.     Pixler and Huff, through their control of Midwest, also controlled Certified. They controlled Midwest through their nominees, Sheri Huff and Roxann Pixler, who together owned a majority of Midwest's stock. In turn, they exercised control over Certified since Midwest was Certified's controlling shareholder.

23.     Huff managed every aspect of Midwest's business, using a former full-time secretary from Certified and minority owner of Midwest as a front. While the secretary was held out as a person with substantial authority over Midwest, in reality she needed Huff's approval before entering into any contract for Midwest and her duties were largely ministerial, such as withdrawing cash from Midwest's bank accounts and delivering it to Huff. Furthermore, Certified paid her salary, even though she purportedly worked for Midwest.

24.     Pixler also played an important and undisclosed role in Midwest's operations. Through his wife's ownership interest he was an owner of Midwest. In addition, he received $2,500 per week from Midwest and acted as its co-manager.

25.     Huff and Pixler also controlled Certified. Pixler ran Certified's daily operations and approved payments and transactions on behalf of the company, including approving the Certified payments to Midwest that were integral to Pixler and Huff's scheme to loot Certified. Huff's control of Certified was substantial and concealed from investors. For example, Huff frequently attended Certified's management meetings, regularly represented Certified, referred to himself as Certified's significant shareholder in important business negotiations, routinely made financial decisions for Certified such as approving payments, and decided what information Certified would disclose in its public filings.

## V.      The Fraudulent Scheme

26.      During the relevant time period, Pixler and Huff, either directly or by directing others associated with Certified, siphoned millions of dollars from Certified's coffers into their or their nominees' pockets.   Overall, Certified transferred approximately $130 million to Midwest, of which Midwest retained approximately $30 million without providing legitimate services for this substantial sum.

27.      Defendants either directly or by directing others, enhanced Certified's balance sheet through the auspices of Brentwood, another private company with close ties to Certified and Midwest.  As part of the fraudulent scheme, McCartha and Spinelli obtained $48 million of dollars worth of fabricated Letters of Credit.  Even though the Letters of Credit were bogus, Defendants recorded them as assets of Certified.

28.      Defendants also failed adequately to disclose in Certified's public filings material related-party relationships and related-party transactions used to siphon money out of Certified. Defendants, specifically Pixler, Russo and Huff, knew or were severely reckless in not knowing about these related party relationships when they each signed or caused Certified to submit false filings with the Commission.  As further described below, Defendants' misconduct caused Certified to file false financial information in violation of Generally Accepted Accounting Principles ("GAAP") beginning no later than the third quarter of fiscal year 2002 and continuing through the third quarter of fiscal year 2004.

### A.      The Sham Risk Agreement

29.      Certified grew from a shell company with minimal assets to a company with approximately $78 million in revenues and reported approximately $107 million in assets in 2003, principally by issuing stock and debt to acquire professional employee organizations.

8

30.     As Certified's business expanded, it entered into a Risk Allocation Agreement ("Risk Agreement") with Midwest, purportedly for Midwest to manage Certified's workers' compensation program and to protect against the exposure Certified would face from large claims.

31.     In reality, the Risk Agreement lacked economic substance and did not shift risk from Certified to Midwest.  Instead, it served as a way to siphon Certified's money into Midwest.  According to Certified's 2002 amended Form 10-KSB/A filing, the express terms of the Risk Agreement where that Midwest would "assume responsibility for and promptly make all required payments *in excess of the applicable deductibles*" (emphasis added).  However, Certified already had re-insurance that protected it against having to make payments in excess of the applicable deductible ($1 million per claim).  Thus, there was no legitimate reason for the Risk Agreement.

32.     Moreover, even if the Risk Agreement had provided any real economic protection, it is very unlikely that Midwest would have been able to honor the agreement as Midwest had an initial capitalization of only $500, negative equity for 2001 – 2003, and no actual staff other than a secretary who followed Huff's orders.

33.     The bogus nature of the Risk Agreement is further demonstrated by the fact that it was backdated to reflect an effective date of January 1, 2002 even though it was actually signed in early 2003.  Defendants represented that Certified and Midwest entered into the Risk Agreement on January 1, 2002 and it was signed by Russo as President for Certified and signed by Huff's nominee for Midwest.  It is, however, demonstrably false that Russo could enter into the agreement as Certified's President, since as of January 1, 2002 he was neither Certified's President nor employed by Certified.  Moreover, even though the Risk Agreement was not

actually entered into early 2003, by December 31, 2002 Certified had already paid Midwest more than $16 million under this backdated sham agreement.

34.     Moreover, Defendants used the Risk Agreement to remove a huge liability from Certified's balance sheet.  Beginning in the third quarter of 2002 through the third quarter of 2004, Defendants violated GAAP when, at its height, they failed to record approximately $65 million in workers compensation liabilities on Certified's balance sheet that was included in filings with the Commission.  Defendants purportedly did not include these liabilities on Certified's balance sheet because the Risk Agreement shifted workers compensation claims to Midwest.  However, in reality these filings improperly omitted Certified's liabilities since Certified was still obligated to pay these liabilities and these liabilities were not transferred to Midwest.  Furthermore, Certified's reinsurance provider never contracted with Certified to substitute Midwest as the responsible party for deductibles.  Thus, Defendants knew, or were extremely reckless in not knowing, they had improperly removed that tens of millions of dollars of liabilities from Certified's financial statements.

35.     Moreover, Huff, Pixler and Russo knew, or were extremely reckless in not knowing, that the Risk Agreement lacked economic substance and transferred Certified's funds to Midwest for meaningless services.  From approximately 2002 through 2005, Certified paid Midwest approximately $130 million.  Midwest kept approximately $30 million of that amount without providing any real services because, as described above, in reality there was no transfer of risk or liabilities from Certified to Midwest.

36.     Furthermore, Russo who signed the Risk Agreement on behalf of Certified testified Certified retained the liability for the workers' compensation policies, yet admitted that the liability was not reflected on Certified's financial statements.

**B.**   **Defendants Should Not Have Reported the Letters of Credit as an Asset**

37.   Beginning no later July 2002, Certified's reinsurance provider required the Cura Group, a Certified subsidiary, to post more collateral due to Certified's rapidly expanding business. Certified purportedly obtained the collateral in the form of Letters of Credit that were to expire in one year.

### 1.   The Letters of Credit were Fake

38.   From July 2002 through May 2003, Brentwood procured 16 Letters of Credit for Certified with a purported face amount of $47 million through Strategic Bancorp, LLC ("Strategic"). McCartha, a Brentwood executive vice-president, worked directly with Strategic to obtain the Letters of Credit for Cura. During part of this time, McCartha was also both a member of Certified's board of directors and a Certified employee.

39.   Spinelli approved each Letter of Credit transaction with Strategic. Most of the time, Spinelli signed disbursement forms authorizing withdrawals from Brentwood's bank account to pay Strategic for the Letters of Credit. However, the Letters were neither backed nor issued by a financial institution and were not collateralized. Strategic simply drafted and executed the fake Letters of Credit and forwarded them to McCartha, who then delivered them to Certified or the reinsurance company.

40.   Based on his prior illegal dealings with Strategic's president, Spinelli knew, or was extremely reckless in not knowing, the Letters of Credit were bogus. For example, in June 2002, Spinelli appointed Strategic's president as a Brentwood assistant vice-president for the purpose of authorizing him to create a fake $5 million bank account for Brentwood. Furthermore, Spinelli saw a Letter of Credit with a suspicious letterhead but made no further inquiry once Huff assured him he had resolved the matter.

41.     McCartha knew, or was extremely reckless in not knowing, that the Letters of Credit were bogus because he was working at Brentwood and dealing directly with the forger to fabricate them.  McCartha occasionally directed the forger to revise or adjust specific terms of the yet to be issued Letters of Credit, such as cautioning him to take steps to ensure the return address on the envelope containing a Letter of Credit was consistent with the one on the bank letterhead.

42.     Additionally, Huff, a central figure at Certified, Brentwood, and Midwest had ample knowledge based on his assurance to Spinelli that he had resolved the matter regarding the suspicious letterhead that the Letters of Credit were bogus.  These factors, coupled with the fact that Certified, Midwest and Brentwood did not furnish the collateral to secure the Letters of Credit, provided sufficient notice to Huff and McCartha that the Letters of Credit were fake. Instead of acting to protect Certified's shareholders, Huff and Pixler acted to protect themselves by having Certified execute a release in favor of Midwest to shield it from liability in connection with the fake Letters of Credit.

43.     Starting with Certified's 3rd quarter 2002 Form 10-Q through Certified's 2nd Quarter 2003 Form 10-Q, in violation of GAAP, Defendants reported between $9 million and more than $47 million of fake Letters of Credit on Certified's financial statements filed with the Commission and disseminated to the investing public.  Defendants Huff and McCartha knew, or were extremely reckless in not knowing, they should not have reported the fake Letters of Credit as an asset.

44.     Even if these Letters of Credit obtained by Defendants were genuine, which they were not, Defendants violated GAAP by reporting the Letters of Credit as an asset on Certified's balance sheet.  This is true for several reasons: (1) the Letters provided no future economic

benefit or positive cash flow to Certified because it did not own or control them; consequently, Certified could not convert the Letters to cash or transfer them; (2) the cash that purportedly backed the Letters of Credit would not have flowed to Certified under any circumstance – either upon expiration or if Certified drew on them; (3) Certified did not derive any future economic benefit from the Letters of Credit because it paid fees to use them for a fixed period of time, usually one year; and (4) Certified was wholly dependent on third parties renewing them when they expired. Under these circumstances, by reporting the Letters of Credit on Certified's balance sheet, Defendants violated GAAP by booking the Letters as an asset on Certified balance sheets on filings made with the Commission starting with Certified's 3rd quarter 2002 Form 10-Q through Certified's 2nd Quarter 2003 Form 10-Q.

### C. Defendants Failed to Disclose Related Party Transactions

45. Defendants failed to make legally required disclosures regarding related parties. For example, Certified disclosed in its 2002 Form 10-K that Midwest controlled Certified, but did not disclose Pixler was a co-manager of Midwest and Huff, a convicted felon, was exercising control over Certified. In addition, this disclosure and the ones that followed were legally deficient since, among other reasons, Defendants failed to disclose until the 3rd Quarter of 2004 that Pixler had received payments from Midwest.

46. Moreover, Defendants did not disclose that Pixler's wife owned at least a 40% stake in Midwest or that Huff controlled Midwest so that in reality, a convicted felon controlled Certified.

47. Consequently, Defendants omitted material information that made the representations about Certified's business dealings with Midwest false and misleading.

13

### D.   Additional Schemes to Funnel Money to Midwest and Brentwood

48.    Certified entered into a Long Term Capital Agreement ("Capital Agreement") with Brentwood, Subscription Agreements with both Brentwood and Midwest, and a Consulting Agreement with Midwest.  These agreements served to further enrich Midwest and Brentwood at the expense of Certified's shareholders by improperly funneling even more cash.

### 1.   Capital Agreement

49.    At Huff's instigation, Certified and Brentwood executed the Capital Agreement purportedly on September 30, 2002 with Pixler signing on behalf of Cura and Russo signing on behalf of Certified.  Even though the Capital Agreement was dated September 30, 2002, it covered, among other things, letters of credit already provided to Certified.  Certified and Brentwood executed an amendment to the Capital Agreement purportedly on February 26, 2003 with Pixler again signing on behalf of Cura and Russo again signing on behalf of Certified.  The purpose of the Capital Agreement and the amendment was to compensate Brentwood for its role in obtaining the fake Letters of Credit for Certified.  Certified transferred almost $6 million in cash and $1 million of preferred stock to Brentwood.  From that amount, Brentwood netted approximately $1.4 million in fees pursuant to the Capital Agreement for its role in procuring the bogus Letters of Credit.

50.    Certified entered into the Capital Agreement even though it had already paid Midwest for at least one of the same Letters of Credit by transferring shares of preferred stock. In essence, Certified provided excessive compensation to both Brentwood and Midwest for Letters of Credit that did not exist, and Brentwood and Midwest did not own.

14

**2.     Subscription Agreements**

51.     Midwest entered into a Subscription Agreement with Certified to purchase shares of Certified's preferred stock, purportedly valued in the tens of millions of dollars.    The Subscription Agreement was purportedly executed on December 31, 2002, with Pixler signing on behalf of Certified and Huff's nominee signing on behalf of Midwest.    Brentwood also entered into a similar Subscription Agreement.

52.     The Subscription Agreements allowed subscribers to participate in Certified's preferred share offering, and thereby obtain substantial voting rights.    It specifically provided that a subscriber could use various forms of consideration to subscribe to the offering, including cash or Letters of Credit.    Midwest used the same Letter of Credit it obtained from Strategic for Cura's collateral requirement as consideration for the subscription.

53.     The Subscription Agreements were merely another way to transfer Certified's assets to Midwest and Brentwood.    In at least two transactions, Certified compensated both Brentwood and Midwest for the same Letter of Credit by providing cash to Brentwood (pursuant to the Capital Agreement) and preferred stock to Midwest (pursuant to the Subscription Agreement).

**3.     Consulting Agreement**

54.     In January 2003, Midwest and Certified entered into a Consulting Agreement that siphoned approximately $500,000 from Certified.    As with the Subscription Agreement, Pixler signed for Certified and Huff directed his assistant to sign for Midwest.    Under the Consulting Agreement, Certified paid Midwest $10,000 per week for so-called general administrative services.

55.    The Consulting Agreement had no substance.   Other than processing checks, Midwest did not perform any services to justify receipt of these substantial fees.

56.    Through these fraudulent schemes as described above Defendants and Relief Defendants received ill-gotten gains.

**E.    Defendants Repeatedly Made False Filings with the Commission**

57.    As a result of the fraudulent schemes as described above, Certified's 2002 3rd quarter filing, its fiscal year 2002 annual filing, its 2003 quarterly filings, its fiscal year 2003 annual filing and nearly all of its 2004 quarterly filings were rife with misstatements and omissions concerning Certified's assets, liabilities, or related party relationships and/or transactions.

58.    Certified's 3rd Quarter 2002 Form 10-QSB for the period ending September 30, 2002 was filed on or about November 14, 2002 and contained numerous misrepresentations and omissions.  For example, Defendants reported nearly $9 million of Letters of Credit as assets, which caused them to overstate Certified's assets by approximately 34%.  Defendants also did not record nearly $9 million of workers compensation liabilities on Certified's balance sheet, which caused them to understate Certified's liabilities by approximately 38%.  Furthermore, there were no disclosures regarding related party transactions involving Midwest, Pixler, Huff, Roxann Pixler or Sheri Huff.

59.    Certified's 3rd Quarter 2002 Form 10-QSB was signed by, among others, Russo as CEO.  In addition, Russo certified that, among other things that, this filing did not contain or omit any untrue statement of material fact and that Certified's financial condition was fairly presented in all material respects.

60.     Certified's 2002 Form 10-KSB for the period ending December 31, 2002 was filed on or about March 31, 2003 and also contained numerous misrepresentations and omissions.  For example, Defendants reported more than $18 million of Letters of Credit as assets, which caused them to overstate Certified's assets by approximately 35%.  Defendants also did not record more than $18 million of workers compensation liabilities, which caused them to understate Certified's liabilities by approximately 38%.  Furthermore, Defendants misrepresented when the parties entered into the Risk Agreement and provided misleading disclosures regarding the Risk Agreement by claiming that Midwest would "assume responsibility for and promptly make all required payments *below* the applicable deductibles." (Emphasis added).  This disclosure is materially false and misleading since the express terms of the Risk Agreement only provide for Midwest to "assume responsibility for and promptly make all required payments in *excess* of the applicable deductibles." (Emphasis added).  Moreover, Defendants did not make disclosures regarding related party transactions involving Pixler, Huff, Roxann Pixler or Sheri Huff or disclose in Pixler's background that he co-managed Midwest.

61.     Certified's 2002 Form 10-KSB was signed by, among others, Russo as CEO, Chief Financial Officer and Director; Pixler as President, Chief Operating Officer, and Director; and McCartha as a Director.  In addition, Russo certified this filing as CEO and CFO that, among other things, this filing did not contain or omit any untrue statement of material fact and that Certified's financial condition was fairly presented in all material respects.

62.     On or about April 10, 2003, an amended 2002 Form 10-KSB/A was filed and signed by, among others, Pixler, Russo, and McCartha.  Defendants attached to this filing the backdated Risk Agreement, which expressly contradicts Defendants description contained in the 2002 Form 10-K about the terms of the Risk Agreement.

17

63. Certified's 1st Quarter 2003 Form 10-QSB for the period ending March 30, 2003 was filed on or about April 30, 2003 and also contained numerous misrepresentations and omissions. For example, Defendants reported more than $18 million of Letters of Credit as assets, which caused them to overstate Certified's assets by approximately 38%. Defendants also did not record and more than $18 million of workers compensation liabilities, which caused them to understate Certified's liabilities by approximately 42%. Moreover, Defendants did not make disclosures regarding related party transactions involving Midwest, Pixler, Huff, Roxann Pixler or Sheri Huff.

64. Certified's 1st Quarter 2003 Form 10-QSB was signed by Russo as CEO, CFO and Director, and Pixler as President, COO, and Director. In addition, Russo certified this filing as CEO and CFO that, among other things, this filing did not contain or omit any untrue statement of material fact and that Certified's financial condition was fairly presented in all material respects.

65. On or about May 9, 2003, an amended 1st Quarter 2003 Form 10-QSB/A was filed and signed by Russo to include as exhibits certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

66. Certified's 2nd Quarter 2003 Form 10-QSB for the period ending June 30, 2003 was filed on or about August 15, 2003 and also contained numerous misrepresentations and omissions. For example, Defendants reported more than $47 million of Letters of Credit as assets, which caused them to overstate Certified's assets by approximately 45%. Defendants also did not record more than $47 million of workers compensation liabilities, which caused them to understate Certified's liabilities by approximately 43%. Moreover, Defendants did not

make disclosures regarding related party transactions involving Midwest, Pixler, Huff, Roxann Pixler or Sheri Huff.

67.     Certified's 2nd Quarter 2003 Form 10-QSB was signed by Russo as CFO and Director, and Pixler as CEO and Director. In addition, Russo as CFO and Pixler as CEO certified that, among other things, this filing did not contain or omit any untrue statement of material fact and that Certified's financial condition was fairly presented in all material respects.

68.     Certified's 2003 3rd quarter Form 10-QSB for the period ending September 30, 2003 was filed on or about November 18, 2003 and also contained numerous misrepresentations and omissions. For example, Defendants did not record more than $49 million of workers compensation liabilities, which caused them to understate Certified's liabilities by approximately 44%. Moreover, Defendants did not make disclosures regarding related party transactions involving Pixler, Huff, Roxann Pixler or Sheri Huff.

69.     Certified's 3rd Quarter 2003 Form 10-QSB was signed by Russo as CFO and Director, and Pixler as CEO and Director. In addition, Russo certified as CFO and Pixler certified as CEO that, among other things, this filing did not contain or omit any untrue statement of material fact and that Certified's financial condition was fairly presented in all material respects.

70.     Certified's 2003 Form 10-K for the period ending December 31, 2003 was filed on or about March 30, 2004 and also contained numerous misrepresentations and omissions. For example, Defendants did not report more than $55 million of workers compensation liabilities, which caused them to understate Certified's liabilities by approximately 53%. Moreover, Defendants did not make disclosures regarding related party transactions involving Pixler, Huff, Roxann Pixler or Sheri Huff.

71.     Certified's 2003 Form 10-K was signed by, among others, Pixler as CEO and Director.  In addition, Pixler also certified that, among other things, this filing did not contain or omit any untrue statement of material fact and that Certified's financial condition was fairly presented in all material respects.

72.     Certified's 1st Quarter 2004 Form 10-Q for the period ending March 30, 2004 was filed on or about May 12, 2004 and also contained numerous misrepresentations and omissions. For example, Defendants did not report more than $57 million of workers compensation, which caused them to understate Certified's liabilities by approximately 49%.  Moreover, Defendants did not make disclosures regarding related party transactions involving Midwest, Pixler, Huff, Roxann Pixler or Sheri Huff.

73.     Certified's 1st Quarter 2004 Form 10-Q was signed by, among others, Pixler as President, CEO and Director.  In addition, Pixler also certified that, among other things, this filing did not contain or omit any untrue statement of material fact and that Certified's financial condition was fairly presented in all material respects.

74.     Certified's 2nd Quarter 2004 Form 10-Q for the period ending June 30, 2004 was filed on or about August 12, 2004 and also contained numerous misrepresentations and omissions.     For example, Defendants did not report more than $60 million of workers compensation liabilities, which caused them to understate Certified's liabilities by approximately 48%.  Moreover, Defendants did not make disclosures regarding related party transactions involving Pixler, Huff, Roxann Pixler or Sheri Huff.

75.     Certified's 2nd Quarter 2004 Form 10-Q was signed by, among others, Pixler as President, CEO and Director.  In addition, Pixler certified that, among other things, this filing did

not contain or omit any untrue statement of material fact and that Certified's financial condition was fairly presented in all material respects.

76.     Certified's 3rd Quarter 2004 Form 10-Q for the period ending September 30, 2004 was filed on or about November 18, 2004 and also contained numerous misrepresentations and omissions.     For example, Defendants did not report more than $65 million of workers compensation liabilities, which caused them to understate Certified's liabilities by approximately 46%.     Moreover, Defendants did not make disclosures regarding related party transactions involving Huff, Roxann Pixler or Sheri Huff and failed to disclose that Pixler was a co-manager of Midwest.

77.     Certified's 3rd Quarter 2004 Form 10-Q was signed by, among others, Pixler as President, CEO and Director.   In addition, Pixler certified that, among other things, this filing did not contain or omit any untrue statement of material fact and that Certified's financial condition was fairly presented in all material respects.

78.     Moreover, each of these above filings made with the Commission, failed to adequately disclose related party relationships and/or transactions.

### 1.     **Fraudulent Stock Offering**

79.     On or about June 1, 2004, Defendants Huff and Pixler caused Certified to file a Form S-3 Registration Statement with the Commission that was executed by, among others, Pixler as Chairman of the Board, President, CEO, Principal Executive Officer and Director.   It was later amended to include the financing documents, to disclose that Certified obtained funding from an investment firm that provides financing to small companies. The Registration Statement disclosed that Certified and the investment firm had entered into a Securities Purchase Agreement.   On or about April 15, 2004, the parties entered into the Securities Purchase

Agreement that Pixler apparently executed on Certified's behalf. In addition, this agreement was filed as an attachment to an 8-K filed on or about April 23, 2004 that was signed by Pixler as CEO. Huff negotiated the transaction on Certified's behalf, which resulted in Certified issuing the financing company a note convertible into approximately 13.3 million shares of Certified's common stock and a warrant for 2.2 million shares in exchange for an \$8.5 million line of credit. The note was convertible into common stock at a conversion price of \$0.95 per share. The warrant was exercisable at prices ranging from \$1.11 to \$1.26 per share.

80.     These filings contained materially false and misleading information because, among other reasons, Certified's financial statements, which were incorporated by reference, failed to properly record its workers' compensation liabilities and did not properly disclose related party relationships and transactions. In addition, the Securities Purchase Agreement was materially false and misleading information because, among other reasons, it represented that Certified December 31, 2002 and December 31, 2003 10-K's and its Quarterly Reports on Form 10-QSB for its fiscal quarter ended September 30, 2003, did not contain any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. This statement was false since, among other reasons, these filings failed to record Certified's workers' compensation liabilities, booked bogus Letters of Credit as an asset, or failed to properly describe its related party relationships and transactions.

### 2.     False Representations to the Auditors

81.     Certified auditors issued unqualified audit opinions for Certified's financial statements for the fiscal years ending 2002 and 2003 that were filed with the Commission.

22

82.    In connection with Certified's fiscal year-end 2002 audit, Pixler and Russo provided Certified's audit firm with a management representation letter that was materially false and misleading.  Pixler provided the audit firm with a similarly false management representation letter in connection with Certified's fiscal year-end 2003 audit.  In these letters dated March 28, 2003 and March 24, 2004, respectively, Pixler or Russo falsely represented, among other things, that: (1) Certified's financial statements were fairly presented in conformity with GAAP; (2) there were no material transactions that were not properly recorded; and (3) related party transactions were properly recorded or disclosed in the financial statements.  In addition, the March 24, 2004 letter falsely represented that Certified's liabilities were fairly presented in its financial statements.  These representations were false since Pixler and Russo knew, or were extremely reckless in not knowing, the financial statements were not fairly presented in conformity with GAAP; there were material transactions that were not properly recorded; and related party transactions were not properly recorded or disclosed in the financial statements.

### CLAIMS FOR RELIEF

### COUNT I

### FRAUD IN VIOLATION OF SECTION 17(A)(1) OF THE SECURITIES ACT
#### (As to Defendants Huff and Pixler)

83.    The Commission repeats and realleges Paragraphs 1 through 82 of its Complaint as if fully set forth herein.

84.    Defendants Huff and Pixler from approximately 2001 through 2004, have directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

85.     By reason of the foregoing, these Defendants have directly and indirectly, violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

### FRAUD IN VIOLATION OF SECTIONS 17(A)(2) AND 17(A)(3) OF THE SECURITIES ACT
### (As to Defendants Huff and Pixler)

86.     The Commission repeats and realleges Paragraphs 1 through 82 of its Complaint as if fully set forth herein.

87.     Defendants Huff and Pixler from approximately 2001 through 2004, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, as described in this Complaint, have: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices and courses of business which are now operating and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

88.     By reason of the foregoing, these Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3).

## COUNT III

### FRAUD IN VIOLATION OF SECTION 10(B) AND RULE 10B-5
### OF THE EXCHANGE ACT
#### (As to Defendants Huff, Pixler, Russo and McCartha)

89.     The Commission repeats and realleges Paragraphs 1 through 82 of this Complaint as if fully set forth herein.

90.     Defendants Pixler, Huff, Russo and McCartha from approximately 2001 through 2004, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

91.     By reason of the foregoing, Defendants Pixler, Huff, Russo and McCartha directly or indirectly, violated and will continue to violate unless enjoined, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## COUNT IV

### AIDING AND ABETTING VIOLATIONS OF SECTION 10(B) AND RULE 10B-5 OF
### THE EXCHANGE ACT
#### (As Huff and Spinelli)

92.     The Commission repeats and realleges Paragraphs 1 through 82 of this Complaint as if fully set forth herein.

93.     Certified, Russo, Pixler, and McCartha from approximately 2001 through 2004, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of

the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

94.     Defendants Huff and Spinelli from approximately 2001 through 2004, directly and indirectly, had a general awareness that they were part of an overall activity that was improper or illegal and knowingly, or were extremely reckless in not knowing, and provided substantial assistance to violations by Certified, Russo, Pixler, and McCartha of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

95.     By reason of the foregoing, Defendants Huff and Spinelli, directly or indirectly, violated and will continue to violate unless enjoined, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## COUNT V

### SECTION 20(a) – CONTROL PERSON – LIABILITY FOR VIOLATIOS OF SECTION 10(b) AND RULE 10B-5 OF THE EXCHANGE ACT
### (As to Huff)

96.     The Commission repeats and realleges Paragraphs 1 through 82 of this Complaint as if fully set forth herein.

97.     Defendant Huff from approximately 2001 through 2004 has been, directly or indirectly, a control person of Certified for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

98.     Certified from at least 2001 through 2004 violated Section 10(b) and Rule 10b-5 of the Exchange Act.

99.     As a control person of Certified, Defendant Huff is jointly and severally liable with and to the same extent as Certified for its violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

## COUNT VI

## VIOLATIONS OF SECTION 13(b)(5) AND RULES 13A-14, 13B2-1 AND 13B2-2 OF THE EXCHANGE ACT
### (As to Pixler and Russo)

100.    The Commission repeats and realleges Paragraphs 1 through 82 of this Complaint as if fully set forth herein.

101.    Defendants Pixler and Russo from approximately 2001 through 2004, in violation of Section 13(b)(5) of the Exchange Act, knowingly circumvented or failed to implement a system of internal accounting controls or falsified books, records or accounts as described in Section 13(b)(2) of the Exchange Act.

102.    Defendants Pixler and Russo from approximately 2001 through 2004, in violation of Rule 13b2-1 of the Exchange Act, directly or indirectly, falsified or caused to be falsified books, records or accounts subject to Section 13(b)(2) of the Exchange Act.

103.    Defendants Pixler and Russo, from at least 2001 through 2004, in violation of Rule 13b2-2 of the Exchange Act, directly or indirectly, as an officer or director of an issuer, in connection with the preparation of an audit, made or caused to be made, misrepresentations or omissions to an accountant.

104.    By reason of the foregoing, Defendants Pixler and Russo, directly or indirectly, violated and will continue to violate unless enjoined, Section 13(b)(5) of the Exchange Act, 15

U.S.C. § 78m(b)(5), and Rules 13b2-1 and 13b2-2 thereunder, 17 C.F.R. §§ 240.13b2-1 and 240.13b2-2.

### COUNT VII

### AIDING AND ABETTING CERTIFIED VIOLATIONS OF SECTION 13(A) AND RULES 12B-20, AND 13A-1 OF THE EXCHANGE ACT
### (As to Pixler, Russo and McCartha)

105.    The Commission repeats and realleges Paragraphs 1 through 82 of this Complaint as if fully set forth herein.

106.    Defendants Pixler, Russo and McCartha from approximately 2001 through 2004, aided and abetted or caused Certified's violations of Sections 13(a) and Rules 12b-20 and 13a-1of the Exchange Act, by knowingly, or acted extremely recklessly, providing substantial assistance to Certified, which failed to timely and accurately file reports with the Commission regarding its assets, liabilities, and related party descriptions and transactions; omitted information necessary to make the required information, in the light of the circumstances under which they were made, not misleading; and by filing or causing to be filed with the Commission materially false and misleading financial and informational statements.

107.    By reason of the foregoing, Defendants Pixler, Russo and McCartha aided and abetted or caused Certified's violations, and, unless enjoined, will again aid and abet or cause violations of Sections 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-1 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13.

<u>COUNT VIII</u>

## AIDING AND ABETTING CERTIFIED VIOLATIONS OF SECTIONS 13(B)(2)(A) AND 13(B)(2)(B) AND RULE 13A-13 OF THE EXCHANGE ACT
### (As to Pixler and Russo)

108.    The Commission repeats and realleges Paragraphs 1 through 82 of this Complaint as if fully set forth herein.

109.    Defendants Pixler and Russo from approximately 2001 through 2004, aided and abetted or caused Certified's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) and Rule 13a-13 of the Exchange Act, by failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions of the issuer; by failing to devise and maintain a system of internal accounting controls sufficient to reasonably assure that transactions were recorded and financial statements were prepared in conformity with GAAP; and by filing or causing to be filed with the Commission materially false and misleading financial and informational statements.

110.    By reason of the foregoing, Defendants Pixler and Russo aided and abetted or caused Certified's violations, and, unless enjoined, will again aid and abet or cause violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m, and Rule 13a-13 thereunder, 17 C.F.R. § 240.13a-13.

### <u>RELIEF REQUESTED</u>

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### <u>Declaratory Relief</u>

Declare, determine and find that Defendants committed the violations of the federal securities laws alleged in this Complaint.

## II.

### Permanent Injunctive Relief

Issue a Permanent Injunction, restraining and enjoining:

(1) Defendant Pixler, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, from violating Section 17(a) of the Securities Act; Sections 10(b) and 13(b)(5) and Rules 10b-5, 13a-14, 13b2-1, 13b2-2 of the Exchange Act; and aiding and abetting any violation of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) and Rules 12b-20, 13a-1 and 13a-13 of the Exchange Act;

(2) Defendant Huff, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, from violating Section 17(a) of the Securities Act; Sections 10(b) and 20(a) and Rule 10b-5 of the Exchange Act; and aiding and abetting any violation of Section 10(b) and Rule 10b-5 of the Exchange Act;

(3) Defendant Russo, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, from violating Sections 10(b) and 13(b)(5) and Rules 10b-5, 13a-14, 13b2-1, 13b2-2 of the Exchange Act and aiding and abetting any violation of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) and Rules 12b-20, 13a-1 and 13a-13 of the Exchange Act;

(4) Defendant McCartha, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, from violating Section 10(b) and Rule 10b-5 of the Exchange Act and aiding and abetting any violation of Section 13(a) and Rules 13a-1 and 12b-20 of the Exchange Act; and

(5) Defendant Spinelli, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, from aiding and abetting any violation of Section 10(b) and Rule 10b-5 of the Exchange Act.

### III.

### Accountings

Issue an Order requiring sworn accountings by Defendants Pixler, Huff and Russo and Relief Defendants Sheri Huff, Roxann Pixler, Midwest and Brentwood.

### IV.

### Disgorgement

Issue an Order requiring Defendants Pixler, Huff and Russo and Relief Defendants Sheri Huff, Roxann Pixler, Midwest and Brentwood to disgorge ill-gotten gains, plus prejudgment interest, which each received as a result of the acts or courses of conduct complained of herein.

### V.

### Penalties

Issue an Order directing Defendants Pixler and Huff to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3), and directing Defendants Russo to pay a civil money penalty pursuant to Section 21(d) of the Exchange Act.

### VI.

### Officer and Director Bar

Issue an Order barring all Defendants from serving as an officer or director of any public company pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78(d)(2).

## VII.

### Penny Stock Bar

Issue an Order pursuant to the Court's equitable jurisdiction and Section 603 of the Sarbanes-Oxley Act of 2002 barring all Defendants from directly or indirectly participating in an offering of penny stock, as defined by Rule 3a51-1 under the Exchange Act, 17 C.F.R. § 240.3a51-1.

## VIII.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## IX.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

Respectfully submitted,

March 6, 2008                          By: _Christopher E. Martin_

Christopher E. Martin
Senior Trial Counsel
SD Fla. Bar No. A5500747
Direct Dial:  (305) 982-6386

Linda S. Schmidt
Senior Counsel
Fla. Bar No. 0156337
Direct Dial:  (305) 982-6315

Attorneys for Plaintiff
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154

℆JS 44   (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS
Securities and Exchange Commission

**DEFENDANTS**
W. Anthony Huff, Danny L. Pixler, Anthony R. Russo, Otha Ray McCartha, and Charles J. Spinelli, et al.

# 08 - 60315

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Jefferson
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

# CIV-ZLOCH

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Securities and Exchange Commission
Christopher E. Martin, Esq. (305) 982-6386
801 Brickell Ave., Suite 1800, Miami, FL 33131

Attorneys (If Known)

See Attached

# MAGISTRATE JUDGE
# SNOW

**(d)** Check County Where Action Arose:   ☐ MIAMI- DADE   ☐ MONROE   ☑ BROWARD   ☐ PALM BEACH   ☐ MARTIN   ☐ ST. LUCIE   ☐ INDIAN RIVER   ☐ OKEECHOBEE   ☐ HIGHLANDS

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☑ 1  U.S. Government
     Plaintiff

☐ 3  Federal Question
     (U.S. Government Not a Party)

☐ 2  U.S. Government
     Defendant

☐ 4  Diversity
     (Indicate Citizenship of Parties in Item III)

FTL-08-60315-CV-Zloch-SNow

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                     and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☑ 1  Original
     Proceeding

☐ 2  Removed from
     State Court

☐ 3  Re-filed-
     (see VI below)

☐ 4  Reinstated or
     Reopened

☐ 5  Transferred from
     another district
     (specify)

☐ 6  Multidistrict
     Litigation

☐ 7  Appeal to District
     Judge from
     Magistrate
     Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO   b) Related Cases ☐ YES ☑ NO

JUDGE _____   DOCKET NUMBER _____

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

Violations of the federal securities laws.  15 USC §§ 77q(a)(1), 77q(a)(2) and 77q(a)(3); 17 CFR § 78j(b) and 17 CFR § 240.10b-5; 15 USC § 78m(b)(5), 17 CFR §§ 240.13b2-1 and 240.13b2-2; 15 USC § 78m

LENGTH OF TRIAL via _12_ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $
Disgorgement, Penalties

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☐ Yes  ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE
March 6, 2008

**FOR OFFICE USE ONLY**

AMOUNT _____   RECEIPT # _____   IFP _____

**Attorneys (If known)**

Jeffrey Tew, Esq.
Dennis Nowak, Esq.
Tew Cardenas, LLP
Four Seasons Tower
1441 Brickell Avenue, 15th Floor
Miami, Florida 33131-3407
Tel. 305-536-1112
*Counsel for Danny L. Pixler*

Jeffrey Tew, Esq.
Dennis Nowak, Esq.
Tew Cardenas, LLP
Four Seasons Tower
1441 Brickell Avenue, 15th Floor
Miami, Florida 33131-3407
Tel. 305-536-1112
*Counsel for Anthony R. Russo*

Russell C. Weigel, III, Esq.
Russell C. Weigel, III, P.A.
One Southeast Third Avenue, Suite 1750
Miami, Florida 33131
Tel. 786-888-4567
*Counsel for W. Anthony Huff*

Donald L. Cox, Esq.
Lynch, Cox, Gilman and Mahan
500 West Jefferson St., Suite 2100
Louisville, KY 40202
*Co-Counsel for W. Anthony Huff*

David Schertler, Esq.
Schertler and Onorato, L.L.P.
601 Pennsylvania Ave. NW
North Building, Suite 900
Washington, D.C. 20004
Tel. 202-628-4199
*Counsel for Otha Ray McCartha*

Bruce Lehr. Esq.
Shirleen Mendez-Bejerano, Esq.
Lehr, Fischer & Feldman
1401 Brickell, Suite 910
Miami, Florida 33131
Tel. 305-377-1777
*Counsel for Charles J. Spinelli*

Russell C. Weigel, III, Esq.
Russell C. Weigel, III, P.A.
5775 Blue Lagoon Dr., Suite 100
Miami, Florida 33126
Tel. 786-888-4567
*Counsel for Sheri Huff*

Russell C. Weigel, III, Esq.
Russell C. Weigel, III, P.A.
5775 Blue Lagoon Dr., Suite 100
Miami, Florida 33126
Tel. 786-888-4567
*Counsel for Roxann Pixler*

Russell C. Weigel, III
Russell C. Weigel, III, P.A.
5775 Blue Lagoon Dr., Suite 100
Miami, Florida 33126
Tel. 786-888-4567
*Counsel for Midwest Merger Management, LLC*

Bruce Lehr. Esq.
Shirleen Mendez-Bejerano, Esq.
Lehr, Fischer & Feldman
1401 Brickell, Suite 910
Miami, Florida 33131
Tel. 305-377-1777
*Counsel for Brentwood Capital Corp.*

Andrew T. Solomon, Esq.
Franklin B. Velie, Esq.
Sullivan & Worcester, LLP
1290 Avenue of the Americas
New York, NY 10104
Tel. 212-660-3000
*Co-counsel for Brentwood Capital Corp.*