UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-60315-CIV-ROSENBAUM

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

W. ANTHONY HUFF,
DANNY L. PIXLER,
ANTHONY R. RUSSO,
OTHA RAY MCCARTHA, and
CHARLES J. SPINELLI,

    Defendants,

SHERI HUFF, ROXANN PIXLER,
MIDWEST MERGER MANAGEMENT, LLC, and
BRENTWOOD CAPITAL CORPORATION,

    Relief Defendants.
_____/

## ORDER

This matter comes before the Court upon Defendant Anthony Huff's and Relief Defendant Sheri Huff's Motion for Order Enjoining Investigation and Quashing Administrative Subpoenas Issued by Plaintiff and for Other Equitable Relief [D.E. 173] (the "Huffs' Motion"). On October 8, 2009, this Court issued an Order denying in part the Huffs' Motion as it seeks to quash administrative subpoenas issued by the SEC in *In the Matter of Oxygen Unlimited, LLC,* FL-3493, and directed to individuals and entities other than the Huffs and any companies that they may own. *See* D.E. 188. In that Order, the Court expressly reserved ruling on the Huffs' Motion as it relates to the Huffs' request to quash the *Oxygen* Investigation subpoenas served on the Huffs and any

companies that they may own. *See id.* The Court now denies all remaining aspects of the Huffs' Motion.

The Court has previously set forth the factual background and procedural history of this case leading to the Huffs' filing of the pending Motion, *see* D.E. 188, and will not belabor the record here by repeating it. Instead, it suffices to note that the remaining part of the Huffs' Motion at issue in this Order argues that a provision in 15 U.S.C. §78u(c) allowing for criminal prosecution of individuals and entities who fail to comply with SEC subpoenas is so coercive it effectively forces the Huffs to forfeit judicial review of the subpoenas issued to them to ensure that they will not suffer criminal prosecution, thus violating procedural due process under *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny.

Because understanding the basis for the Huffs' argument depends upon a grasp of 15 U.S.C. §78u(c), the Court sets forth the statute below:

> **[Part 1**[1]**]** In case of contumacy by, or refusal to obey a subp[o]ena issued to, any person, the Commission may invoke the aid of any court of the United States within the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business, in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, and other records. And such court may issue an order requiring such person to appear before the Commission or member or officer designated by the Commission, there to produce records, if so ordered, or to give testimony touching the matter under investigation or in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof. **[Part 2]** Any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records, if in his power so to do, in obedience to the subp[o]ena of

---

[1] For ease of discussion later in this Order, the Court identifies portions of Section 78u(c) as "Part 1" and "Part 2."

> the Commission, shall be guilty of a misdemeanor and, upon conviction, shall be subject to a fine of not more than $1,000, or to a term of imprisonment of not more than one year, or both.

15 U.S.C. §78u(c).

As this Court recently explained in its October 8, 2009, Order in this case, under Part 1 of Section 78u(c), courts have found SEC subpoenas not to be self-enforcing. *See* D.E. 188 at 13-14. Rather, should the SEC wish to compel compliance with a subpoena that it issues, the SEC must file an enforcement action in district court in accordance with Part 1 of Section 78u(c). Based on the existence of this procedure and the finding by several courts that Congress has left the initiation and conduct of SEC investigations to SEC discretion, courts have concluded that they lack jurisdiction to consider challenges to SEC subpoenas or investigations except in the context of an SEC subpoena enforcement action. *See id.* at 11-14.

As far as this Court's research has revealed, however, no court addressing the issue of jurisdiction to review SEC subpoenas or investigations has expressly discussed what, if any, effect Part 2 of Section 78u(c) might have on the jurisdictional analysis. In this case the Huffs complain that under Part 2 of Section 78u(c), if they wait to challenge the subpoenas and investigation until such time that the SEC may seek to enforce its subpoenas against them in district court, they expose themselves to possible criminal prosecution if they guess wrong that their reasons for opposing the subpoenas constitute "just cause." Thus, the Huffs contend, the Court's failure to entertain the Huffs' challenge to the SEC's *Oxygen* Investigation and subpoenas before the SEC has attempted to enforce the subpoenas would cause a violation of the Huffs' procedural due process rights.

The Huffs' argument finds its roots in *Ex parte Young*, 209 U.S. 123 (1908) ("*Young*"). In *Young*, under a Minnesota statute, an administrative commission established a schedule of railroad

freight rates. The statute did not provide for judicial review regarding the reasonableness of the rates, and the commission held no hearing before imposing the rates. Instead, if a railroad wanted to challenge the rates as depriving it of its property without just compensation, the railroad had to fail to abide by the specified rates, wait to be indicted, and contest the fairness of the rates in the course of the resulting criminal prosecution. In finding that the court enjoyed jurisdiction to challenge the established rates without the need for the railroad first to be indicted, the Supreme Court reasoned that it was possible for the commission to have set rates that amounted to a taking, so the railroads needed to have some way short of exposing themselves to criminal indictment to test the validity of the rates set by the commission. As the Supreme Court explained,

> [T]o impose upon a party interested the burden of obtaining a judicial decision of such a question (no prior hearing having ever been given) only upon the condition that, if unsuccessful, he must suffer imprisonment and pay fines, . . . is, in effect, to close up all approaches to the courts . . . .

209 U.S. at 148. Consequently, such a statutory framework effects a violation of procedural due process. *See id.*

Not too long after the Supreme Court decided *Young*, however, it subsequently identified ways in which a statute that is susceptible to the *Young* problem may avoid violating procedural due process. In *Okla. Operating Co. v. Love*, 252 U.S. 331 (1920) ("*Love*"), a state commission set rates for laundry work. As in *Young*, no company subject to the rates could challenge the reasonableness of them without exposing itself to possible significant punishment – this time, in the way of contempt and monetary penalties. Although, as in *Young*, the Supreme Court concluded that under the statutory scheme applicable in *Love*, the Oklahoma Operating Company had a right to contest in federal court the fees imposed by the commission, the Supreme Court was careful to note,

> If upon final hearing the maximum rates fixed should be found not to be confiscatory, a permanent injunction should, nevertheless, issue to restrain enforcement of penalties accrued *pendente lite, provided that it also be found that the plaintiff had reasonable ground to contest them as being confiscatory.*

252 U.S. at 338 (emphasis added). Additionally, the Supreme Court held that the commission could continue its investigation of the Oklahoma Operating Company's rates and practices, as long as the commission's findings and conclusions were subjected to the review of the district court. *Id.*

In *Reisman v. Caplin*, 375 U.S. 440 (1963), the Supreme Court once again visited the intersection of the exercise of the right to challenge the constitutionality of agency action and exposure to criminal and significant civil penalties. *Reisman* involved provisions of the Internal Revenue Code. More specifically, the Internal Revenue Service ("IRS") had issued summonses to the petitioners in the case. Like Section 78u(c), the applicable part of the Internal Revenue Code rendered the IRS summonses non-self-executing. Instead, if the IRS wished to enforce its summonses, it had to initiate an action in district court to do so. Then – and not before that time, as with the SEC subpoenas issued under Section 78u(c) in the pending case, the recipient of the process could contest the validity of it in court. The Internal Revenue Code also provided, however – again, much like Part 2 of Section 78u(c) at issue before the Court in the pending case – that any person who "neglects to appear or to produce" in response to an IRS summons could be prosecuted and jailed for up to one year and could be fined $1,000.

Although the *Reisman* petitioners challenged the constitutionality of this structural framework, the Supreme Court rejected their claims, affirming the appellate court's finding that the court lacked jurisdiction. In reaching this result, the Supreme Court, apparently applying the teachings of *Love*, reasoned that under the statutory framework applicable in *Reisman*,

5

"noncompliance is not subject to prosecution . . . when the summons is attacked in good faith." *Reisman*, 375 U.S. at 512.  Consequently, a subpoena recipient could make a good-faith challenge to the validity of an IRS summons without exposing himself to criminal prosecution or contempt proceedings.  Thus, the statutory framework created no constitutional infirmity, and the court lacked jurisdiction to entertain the pre-enforcement challenge to the issuance of the summonses.

To arrive at its construction of the Internal Revenue Code provision as imposing a good-faith safe harbor, the Supreme Court pointed to "[t]he only prosecution" under the relevant statute. *Reisman*, 375 U.S. at 512 n.6.  As the Supreme Court noted, in that prosecution, the court equated the word "neglect" from the criminal provision, with willfulness.  *Id.*  The Supreme Court continued, "The Government admits that the section is inapplicable to persons who appear and in good faith interpose defenses as a basis for noncompliance." *Id.*

Since the Supreme Court decided *Reisman*, courts have had occasion to apply its teachings and those of *Love* in the contexts of other statutory frameworks.  In *Wagner Elec. Corp. v. Thomas*, 612 F. Supp. 736 (D. Kan. 1985) ("*Wagner*"), for example, the district court considered a company's ability to challenge an order of the Environmental Protection Agency ("EPA") under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA").  Under CERCLA, when the EPA determines that a qualifying environmental or public health danger exists, the EPA may file a civil suit to obtain a court order enjoining the responsible party to correct the threat or it may issue an administrative order directing the responsible party to clean up the problem.  If the EPA concludes that that party will not comply with a judicial or administrative order, the EPA may expend Superfund monies to remedy the situation itself.  When that happens, if the responsible party is found to have "fail[e]d without sufficient cause" to comply with an EPA

cleanup order, the EPA may later seek in federal court to recover up to three times the monies it expended to resolve the problem. Therefore, a party that thinks itself not responsible for a hazardous situation, despite a court or administrative order directing that party to undertake a clean-up, must expose itself to the possible infliction of treble damages if a court later determines that that party wrongly viewed itself as not liable without sufficient cause.

In *Wagner*, the EPA issued an administrative order directing Wagner Electric Corporation to clean up a certain site. Thereafter, the EPA notified Wagner that it did not intend to seek a court order enforcing the administrative order and instead would proceed by expending Superfund monies to remediate the property itself, reserving its right to seek up to treble damages from Wagner at a later time. Wagner sought to stay the administrative order. In support of its action, Wagner argued that the statutory scheme under which the EPA issued the order was unconstitutional for violations of procedural due process. More specifically, the EPA urged that the CERCLA statutory framework presented a *Young* problem in that it forced a party subject to an EPA order to risk the imposition of treble damages in order to challenge the merits of an EPA order.

Relying on *Love* and *Reisman*, the district court rejected Wagner's argument. *Wagner*, 612 F. Supp. at 743-45. In so doing, the court honed in on the words "sufficient cause" appearing in the treble damages provision of CERCLA that opens the option of awarding treble damages only if a party is found to have failed to act in accordance with an EPA order "without sufficient cause." In this regard, the court compared CERCLA's "sufficient cause" standard to *Love*'s safe harbor of "reasonable ground to contest" and *Reisman*'s objective good faith qualification of the criminal and contempt aspects of the Internal Revenue Code that it construed. *See id.* Interpreting *Love* and *Reisman* to stand for the proposition that "one must assert an objectively good faith challenge to . . .

7

administrative action before one may invoke the protections of *Ex Parte Young*," *id.* at 743, the court then considered whether CERCLA's "sufficient cause" standard provides for a good-faith defense like those available in *Love* and *Reisman*.  After observing that CERCLA does not define "sufficient cause," the court reviewed the statute's legislative history, concluding that Congress intended for the phrase "without sufficient cause" to establish an objective good-faith defense to treble damages.  *Id.* at 745.  Despite this determination, however, the court continued,

> Even without this useful legislative history, . . . we would construe this phrase as referring to a 'good faith' defense.  Were we not to do so, the statute might well be constitutionally invalid as placing an undue burden on plaintiffs' access to judicial review.  We would thus invoke the Supreme Court's repeated admonition that:
>
>> If a construction of the statute is fairly possible by which a serious doubt of constitutionality may be avoided, a court should adopt that construction.  In particular, this Court has been willing to assume a congressional solicitude for fair procedure, absent explicit statutory language to the contrary.

*Id.* (quoting *Califano v. Yamasaki*, 442 U.S. 682, 693 (1979) (omitting Court's citation, brackets and internal quotations)).

Other courts have also found the CERCLA statutory framework or the enforcement schemes of other similarly drafted statutes to pass constitutional muster under the *Ex Parte Young* doctrine.  *See, e.g., Wagner Seed Co. v. Daggett*, 800 F.2d 310, 315-17 (2d Cir. 1986) (construing CERCLA treble damages provision); *Solid State Circuits, Inc. v. U.S. Environmental Protection Agency*, 812 F. 2d 383, 387-92 (8th Cir. 1987) (same); *Gen'l Elec. Co. v. Johnson*, 362 F. Supp. 2d 327, 342 (D.C.D.C. 2005) (same); *Anheuser-Busch, Inc. v. Federal Trade Comm'n*, 359 F.2d 487, 488-91 (8th Cir. 1966) (reviewing FTC enforcement scheme).  This Court agrees with the reasoning and analysis of these cases.

Essentially, to ensure constitutionality, the courts look for the criminal penalty aspect of a statutory framework to provide an ascertainable standard of conduct to which a litigant can conform behavior so as to avoid criminal prosecution while simultaneously preserving the right to challenge agency action in the forum provided by the statutory scheme. Thus, the question this Court must address concerns whether the phrase "without just cause" contained in Part 2 of Section 78u(c) has a discernible meaning allowing the Huffs to preserve their right to challenge the SEC subpoenas and investigation in the context of a future SEC subpoena enforcement action, while not simultaneously exposing themselves to possible criminal prosecution. This Court finds that the phrase "without just cause" in Section 78u(c) meets this criterion.

Although the statute does not appear to define the phrase and the legislative history seems similarly unrevealing, the Court does not find itself entirely without recourse to construe the meaning of "without just cause." For guidance, the Court considers the types of challenges to SEC subpoenas during SEC district court enforcement proceedings, that courts have found to be permissible. In this regard, the Court notes that in evaluating SEC subpoena enforcement requests, courts have required the SEC to demonstrate four factors identified by the Supreme Court in *United States v. Powell*, 379 U.S. 48 (1964). *See, e.g., RNR Enters., Inc. v. SEC*, 122 F.3d 93, 96-97 (2d Cir. 1997). These include the following: "(1) that the investigation will be conducted pursuant to a legitimate purpose, (2) that the inquiry may be relevant to the purpose, (3) that the information sought is not already within the Commissioner's possession, and (4) that the administrative steps required . . . have been followed." *Id.* (quoting *Powell*, 379 U.S. at 57-58). Additionally, a subpoena recipient challenging the validity of the subpoena or the investigation pursuant to which the SEC issued the subpoena "shoulder[s] the burden of showing that the subpoena is

'unreasonabl[e]' or was issued in bad faith or for an 'improper purpose,' or that compliance would be 'unnecessarily burdensome.'" *Id.* (quoting *SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973)).

In view of the apparent lack of any published cases where a prosecution under Part 2 of Section 78u(c) occurred, the Court finds it appropriate to view as "just cause" any objectively reasonable good-faith argument directed at one of the factors indicated above. Thus, the Huffs do not have to prevail at an SEC subpoena enforcement proceeding to insulate themselves from criminal prosecution under Part 2 of Section 78u(c); rather, to achieve safe harbor from criminal prosecution under Part 2, a subpoena recipient must have only an objectively reasonable good-faith ground based on one of the previously noted factors, to provide the requisite "just cause" for failing to comply with an SEC subpoena. Because this standard gives fair notice to the Huffs of the criteria they must meet to establish "just cause" under Part 2 of Section 78u(c), the statutory framework at issue does not suffer from a *Young* problem, and no jurisdiction to consider the Huffs' objections to the SEC subpoenas or investigation lies at this time.

Nor, as the Huffs suggest, does *Federal Trade Comm'n v. Millers' Nat'l Fed.*, 23 F.2d 968 (D.C. Cir. 1927) ("*Millers I*"), require a contrary result. In *Millers I*, the Court of Appeals of the District of Columbia considered a statutory scheme very similar to the ones at issue in the instant matter and the cases discussed above. Under the statutory framework in *Millers I*, the recipients of FTC subpoenas faced possible criminal prosecution for failure to comply with the subpoenas, and they had no opportunity to challenge the subpoenas or the FTC's investigation unless the FTC sought to enforce the subpoenas. Applying the *Young* analysis, the court determined that it had jurisdiction to hear the plaintiffs' action seeking to enjoin the FTC investigation. *See Millers I*, 23 F.

2d at 972. While the *Millers I* Court cited to *Love* in its analysis, it did not mention the "reasonable grounds" limitation on *Love*'s holding, and it lacked the benefit of *Reisman*, which the Supreme Court decided approximately 34 years later.

Moreover, four years after the Court of Appeals for the District of Columbia decided *Millers I*, the same court (indeed, the same judge), considered the same issue involving the same parties. This time, however, in *Federal Trade Comm'n v. Millers' Nat'l Fed.*, 47 F.2d 428 (D.C. Cir. 1931) ("*Millers II*"), the court reached the opposite conclusion, reversing the district court's entry of a decree enjoining the enforcement of the FTC's subpoenas. In so doing, the court reasoned that the subpoena recipients retained the right to challenge the subpoenas in any enforcement proceedings brought by the FTC. *Id.* Although the court did not address whether the statutory scheme continued to present a *Young* problem, nothing in the decision indicates that any of the salient facts had changed. Moreover, even if *Millers I* were otherwise still good law in the District of Columbia Circuit,[2] it is not binding on this Court, and this Court finds the reasoning of the line of cases discussed above to be more persuasive, in view of the Supreme Court's opinion in *Reisman*, which succeeded the *Millers* Cases in time.

## *Conclusion*

For the foregoing reasons, the Court **DENIES** all outstanding aspects of Defendant Anthony Huff's and Relief Defendant Sheri Huff's Motion for Order Enjoining Investigation and Quashing Administrative Subpoenas Issued by Plaintiff and for Other Equitable Relief [D.E. 173]. The

---

[2] When the court decided *Millers I* and *Millers II*, it was called the Court of Appeals of the District of Columbia. In 1948, however, Congress changed the names of the federal intermediate courts of appeals, including that of the Court of Appeals of the District of Columbia. *See* 62 Stat. 869. At that time, the court became known by its current designation, the United States Court of Appeals for the District of Columbia Circuit.

temporary stay is lifted in its entirety, and the SEC may proceed with the *Oxygen* Investigation and subpoena enforcement.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this 14th day of October, 2009.

_____
**ROBIN S. ROSENBAUM**
**UNITED STATES MAGISTRATE JUDGE**

cc:   All Counsel and Parties of Record