# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 08-60315-CIV-ROSENBAUM
### (CONSENT CASE)

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

W. ANTHONY HUFF,
DANNY L. PIXLER,
ANTHONY R. RUSSO,
OTHA RAY MCCARTHA, and
CHARLES J. SPINELLI,

    Defendants,

SHERI HUFF, ROXANN PIXLER,
MIDWEST MERGER MANAGEMENT, LLC, and
BRENTWOOD CAPITAL CORPORATION,

    Relief Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause is before the Court upon the seven-day bench trial held in this case.  The parties consented to trial before a United States magistrate judge, *see* D.E. 140, and the Honorable William J. Zloch referred the matter to me in accordance with 28 U.S.C. §636(b).  [D.E. 160].

The parties filed certain stipulations for the Court's consideration at trial. *See* D.E. 217 at 5-8.  Following the trial, the parties submitted their Proposed Findings of Fact and Conclusions of Law [D.E. 290, D.E. 291].  The Court has also reviewed the deposition transcripts of Vera Michele Brown, Danny L. Pixler, William Baumgardner, Jr., Richard Steen, Lloyd Davis, Ivan Dobrin, Brian Sly, and Thomas Cunningham, all exhibits entered into evidence at trial, Defendant and Relief

Defendants' Motion for Directed Verdict [D.E. 265], all filings in support thereof and in opposition thereto,[1] the SEC's Notice of Supplemental Authority [D.E. 300], Defendant and Relief Defendants' Motion to Strike Notice of Supplemental Authority [D.E. 301], and all filings in support thereof and in opposition thereto.   Pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure, the Court now issues the following Findings of Fact and Conclusions of Law.

## I. Background

This action began on March 6, 2008, when the Securities and Exchange Commission ("SEC") filed the original Complaint [D.E. 1] in this matter against Defendant W. Anthony Huff ("Huff") and Relief Defendants Sheri Huff, Roxann Pixler, and Midwest Merger Management LLC (collectively "Relief Defendants").   Shortly thereafter, on April 4, 2008, the SEC filed its Amended Complaint for Injunctive and Other Relief [D.E. 15].   The Amended Complaint also sought relief against Defendants Otha Ray McCartha, Charles J. Spinelli, Danny L. Pixler, Anthony Russo, and Relief Defendant Brentwood Capital Corporation.   *See* D.E. 15.

Defendants, McCartha, Spinelli, Pixler, and Russo consented to judgment against themselves, *see* D.E. 2, D.E. 3, D.E. 17, and D.E. 73, respectively, and the Court entered judgments and final injunctions against these Defendants.   *See* D.E. 24, D.E. 23, D.E. 25, D.E. 74.   As for the Relief Defendant Brentwood Capital Corporation, on May 21, 2008, the Court affirmed an Order of Default entered by the Clerk against Brentwood Capital Corporation, Inc.   *See* D.E. 33.   Because these Defendants and Relief Defendant no longer play a role in this case, these Findings of Fact and

---

[1] The Court notes that the document docketed at entries 292 and 293 appears to be the same item, but it is identified on the docket sheet by two different names: SEC's Trial Brief [D.E. 292] and SEC's Response to Motion for Directed Verdict [D.E. 293].

Conclusions of Law will not review their involvement except as necessary to explain currently pending matters.

The Amended Complaint alleges that from 2001 through 2004, Defendant Huff, along with others, "siphoned tens of millions of dollars" from Certified Services, Inc. ("Certified"), a professional employee leasing organization. D.E. 15 at ¶ 1. According to the Amended Complaint, Huff secretly served as a "control person of Certified," and, with others, employed "an elaborate scheme conducted in flagrant disregard of the federal securities laws." *Id.* More specifically, the Amended Complaint asserts that Huff and others artificially inflated Certified's financial condition and failed to disclose related party transactions that benefitted Huff and the others. *Id.* at ¶ 2. As a result, the Amended Complaint continues, Huff and others overstated Certified's financial condition to the SEC and the investing public by approximately $112 million. *Id.*

The Amended Complaint further contends that Huff and others accomplished this feat by recording almost $47 million in "bogus Letters of Credit" as an asset on Certified's balance sheet while simultaneously failing to report approximately $65 million in liabilities. Consequently, Certified allegedly overstated its assets by approximately 35% and understated its liabilities by about 38% for the fiscal year-end 2002 and understated its liabilities by more that 50% for the fiscal year-end 2003. *Id.*

In addition, the Amended Complaint accuses Huff of using his control over Relief Defendant Midwest Management, LLC ("Midwest"), Certified's controlling shareholder, to divert money improperly out of Certified's coffers and into his own pocket by orchestrating Midwest's entry into "bogus agreements" with Certified. *Id.* at ¶ 3. As a result of these alleged violations, the SEC suggests, Huff and the Relief Defendants reaped "millions of dollars in ill-gotten gains." *Id.* at

¶ 4.  To remedy these purported transgressions, the SEC seeks (1) a declaration that Huff violated the federal securities laws as alleged in the Amended Complaint; (2) a permanent injunction enjoining Huff and his agents from violating Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* ("Securities Act"), and Sections 10(b) and 20(a) and Rule 10b-5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* ("Exchange Act"), and from aiding and abetting any violation of Section 10(b) and Rule 10b-5 of the Exchange Act; (3) an order requiring sworn accountings from Huff and Relief Defendants Sheri Huff, Roxann Pixler, Midwest; (4) an order requiring Huff and the Relief Defendants to disgorge ill-gotten gains;  (5) an order directing Huff to pay civil money penalties under the Securities Act and the Exchange Act; (6) an order barring Huff from serving as an officer or director of any public company; and (7) an order precluding Huff from directly or indirectly participating in an offering of penny stock.

The SEC, Huff, and the Relief Defendants (collectively, "the Parties") filed a Notice of Right to Consent to Disposition of a Civil Case By A United States Magistrate.  [D.E. 160].  The Honorable William J. Zloch then assigned this matter to me.  *See* D.E. 160.  The Court conducted a seven-day bench trial. [D.E.s 258-264].  Prior to trial, the Parties filed a Joint Pretrial Stipulation in which they entered into certain stipulations of fact.  *See* D.E. 217 at 5-8.

During the trial, the Court heard live testimony from Huff, Sheri Huff, Roxann Pixler, Charles Spinelli, Ivan Dobrin, Adam Dobrin, James Feltman, William Romashko, Otha Ray McCartha, Thomas Bean, and R. David Wallace.  In addition, the Parties submitted by designation the depositions of Vera Michele Brown, Danny L. Pixler, William Baumgardner, Jr., Richard Steen, Thomas Cunningham, Lloyd Davis, Ivan Dobrin, and Brian Sly.  *See* D.E. 220 at 3-15; D.E. 218 at 62-66.  The Court has reviewed these deposition transcripts.

The following exhibits were admitted into evidence during the trial: Plaintiff's Exhibits ("PX") 7, 59, 86, 88, 105, 115,[2] 150, 151, 158, 164, 167, 173, 178, 180, 182, 231a, 268, 308, 309, 341, 416b, 425, 448, 456b, 464, 490, 491, 505, 548, 550, 553, 554, 555, 556, 557, 560, 562, 564, 565, 566, 567, 570, 575, 576, 578, 579, 580, 583, 584, 585, 588, 590, 591, 594, 595, 599, 600, 608, 609, 612, 615, 616, 617, 618, 630, 631, 632, 635, 636, 637, 639, 643, 647, 652, 658, 659, 672, 674, 675, 676, 677, 678, 679, 680, 681, 682, 683, 691, 722, 723, 724, 725, 800, 802, 814, 816, 817, 818, 819, 820, 822, 823, 824, 827, 829, 830, 831, 832, 836, 845, 846, 847, 848, 849, 856, 862, 865, 866, 869, 872, 875, 877, 878, 879, 879b, 879c, 880, 881, 882, 883, 884, 885, 886a, 886b, 886c, 886d, 886e, 889, 890, 892, 907, 908, 909, 920, 921, 929, 930, 931, 932, 933, 934, 938, 966, 968, 969, 970, 972, 976, 977, 980, 984, 986, and 994 (pages strat 000482 - strat 000486 of what Defendant submitted to the Court as DX 35 prior to trial but did not seek to admit at trial); and Defendants'

---

[2]PX 115 is a copy of a document called the Risk Allocation Agreement. It is signed by Brown only, not by Anthony Russo, for whom a blank signature line exists. Additionally, the exhibit contains a facsimile transmission cover sheet and note dated February 13, 2003, which indicates that Brown faxed the Agreement back to Russo after she signed it at his instruction. The SEC did not seek admission of PX 115 at trial but instead advised the Court that it was offering PX 115 in relation to the deposition testimony of Michele Brown. *See* Trial Transcript at 1442; *see also* D.E. 218 at 7. Defendant and Relief Defendants objected to the admissibility of PX 115 on the basis of authentication only. *See* D.E. 220-1 at 4. The Court first notes that the underlying, executed version of the Risk Allocation Agreement has been admitted into evidence as DX 14. A comparison of DX 14 and PX 115 reveals that the actual contents of the Risk Allocation Agreement itself is precisely the same in both exhibits. Consequently, the only issue surrounds whether the unsigned Russo signature line, the signed Brown signature line, and the facsimile transmission have been authenticated. Brown testified during her deposition that the signature appearing on PX 115 was, in fact, her signature. D.E. 214-17 at 70. She further stated that she had previously seen the document, that she had faxed the document on or about February 13, 2003, and that Russo had not signed the version that she had faxed. *Id.* Particularly in view of the fact that the content of the Risk Allocation Agreement portion of PX 115 represents what appears to be an exact duplicate of DX 14, the Court finds this testimony sufficient to demonstrate that PX 115 "is what its proponent claims" under Rule 901, Fed. R. Evid., and consequently overrules the authentication objection and admits the exhibit.

Exhibits ("DX") 4, 5, 6, 7, 13, 14, 20, 58, 61, 62, 67, 98, 117, 120, 149, 150, 151, 153, 154, 159, 160, 161 (the documents Defendant submitted to the Court as DX 25 and DX 26 prior to trial but did not seek to admit at trial under those exhibit numbers), and 162.

After the trial, Huff and the Relief Defendants submitted a written Motion for Judgment pursuant to Rule 52, Fed. R. Civ. P. [D.E. 265]. During the trial, the Parties had agreed and the Court had authorized that the written Motion for Judgment would be treated as if it had been made at the close of the SEC's case-in-chief and renewed at the conclusion of all evidence in the event that the Motion had been unsuccessful at the close of the SEC's case-in-chief, and that the Court would reserve ruling until the written Motion had been fully briefed and submitted to the Court. Trial Transcript ("TT"), pp. 1224, 1225. The SEC timely filed its written Response to Huff and the Relief Defendants' Motion for Judgment [D.E. 293], and Huff and the Relief Defendants timely filed their Reply [D.E. 299].

## II.  Findings of Fact[3]

### A.  Parties, Relevant Individuals and Entities, and Jurisdiction

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a), and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§78u(d), 78u(e), and 78aa.

---

[3]To the extent that any of these Findings of Fact constitute conclusions of law, they are adopted as such.

**Defendant W. Anthony Huff**

2.      Defendant Huff does not have a college degree, but he did take some college courses and insurance courses, and he did graduate from the Dale Carnegie School.  TT[4] at 834, 1227-28. Defendant Huff is neither a certified public accountant nor a lawyer.  *Id.* at 1228.

3.      In the mid-90's Defendant Huff filed for personal bankruptcy.  *Id.*  The bankruptcy court found, however, that Huff had non-dischargeable debt.  *Id.*

4.      Defendant Huff previously held State of Kentucky licenses for property and casualty insurance and for life and health insurance.  *Id.* at 834-35.  In October 1998, however, following a contested proceeding, the Insurance Commissioner for the State of Kentucky either revoked or forced Defendant Huff to surrender his life and health insurance license.  *Id.* at 836-38.  Defendant Huff's property and casualty insurance license expired.  *Id.* at 836.

5.      On November 6, 2000, Defendant Huff was indicted in the Western District of Kentucky for mail fraud, money laundering, and money-laundering conspiracy.  DX 920; TT 839. The indictment pertained to Defendant Huff's association with All Risk Services, Ltd., a wholesale insurance brokerage business purportedly in the business of placing trucking insurance risks with various insurance companies.  DX 920.  According to the indictment, Defendant Huff approached insurance companies to obtain large insurance policies on behalf of North American Trucking Association members.  *Id.*  The indictment further alleged that Defendant Huff arranged for insurance premium-financing loans from a premium-financing company in order to cover the cost of the insurance premiums on the policies.  *Id.*  In so doing, the indictment continued, Defendant Huff falsely represented to the insurance premium-financing companies that the down payment on the

---

[4]As previously noted, "TT" refers to the trial transcript.

policy had been made and that the monies from the insurance premium-finance agreement would be used to pay for the master insurance policies. *Id.* The indictment further asserted that instead of using the insurance premium-financing monies to pay for the insurance policy, Defendant Huff spent the monies for his personal benefit and for the benefit of his family members. *Id.*

6. On May 22, 2003, Defendant Huff pled guilty to three counts of mail fraud contained in the indictment. DX 921; TT 839-40. In the plea agreement, Defendant Huff agreed that he had obtained three insurance premium finance loans upon false representations that he would use the loan proceeds to pay premiums due on insurance policies issued by Liberty Mutual Insurance Company. DX 921. According to the statement to which Defendant Huff agreed in the plea agreement, however, after receiving the loan proceeds, Defendant Huff intentionally expended them for purposes other than paying the premiums to Liberty Mutual. *Id.* Huff further acknowledged in the plea agreement that he pled guilty "because he [was], in fact, guilty of these three charges." TT at 841.

7. Prior to being indicted in the Western District of Kentucky, Defendant Huff had served as a director of two entities with offerings registered with the SEC. TT at 879. These entities included U.S. Trucking, where Defendant Huff held the titles of executive vice president and chairman of the board, and Professional Transportation Group, Ltd., where Defendant Huff was the chairman of the board. *Id.* at 879, 886. In his capacity as the executive vice president and chairman of the board of these companies, Defendant Huff had to and did disclose his background in offering materials and likewise had to and did sign publicly filed registration statements and reports. *Id.* at 885-87; *see also* PX 848 at 18, F-33. Some of the background information that Huff disclosed was negative in that it pertained to his bankruptcy in 1994. PX 848 at 18.

8.      As chairman of the board at U.S. Trucking, Huff's duties included raising capital, talking to the market place, communicating with shareholders, and engaging in public relations, although he was not involved in the "day-to-day grind" of the company.  TT at 884-85.  Nor did Huff find potential acquisitions for U.S. Trucking.  *Id.* at 884.  Huff and former co-defendant Danny Pixler also served as the sole members of U.S. Trucking's audit and compensation committee.  PX 848 at 18; TT at 880-81.  Upon his indictment in the Western District of Kentucky, Defendant Huff resigned his official positions with U.S. Trucking and was removed from his position with Professional Transportation Group, Ltd.  TT at 885-91.  In the late 1990s, U.S. Trucking filed for bankruptcy or otherwise became defunct.  *Id.* at 184.  Since Defendant Huff's indictment in 2000, Huff has never served in name as an officer or director of any entity registered with the SEC.  *Id.* at 891.

9.      Following Defendant Huff's resignation from U.S. Trucking, U.S. Trucking continued to have debts and obligations.  *Id.* at 212-13.  Among these were debts and obligations to Wells Fargo; Neligan, Tarpley, Andrew and Foley; Monarch Capital; and All State World Cargo, Inc.  *Id.* at 212-14.  Logistics Management Resources, Inc. ("LMRI") became the successor corporation to U.S. Trucking.  *Id.* at 211.

10.      Huff carries a business card, but the card does not state his position, title, or company affiliation.  TT at 1071.

**Relief Defendant Sheri Huff**

11.     Relief Defendant Sheri Huff has lived with Defendant Huff[5] for most of the time since she was 17 years old.  TT at 353, 142.  Although they were once married, Defendant Huff and Sheri Huff divorced in 1993.  *Id.*  Nevertheless, Relief Defendant Sheri Huff and Defendant Huff continue to refer in public to each other as "husband" and "wife" and to reside together.  *Id.*  Additionally, Sheri Huff still wears her wedding ring.  *Id.*  The Huffs also have children together.  *Id.*

12.     Sheri Huff owns a house at 313 Longview Park Place in Kentucky, where she resides with Huff.  TT at 353, 142, 959-60.  Huff's name is not on the property.  *Id.* at 959-60.  Sterling Development built and owned the home before Sheri Huff purchased it.  *Id.*  Prior to living at that address, Sheri Huff and Defendant Huff resided at a house at 707 Oxmor Woods Parkway in Kentucky.  *Id.* at 960.  Previously, that house was owned by the Huff Grandchildren Irrevocable Trust, of which Defendant Huff is a trustee, but currently, Sheri Huff owns the property.  *Id.*  In addition to these residences, for a period in 2004, Sheri Huff stayed with Defendant Huff at a condominium in Hollywood, Florida, in part, so Huff could be close to Certified's office in Fort Lauderdale.  *Id.* at 404-05.

**Relief Defendant Roxann Pixler**

13.     Relief Defendant Roxann Pixler has been married to former Defendant Danny Pixler for the past 31 years.  *Id.* at 133-34.  Roxann Pixler worked for Gulf Northern, which changed its name to U.S. Trucking.  *Id.* at 137.  While employed at Gulf Northern, Roxann Pixler met

---

[5]These Findings of Fact and Conclusions of Law refer to Defendant Huff as "Huff" or "Defendant" and to Relief Defendant Sheri Huff as "Sheri Huff."

Defendant Huff in the mid-1990's.  *Id.*  She worked for U.S. Trucking until the fall of 1999.  *Id.* From the mid-1990's until at least 2005, Danny Pixler and Huff were involved in business together. *Id.* at 137-38.  Roxann Pixler has resided with her husband Danny Pixler in various locations, including Fort Lauderdale, Florida.  TT at 134.

14.     Roxann Pixler eventually invested approximately $150,000 with Huff.  TT at 181-82.  When she asked him to put her investment into some type of written form, Huff told Roxann Pixler to "shut up," told her she was a trouble-maker, and banned her from future meetings relating to the investment.  *Id.*

**Charles Spinelli**

15.     Charles Spinelli ("Spinelli") graduated from the Fordham University College of Business and the Fordham University Law School.  TT at 183.

16.     Spinelli first met Defendant Huff in approximately 1996, when Spinelli served as counsel for a small broker-dealer located in New York City.  *Id.* at 184.  At the time, Huff was a shareholder in U.S. Trucking, Inc., which was a client of the same broker-dealer.  *Id.*  Subsequently, U.S. Trucking retained Spinelli to perform some legal work.  *Id.*

17.     Between 1999 and 2002, Spinelli practiced law at a law firm called Levy & Boonshoft, P.C.  *Id.* at 183.  During that period, Spinelli and Levy & Boonshoft, P.C., represented Defendant Huff, Defendant Huff's entities, and Certified.  *Id.* at 59, 204.  In March 2002, however, Spinelli left Levy & Boonshoft, P.C., and stopped practicing law.  *Id.* at 184, 203-04, 319; *see also id.* at 126.

18.     In addition to providing legal representation to Huff prior to retiring his law license in 2002, Spinelli also had a separate business relationship with Huff beginning in 2001.  *Id.* at 204.

Spinelli's personal relationship with Huff led to a partnership involving Spinelli and Huff as the majority partners, with Dan Pixler also receiving a percentage of profit from the venture. *Id.* at 196-97, 293, 309. Spinelli and Huff's partnership pursued a business enterprise intended to have involvement in three areas: (1) a professional employment organization ("PEO"); (2) an insurance carrier; and (3) a financing arm. *Id.* at 196. The companies corresponding to each of these functions were as follows: Certified was the PEO, Brentwood Capital ("Brentwood") sought to serve as the insurance arm, and Midwest Merger Management, Inc. ("Midwest"), was intended to be the finance company. *Id.* at 196-97. Despite the existence of the partnership, no documents memorialized the relationship, and on paper, the companies did not reflect that they were controlled by the partnership. *See id.* at 292-94.

19.     Nevertheless, those who interacted with Huff, Spinelli, and their entities saw them as a close group. William Baumgardner, who sold the PEO company Staff America to Certified, for example, described Huff, Spinelli, Pixler, those with whom they worked, and the various entities as being "a very tight group of people," with Huff at the "dead center" of the relationship. D.E. 214-11 at 13. Baumgardner further explained, "[W]ho was Brentwood on a day, who was Huff on a day, who was Pixler on a day, it depended on the circumstances and the need. And that covers the whole time I knew them." *Id.*; *see also id.* at 65 ("At the center of the hub would have been Pixler, Spinelli, one inch out Campitiello, Huff at the middle.").

20.     Based on Spinelli's involvement with Certified, Brentwood, and Midwest, the United States of America criminally prosecuted Spinelli. *Id.* at 264-65. Spinelli pled guilty to a count of misprision of a felony and served a prison sentence. *Id.* at 265, 321. At the time that he testified at trial in the pending case, Spinelli was on supervised release from the criminal case. *Id.* at

264.  Spinelli characterized his experience with the criminal justice system as "a very cathartic and important experience for me and my family and we are much, much better off as a result of it."  *Id.* at 321.

21.    Additionally, the SEC filed the pending enforcement action against Spinelli as well as against Huff and other defendants.  *Id.* at 278-79, 281.  Prior to filing the enforcement action, the SEC took Spinelli's deposition on more than one occasion.  *See id.* at 266-73.  Spinelli admitted when he testified at trial in this matter that during one of the SEC depositions, he committed perjury.  *Id.* at 265–67.  In making this admission, Spinelli explained, "When I originally testified in 2005 with the SEC, the purpose of failing to disclose the truth was an attempt to protect myself from prosecution, and others."  *Id.* at 266; *see also id.* at 300 ("I was trying to protect myself and Mr. Huff"), 317 ("I was concerned about potential prosecution for [Spinelli and Huff]").  As a result of Spinelli's involvement with Huff, he had come to view Huff as a "friend" and a "brother."  *Id.* at 317.

22.    Spinelli entered into a settlement agreement with the SEC to resolve his involvement in the instant matter.  *Id.* at 279-82.  The terms of the settlement agreement administratively barred Spinelli from acting as a securities lawyer before the SEC, from serving as an officer or director, and from participating in penny stocks, and it enjoined Spinelli from violating securities laws.  *Id.* Additionally, under the terms of the settlement agreement, Spinelli agreed to cooperate fully with the SEC.  *Id.* at 282.  The settlement agreement did not subject Spinelli to disgorgement.  *Id.* at 282. As for Spinelli's take on the SEC's enforcement action against him, Spinelli opined that he was not a "fall guy," but, rather, "got exactly what [he] deserved."  *Id.* at 266.

23.     In addition to the criminal and SEC enforcement litigation, the bankruptcy trustee acting on behalf of the creditors of Certified also sued Spinelli and Huff, as well as others. *Id.* at 280, 291, 319.  Spinelli and Huff settled the litigation with the bankruptcy trustee. *Id.* at 291.

24.     Continental Casualty Company ("CNA"), an insurance company, and Staff America, a PEO company that Certified acquired, also each filed a lawsuit against Spinelli, Huff, and others. *Id.* at 279-80, 318, 324.  Spinelli's insurance carrier settled Spinelli's involvement in the CNA lawsuit for $40,000. *Id.* at 279-80.  Huff settled the CNA litigation for a lot more. *Id.* at 318-19.

25.     The Court finds Spinelli to have been a credible witness during the trial of this matter.  His demeanor on the witness stand, his responses to questioning – particularly cross-examination, and other evidence corroborating Spinelli's testimony guide the Court in this determination.  Although the Court initially had some reservations about believing an individual who admitted to having committed perjury in the course of the 2005 SEC deposition preceding the filing of the matter at hand, the reason expressed by Spinelli for having done so – that he was trying to protect himself and others from legal action – rings true and no longer existed at the time that Spinelli testified in the instant matter.  Moreover, as reflected through the citations supporting other findings of fact in this document, in many cases, other evidence tends to corroborate Spinelli's testimony.  In addition, as Spinelli was on supervised release at the time of his testimony, he stood to lose more than the average witness, had he perjured himself in a detectable way during this trial. Finally, and significantly, Spinelli's demeanor on the stand and answers to questions concerning his involvement in the matters at issue in this case reflect that Spinelli has taken responsibility for his actions and that he appears genuinely to have turned over a new leaf.

**Midwest Merger Management, Inc.**

26.     Midwest was formed on July 20, 2001, as a limited liability holding company to hold the stock of Certified. D.E. 214-3 at 27[6] (p. 265); D.E. 217 at 8.  Midwest had offices in Kentucky. TT at 874.  Brentwood operated out of the same office space as Midwest in Kentucky.  *Id.* at 873-74.

27.     Originally, Relief Defendants Sheri Huff and Roxann Pixler each owned a 50% interest in the company, although Roxann Pixler never took part in any initial meetings regarding the formation of Midwest.  *Id.* at 146, 152; PX 683 at 3.  The opening corporate records for Midwest identified Roxann Pixler as the secretary of the company, although no one asked her whether she wished to assume this role, and she never actually performed any functions in this position.  *Id.* at 148.  Nor did Roxann Pixler ever manage or control Midwest.  *Id.* at 147-48; *see also id.* at 176. She similarly never made any business decisions for the company or contributed any capital to it. *Id.* at 147-48, 164.

28.     Likewise, Sheri Huff never invested any money into Midwest.  *Id.* at 368.  She testified that she has no understanding as to why she had an ownership interest in Midwest, as she never negotiated with anyone to obtain it.  *Id.* at 367-68.  In addition, Sheri Huff did not know who the other owners of the company were, had no understanding of whether Midwest ever made money, and had no knowledge of the company's business.  *Id.* at 367-69.  Nor did Sheri Huff actually ever perform any work for Midwest.  *Id.* at 373, 403-04; PX 909 at 3.  On occasion,

---

[6]Some docket entries, including this one, have two page-numbering systems resulting in different page numbers on the same page: the page number of the original document and the page number imprinted across the top of the page by the Court's CM/ECF system.  These Findings of Fact and Conclusions of Law refer to the page numbers left by the Court's CM/ECF system.

however, Sheri Huff personally signed documents and others signed her name on her behalf for Midwest.  PX 909 at 3.

29.     Defendant Huff placed Sheri Huff as his nominee for any financial benefit he would receive from Midwest.  TT at 870.  At the time that the ownership structure of Midwest was being determined, Huff was winding down liabilities he had from prior business dealings.  *Id.* at 871.  In addition, at the time of Midwest's formation, Huff still had personal liability arising out of guarantees he had made in connection with U.S. Trucking.  *Id.* at 872-74.  Indeed, in order to satisfy a personal guarantee Huff made to GE Lending in connection with the U.S. Trucking business, Huff had to pay more than a million dollars.  *Id.* at 872-73.  As Danny Pixler explained with respect to Midwest, he and Huff "decided to put a company together that we could hold our assets through our wives in and go back into business."  July 9, 2009, Deposition of Danny Pixler ("Pixler Depo.") at 166.  Subsequently, Huff arranged for the paperwork to establish Midwest's structure to be drawn up.  *Id.* at 264-65.

30.     At some point in time prior to the filing of Midwest's 2001 tax return, the ownership interests changed so that Roxann Pixler held 40% interest in the company, even though she signed no document authorizing a reduction to her share in the company.  TT at 147; *see also* PX 308: PX 309.  When Roxann Pixler held a 40% interest, Relief Defendant Sheri Huff held a 51% interest in the company, and Vera Michele Brown ("Brown"), who has served as Defendant Huff's secretary since approximately 1995, held the remaining 9%.  TT at 147, 353, 369-75; *see also* PX 308; PX 309.

31.     Defendant Huff is Brown's boss, and Brown has, on many occasions, signed Sheri Huff's name.  TT at 147, 158, 353, 369-75.  Brown also conducted some of Defendant Huff's

banking activities, answered phones, and picked up the Huffs' son from school.  TT at 367.  Brown did not sign any documents for Midwest unless Defendant Huff authorized her to do so.  D.E. 214-17 at 14.

32.     By the time that Midwest filed its 2003 tax return, the ownership interests in the company had changed again.  PX 680.  Although Roxann Pixler continued to own 40% of the company, Sheri Huff at that time held a 59% share, while Brown held 1%.  *Id.*  These interests remained the same through at least the filing of Midwest's 2005 tax return.  *See* PX 681; PX 682.  As of the time of trial, Roxann Pixler owned no part of Midwest, although she never signed a document giving away or otherwise assigning her interest in the company.  TT at 178.  Instead, the Huff Grandchildren Trust is the 100% owner of the company.  *Id.*

33.     Midwest's tax returns show the following ordinary income or loss for each of the following years: 2001: -$744 (PX 308); 2002:  -$755,749 (PX 309); 2003: $362,689 (PX 680); 2004: $909,834 (PX 681); 2005: -$569,231 (PX 682).  In 2004, Roxann Pixler received $60,379.98 from Midwest Merger.  TT at 177; PX 683 at 6.  She used the money to pay taxes related to Midwest for that year.  TT at 177.  The $60,379.98 is the only money that Roxann Pixler ever received from Midwest.  *Id.*; *see also* PX 683.  Between 2002 and 2005, Sheri Huff received approximately $899,714 from Midwest.  TT at 388-400, 405.

34.     In 2005 Defendant Huff became a manager of Midwest.  *Id.* at 149.  Roxann Pixler did not participate in that decision and was not asked for involvement in that determination.  *Id.*  Even prior to this time, however, Huff made the substantive decisions with regard to Midwest and ran it on a day-to-day basis.  *Id.* at 205, 413, 871-72.  Although Roxann Pixler originally believed that Midwest was "Danny [Pixler] and Anthony [Huff's], and . . . they were taking care of

everything," she subsequently came to believe that Huff was controlling Midwest. TT at 149, 162. Huff even had a Midwest e-mail address – ahuff@midwestmerger.com. PX 635; TT at 920. In hindsight, Danny Pixler agreed that he never made decisions regarding Midwest's business. Pixler Depo. at 173. Instead, Huff did. *Id.* at 173-74.

35.    As for Brown's involvement in Midwest, Brown never directed any of Huff's activities with regard to Midwest. TT at 845. Instead, Huff was always the decision-maker, and Midwest always did what Huff recommended. *Id.* at 843, 1057. Huff gave Brown duties to perform, and she executed those tasks. *Id.* For example, if transactions required negotiations between Midwest and Certified, Huff, not Brown or anyone else, negotiated, even though Brown signed resulting agreements on behalf of Midwest. *Id.* at 845-47. To the extent that Brown ever offered any opinions regarding Midwest, Huff's opinion controlled, and he would have overruled Brown, had she ever disagreed. *Id.* at 842-44. In fact, however, Brown never disagreed with Huff. *Id.* at 844.

36.    Based on the findings of fact set forth both previously and below in these Findings of Fact and Conclusions of Law, this Court concludes that Huff always controlled Midwest and that Sheri Huff and Roxann Pixler never had any substantive involvement in the company. Rather, they always acted essentially as straw owners.

37.    Spinelli had a consulting contract with Midwest. *Id.* at 215. Under the consulting contract, Spinelli received payments of $10,000 per week from Midwest. *Id.* These payments to Spinelli from Midwest did not benefit Certified. *Id.*

38.    Midwest had a controlling interest in Certified's stock. *Id.* at 152.

39.     Midwest had at least three bank accounts at National City Bank until the accounts were closed in 2005.  TT at 1005-06.

**Certified Services, Inc.**

40.     According to filings with the SEC, Certified was incorporated in Nevada in 1999.  D.E. 217 at 5.  Certified registered its class of common stock, par value $.0001 per share, with the SEC and therefore was subject to the disclosure and reporting provisions of the federal securities laws.  *Id.*  Certified traded on the NASD OTC Bulletin Board under the ticker symbol CSRV.  *See* PX 831 at Part II, Item 5.

41.     On November 21, 2001, Midwest acquired 52.6% of the issued and outstanding common stock of Certified after Huff had recommended to Midwest that it purchase Certified.  TT at 245, 1057; D.E. 214-3 at 3 (p. 166); D.E. 217 at 5.  Pixler learned of Certified from Huff.  *Id.* at 265-67.  Although Certified previously had stated in its SEC filings that it provided services to mortgage, real estate, and other financial service firms and their customers, D.E. 217 at 5, at the time that Midwest purchased Certified, Certified was a shell without an operating business, and its price per share never exceeded $.40 in 2001.  TT at 245, 1057; PX 677 at Certified Form 10K-SB for the period ending Dec. 31, 2001, at Item 5. Market for Registrant's Common Equity.

42.     On November 28, 2001, Midwest made various filings with the SEC in relation to its purchase of a majority interest in Certified.  D.E. 217 at 5-6.  Among these, Midwest filed Schedule 13-D disclosing that it had a beneficial interest in the common stock of Certified and Forms 3 and 4 disclosing that Midwest had acquired more than a 10% direct interest in the common stock of Certified.  *Id.*

43.     Certified then began focusing on acquiring PEO businesses.  *See* D.E. 217 at 6.  A PEO serves as the employer of its client companies for purposes of providing benefits, paying taxes, ensuring human resource compliance, and engaging in similar functions.   TT at 70.   In approximately November 2001, Certified purchased all of the issued and outstanding common stock of America's PEO Holdings, Inc., a PEO business.  *Id.* at 1048; D.E. 217 at 6.

44.     Ivan Dobrin ("Dobrin"),[7] who effectively managed the PEO the Cura Group, Inc. ("Cura"), met with Defendant Huff and Danny Pixler in Kentucky in an effort to have Midwest acquire Cura.  TT at 73-75.  At some point during the meeting, Pixler and Dobrin's colleague left, leaving Dobrin and Defendant Huff alone.  *Id.* at 73.  At that time, Dobrin and Defendant Huff engaged in further discussions and developed a plan for the acquisition of Cura.  *Id.* at 73-74.  In the summer of 2002, Certified acquired Cura, which was headquartered in Fort Lauderdale.  *Id.* at 74; D.E. 200-3 at 7-8.

45.     Certified's acquisition of Cura occurred in three stages.  *Id.* at 75.  In March 2002, Certified wired $1 million to Cura and effectively took over control of the company.  *Id.*  Certified then bought a significant portion of the stock of Cura in June 2002, completing the purchase of Cura's stock and the acquisition of the company on December 31, 2002.  *Id.*  At that time, Cura became an operating subsidiary of Certified.  *Id.*

---

[7]Dobrin was convicted of four misdemeanors and a felony charge for late payment of payroll taxes.  TT at 128.  Although he was in prison at the time of his testimony during the trial in the pending case, Dobrin testified that he did not expect his testimony to have a positive effect on his sentence, as Dobrin was scheduled to be released from prison within 7 ½ months of his trial testimony, anyway, and nothing had been offered to Dobrin in exchange for his testimony.  *Id.* at 127-28.  Nevertheless, he agreed that he would be a "fool" not to ask for a sentence reduction.  *Id.*  Based on Dobrin's demeanor, his responses to both direct and cross-examination, his apparent lack of anything to gain at this point by lying, and other evidence corroborating Dobrin's statements, the Court found Dobrin to be a credible witness.

46.     Certified also acquired other PEO businesses such as Staff America. *Id.* at 511-12. William Baumgardner ("Baumgardner"), who started Staff America and conducted discussions with Certified regarding the arrangement by Certified of a letter of credit for Staff America, stated that his initial discussions with Certified were with Huff and Dobrin. D.E. 214-11 at 3, 10-11. Baumgardner understood that Huff represented Certified. *Id.* at 11. Based on his dealings with Huff, Baumgardner came to regard Huff, in his "mind and heart, [as] [someone who] would lie if his lips would move. Everything that came to be promised came with strings, attachments, different terms, anything. Everything changed, everything. Nothing was as he agreed to do, nothing. . . ." *Id.* at 19.

47.     All of Certified's acquisitions went through Midwest, and Certified used capital from Midwest to obtain them. TT at 512-14. Subsequently, Certified combined all of its PEO operating subsidiaries under the name Certified HR Services, which remained a subsidiary of Certified. *Id.* at 75, 507-08.

48.     Danny Pixler held the positions of president and chief executive officer of Certified. D.E. 200-3 at 6. He also served as the president of all of Certified's subsidiaries. *Id.* at 7. Before Pixler became an officer of Certified, however, Pixler was compensated by Brentwood for his work for Cura/Certified. *Id.* at 12. Pixler also received compensation from Midwest. *Id.* at 13. Brown testified that she worked for Pixler at Certified as Pixler's secretary, although Pixler was located in Fort Lauderdale, and Brown was in Kentucky. D.E. 214-17 at 4-6. Pixler, on the other hand, disputed this assertion. D.E. 200-4 at 17. In view of her location, her subservient position to Huff, and the facts that Pixler had his own secretary in Fort Lauderdale and Brown admitted that at the time that Brown was supposedly working as Pixler's secretary she continued to serve as Huff's

secretary and to do work for Midwest, this Court does not find Brown's assertion to be credible.  *See* 214-17 at 5-6.  Nevertheless, Brown received her compensation from Certified.  D.E. 200-4 at 17.

49.     Following Certified's acquisition of Cura, Dobrin remained involved with the company as the managing director.  *Id.* at 76.  In his position as managing director, Dobrin had responsibility for sales, workers' compensation, and operations.  *Id.*  These duties required Dobrin to interact with Defendant Huff.  *Id.* at 76-77.  Typically, Dobrin communicated with Huff several times weekly regarding sales, workers' compensation, operations, and other matters.  *Id.* at 76-77, 112.  Certified also communicated with Huff regarding its financials.  *Id.* at 535.

50.     In addition, Adam Dobrin,[8] who performed information analysis and report gathering at Cura and Certified from 2002 through 2004, sent Huff, Pixler, and others weekly reports summarizing the operations of the company, including analysis of weekly revenue, changes in claims, and new and terminated business.  TT at 508-09, 521-22.  Although Adam Dobrin ceased sending the reports for a few months, he resumed providing them to Huff after the break.  *Id.*

51.     Based on his frequent interactions with Huff between 2002 and 2004, even though on paper Dobrin reported to Danny Pixler, Dobrin felt that he really reported to both Pixler and Huff and concluded that, with regard to Certified, Huff "was the man.  He ran, he made all the ultimate decisions."  TT at 78, 81, 87, 113.  Adam Dobrin agreed.  *See id.* at 513-14, 517-18 (Adam Dobrin stating, "To me, it seemed that the larger macro decisions were influenced greatly or derived from

---

[8]Adam Dobrin is a separate individual from Ivan Dobrin.  The Court refers in these Findings of Fact and Conclusions of Law to Ivan Dobrin as "Dobrin" and to Adam Dobrin by his full name.

Midwest," and Pixler, Ivan Dobrin, and Ray McCartha deferred to Huff).[9]  Dobrin further described

Huff as the "puppet master," clarifying that Huff was "running the show from top to bottom."  *Id.* at

114.  In fact, Huff specifically described himself to Dobrin as the "king maker," meaning that he

preferred to control things from the background rather than being the man in charge by name.  *Id.* at

115-16.

52.   Dobrin wanted Certified to acquire a company called Presideon, for example, so he

discussed the matter with Danny Pixler.  *Id.*  When Pixler opined that it was a "terrible idea," Dobrin

---

[9]While Huff and the Relief Defendants suggest that Adam Dobrin did not view Huff as
controlling Certified, this Court disagrees.  Huff and the Relief Defendants rely on a letter that
Adam Dobrin wrote to Pixler in which Adam Dobrin said,

> It is my firm belief that our Company, having collected premiums
> for workers compensation insurance under your direction, is liable
> for and must as a matter of law handle these claims appropriately.
> I feel the need to express my internal and heartfelt concern for you
> personally in this matter being (one) the only person authorized to
> sign checks under CurCo Company, (two) being in full operating
> control of Certified HR Services/CurCo, (and three) being named
> on the Form-A for the purchase of Cascade National.

PX 676.  During Adam Dobrin's testimony, the defense asked him whether he had carefully
researched all of the statements that he made in the letter and whether he believed each statement
set forth above to be correct.  *See* TT at 573-74.  Adam Dobrin replied that he had and he did.
*See id.*  He further testified that he wrote the letter because he was concerned that Pixler "might
personally get in some kind of trouble because he was on the line in all these different ways."
*Id.* at 574.  The Court understands the statements in this letter to express concern for Pixler
because Pixler's name was on everything for Certified, not because Pixler was actually single-
handedly controlling Certified.  In other words, Adam Dobrin was worried that Pixler was being
"hung out to dry."  When Adam Dobrin was asked directly about "the influence that Midwest
had with Certified," he explained, "To me, it seemed that the larger macro decisions probably
were influenced greatly or were derived from Midwest."  *Id.* at 513-14.  More specifically,
Adam Dobrin clarified, he was speaking about the "mergers and acquisitions that occurred and
the choices for options for insurance coverage."  *Id.* at 514.  He further opined that Pixler,
Dobrin, and McCartha "deferred to" Huff.  *Id.* at 517-18.  In light of this testimony, the Court
declines to adopt the construction of Adam Dobrin's letter that Defendant and Relief Defendants
urge.

approached Huff about the plan.  *Id.*  Nearly immediately thereafter, Pixler returned to Dobrin, saying how good the idea of acquiring Presideon was.  *Id.*

53.    On another occasion, Dobrin had scheduled a vacation.  *Id.* at 80.  Although Certified/Cura was going through some upheaval at the time, Dobrin advised Pixler that Dobrin still intended to take his vacation.  *Id.* at 80-81.  Pixler did not object.  *Id.* at 81.  Later that day or the next day, however, Huff called Dobrin and told Dobrin that he really needed Dobrin not to go on vacation.  *Id.*  Consequently, Dobrin canceled his plans.  *Id.*

54.    Similarly, at some point, Dobrin mentioned to Huff that the sales people had expressed concern about Certified/Cura because it was going through a difficult time.  *Id.* at 82. Dobrin asked Huff to come down to South Florida to speak to the sales force because Huff "was running the show."  *Id.* at 83.  When Huff met with the sales force, he committed to doing things that would improve the lives of the sales people.  *Id.*

55.    Huff also frequently called Danny Pixler on the telephone.  TT at 86.  These calls occurred at multiple times throughout the work day and into the evenings.  *Id.*  Indeed, Dobrin recalled that Pixler received pages to speak with Huff on the telephone two to three times an hour at Certified's offices.  *Id.*  Because of the high frequency of calls that Pixler received from Huff, Dobrin suggested that they make up an alias for Huff so the same page would not recur so often.  *Id.* In Dobrin's opinion, "there was no question" that Huff was more "dominant" than Pixler.  *Id.* at 87.

56.    In the spring or summer of 2002, Dobrin became a member of the board of directors of Certified after Huff asked him to do so.  TT at 83-84.  Dobrin remained on the board until he left Certified in 2004.  *Id.* at 84.  Certified had approximately five board-of-director meetings during this time.  *Id.* at 121-22.  Although Huff attended none of these meetings, *id.* at 122, the meetings were

not really substantive.  According to Dobrin, little discussion occurred, and the attendees were there to "rubber-stamp" proposed actions.  *Id.* at 85-86.

57.     After Dobrin left Certified, he remained in touch with Huff.  TT at 87.  Dobrin attempted to work with Huff regarding the acquisition of other businesses for Certified.  *Id.*  In so doing, Dobrin never spoke with anyone other than Huff.  *Id.* at 87-88.

58.     Like Dobrin, Spinelli testified that Huff "was, for all intents and purposes, running the operations of Certified . . . ."  *Id.* at 251.

59.     Through Midwest's ownership of Certified's common stock and preferred stock that had voting rights, Huff controlled a majority of Certified's stock.  TT at 1402.  Huff also participated in discussions with Breene Murphy, an investment firm, regarding marketing Certified's securities.  *See* D.E. 214-15 at 9.  In addition, Huff participated in discussions regarding financing for Certified with the Laurus Family of Funds.  *See id.*

60.     Brown, Huff's administrative assistant, had check-writing privileges on at least one of Certified's bank accounts.  TT at 1036.

61.     Sheri Huff was never involved in the business affairs of Certified.  TT at 404.

62.     Certified operated out of offices located in Fort Lauderdale, Florida.  TT at 993-94.  Certified also had office space in New York where Brentwood was located and where Huff had an office.  *Id.* at 222.

**<u>Brentwood</u>**

63.     Brentwood had offices in Kentucky.  TT at 873-74.  At its Kentucky location, Brentwood operated out of the same offices as Midwest.  *Id.*

64.     Although Sheri Huff was identified as a consultant for Brentwood, she never performed any work for the company.  TT at 373-74, 404, 875; PX 909.  Nevertheless, Sheri Huff reported $151,875.03 in income from Brentwood during 2002.  PX 909 at 7-8; TT at 379-80, 384-85.  In 2003, Sheri Huff reported $211,666.72 in income from Brentwood.  PX 909 at 8; TT at 380, 384-85, 405.  In total, Sheri Huff received $2,086,000 from Brentwood.  *Id.* at 877.

65.     The income that Sheri Huff received was Defendant Huff's salary draw from Brentwood.  TT at 202-03, 875.  Huff made the decision to have his Brentwood monies paid to Sheri Huff because of a concern about outstanding liabilities relating to prior businesses.  *Id.* at 203, 879.  In addition, Huff received payments from Brentwood by cash, checks, and wire.  *Id.* at 876.  Huff maintained a Brentwood e-mail address.  *Id.* at 530.

66.     Besides Brentwood, a separate corporation called Brentwood Realty Corporation ("Brentwood Realty") existed.  In 2002, Sheri Huff solely owned Brentwood Realty Corporation.  TT at 916.  Subsequently, the company changed its name to SDH (for Sheri D. Huff) Realty.  *Id.*  Brentwood Realty had its offices at the same location as the offices of Midwest and Brentwood.  *See* PX 609.  Huff signed substantive documents on behalf of Brentwood Realty.  TT at 918; PX 609.

### *B.  The Events Preceding Certified's Demise*

**Certified's Insurance Problem**

67.     Certified's clients were required to carry workers' compensation insurance.  D.E. 200-3 at 8.  Thus, one of the services that Certified and its subsidiaries offered its clients included providing for their workers' compensation insurance needs.  *Id.*  Before June of 2003, Cura covered its clients' workers' compensation insurance needs through a series of policies with CNA Insurance or one of its subsidiaries.  *Id.*  CNA allowed Cura, under assignment agreements, to bring other

subsidiary PEO businesses into the CNA policy.  *Id.*  Thus, Certified used this arrangement to provide workers' compensation insurance to the clients of all of its subsidiaries.  *Id.*

68.     By the late summer of 2002, however, CNA advised Cura/Certified that it would not renew the workers' compensation insurance policies after June of 2003.  D.E. 200-3 at 8, 13.  CNA also informed Cura/Certified that, as of the summer of 2002, Cura/Certified's deductible under the policies would be increased to $1 million per occurrence.  D.E. 200-3 at 12-13.  This meant that for the remainder of the existence of the CNA policy, Cura/Certified was responsible for claims up to $1 million, and CNA was responsible for amounts over $1 million on any claims.  *Id.* at 13; *see also* TT at 326-27.  During the entire pendency of the $1 million–per-occurrence deductible on the CNA policy, no occurrence ever exceeded the $1 million deductible.  D.E. 214-2 at 19.

69.     Despite the deductible, if a covered employee filed a legitimate claim, CNA generally would pay the claim, despite its amount, and then seek reimbursement from Cura/Certified.  D.E. 200-3 at 14.  This is because the carrier (CNA) bears the ultimate responsibility for ensuring that legitimate claims are paid, regardless of whether the insured eventually reimburses the carrier.  TT at 328.  Legitimate claims may continue indefinitely, such as in the situation where a worker suffers a permanent injury requiring significant future medical treatment.  The monies to be paid in the future on claims already made is called the "claims tail," and it can be quite substantial.

70.     To guard against the risk of non-payment by the insured on claims below the deductible that the insurer pays in the first instance, insurers such as CNA require collateral, generally in the form of letters of credit or trust arrangements.  *Id.* at 328-29.  The amounts required

as collateral are determined by estimates of the amounts for which the policy holder is expected to be liable over time. *Id.* at 335.

71.     Because CNA would no longer provide the required coverage as of June 2003, Cura/Certified searched for another carrier. D.E. 200-3 at 9. Huff was involved in trying to find such an alternative carrier. *Id.* at 10. Cura/Certified, however, could find no alternative insurance carrier that would provide workers' compensation coverage to Cura/Certified on a national basis. *Id.* at 9. Consequently, Cura/Certified attempted to procure workers' compensation insurance coverage from a variety of regional carriers. *Id.* at 9-12. In the meantime, however, Certified did not set any cash aside to deal with claims that might be made after the CNA policy ended in June 2003. *Id.* at 21.

72.     One of the insurance providers from whom Cura/Certified ultimately obtained some coverage was Providence Property Insurance Company. D.E. 200-3 at 11. In order for Providence to provide insurance, Midwest put up collateral of either $1 million or $2 million. *Id.*

73.     With regard to the state of Florida, Union American Insurance Company required a $3.5 million letter of credit as collateral. D.E. 200-3 at 11. Thus, on November 11, 2003, UBS issued a $3.5 million letter of credit. *See* PX 505; *see also* TT at 908. UBS was Harmon Burns's bank. TT at 908. Harmon Burns, in turn, was a client of Brian Sly, a substantial investor in Midwest and in Huff's other business ventures. TT at 908, 910-14, 928-940. In connection with the $3.5 million letter of credit, Midwest, Certified, and Huff personally, as well as jointly and severally, promised and guaranteed to pay Brian Sly $50,000 upon the establishment and issuance of the letter of credit. TT at 895-96. Huff signed this document in his personal capacity and as an agent for Midwest. *Id.* at 897. Huff also bound Certified to this agreement, as he was the only person other

than Sly signing the document, which bound Midwest, Certified, and Huff "personally, jointly and severally." PX 505. Huff understood this document to represent his personal guarantee to Sly that monies extended under the letter of credit would be paid back. *Id.* at 896. If someone actually drew down on a letter of credit, Certified would have been the liable party because the letters of credit were posted on Certified's behalf. TT at 866.

**The Letters of Credit**

74.      In the spring of 2002, Huff, Spinelli, and Otha Ray McCartha[10] attended a meeting with Bill Leyton ("Leyton"), the purpose of which was to explore financing opportunities for Certified. TT at 205-06. Following this meeting, Huff and Leyton had another conversation, and, as a result, Brentwood and Certified started a business relationship with Leyton. *Id.*

75.      With regard to Brentwood, Leyton was to provide a letter to act as a balance sheet enhancement. TT at 206-07. The purpose of the letter was to boost Brentwood's balance sheet so it would qualify to purchase an insurance carrier. *Id.* at 207-08. More specifically, the letter regarded an account that Leyton had that Brentwood would "lease" and carry on its books as an asset. *Id.* The amount of the "leased asset" was approximately $5.2 million, and the "lease" payments were

---

[10]Otha Ray McCartha described himself as an independent contractor for Brentwood and Midwest. *See* TT at 410-11. Additionally, he admitted that he held the title of executive vice president for Brentwood. *Id.* at 446-47. He further explained that at some point in time he became an employee of Certified, as well as a member of the board at Certified. *Id.* at 460, 487. This Court does not find McCartha's testimony to be reliable, however, based on his demeanor and the content of his answers to questions posed during the trial. Among other testimony detracting from McCartha's credibility, despite having pled guilty to wire fraud and having forfeited $1.3 million in connection with his guilty plea, TT at 444, when the SEC questioned McCartha about his conviction, McCartha gave answers that attempted to minimize his responsibility. *See, e.g.*, *id.* at 435 ("I kind of felt like I had been used"), 436 (stating that he thought the deal represented in the bogus letters of credit made sense at the time because "I'm not a finance person and I had no real experience with letters of credit, didn't really understand them."), 437 ("I was not in any way a finance person.").

$29,000 periodically.  *Id.* at 220-21.  To pay the lease fee, monies were sent to Strategic Bancorp. *Id.*  Huff and Spinelli authorized such payments.  *Id.* at 219-21, 242; *see also, e.g.*, PX 88.  Spinelli and Huff purposely chose not to disclose the fact that Brentwood did not own the asset and the nature of the "leased asset" to auditors.  *Id.* at 207-08.  Audit financials were then prepared based on the inclusion of the "leased asset" in Brentwood's stated assets.  *Id.*

76.     As for Leyton's involvement with Certified, Leyton provided letters of credit to Certified.  TT at 208.  In mid to late 2002, after Leyton had provided Certified with four or five letters of credit, one of the letters of credit was sent to McCartha's attention at Spinelli's office.  *Id.* The letterhead logo of United California Bank, the bank that purportedly issued the letter of credit, however, became dislodged from the letter and fell off.  *Id.* at 208-09, 249.

77.     As Huff acknowledged in his testimony, Huff, Spinelli, and McCartha were aware that the logo of United California Bank on the letterhead had fallen off.  *Id.* at 1058-59,[11] 1404-07; *see also id.* at 208 (Spinelli's testimony that Huff was aware).  In fact, Huff stated that what he described as the corporate seal did not look "official" and instead appeared to have been "pasted on."  *Id.* at 1059, 1407.  Consequently, Huff and McCartha had a conference call with Leyton during which Leyton advised them that the letter was a sample for recording or filing purposes only.  *Id.* at 209.  Huff subsequently advised Spinelli of this conversation.  *Id.*  Despite this unusual occurrence, Certified continued its relationship with Leyton and continued to rely upon the letters of credit he supplied through Strategic Bancorp.  *Id.*  Spinelli explained that he was, nonetheless, concerned that the program might not be legitimate.  *Id.*  The last of the purported letters of credit bearing United

---

[11] Although Huff referred to the portion of the document that fell off as the corporate seal, *see* TT at 1058-59, his later testimony revealed that he was referring to the same portion of the bogus letter of credit that Spinelli had previously.  *See id.* at 1404-07.

California Bank's logo was dated September 16, 2002.  *See* PX 59.  Thus, this incident must have occurred prior to that date.

78.     When Certified acquired Staff America, part of the transaction required the provision of a letter of credit to Staff America.  TT at 243-44.  As a result of a conversation that William Baumgardner had had with Huff and Dobrin in August and following negotiation and payment of origination fees of approximately $400,000 by Staff America to Brentwood, a purported letter of credit dated August 30, 2002, was to be provided on behalf of Staff America to CNA.  D.E. 214-11 at 14-15, 18.  Although Staff America paid the fees to Brentwood, Baumgardner understood that the beneficiaries of this payment were Huff, Spinelli, Pixler, those with whom they worked, and "whatever company they wanted it moved to, to include Brentwood and Certified and Midwest . . . , whoever."  *Id.* at 18.  The letter of credit provided turned out to be fake.  TT at 243-44.  According to Baumgardner, Huff was the leader of the group who provided the letter of credit at issue.  D.E. 214-11 at 55; *see also* TT at 318 (Spinelli's testimony that "I don't think there's any doubt that Mr. Huff controlled Certified and Midwest and, to a large extent, Brentwood.  Whatever he wanted to have occur occurred in . . . those three enterprises.").

79.     In September 2002, Baumgardner had another meeting with Huff, Pixler, Spinelli, Dobrin, and others.  D.E. 214-11 at 19-20.  This meeting concerned the provision of a second letter of credit.  *Id.* at 20.  Huff ran the meeting.  *Id.*  As Baumgardner described, "If Huff was present, Huff was in control. . . . [W]hat Huff said, went. . . .  If Huff wasn't happy, wasn't nobody going to be happy."  *Id.*  As a result of this meeting, a second letter of credit was issued to CNA on behalf of Staff America.  *Id.* at 22-23.  It, too, turned out not to be valid.  *See id.* at 23.

80.     In August and September 2003, CNA, to whom Certified had provided some of these fraudulent letters of credit, became aware that the letters of credit it was holding for Cura/Certified and its subsidiaries were not valid.  TT at 338-39; PX 966.  Although nothing in the appearance of the letters of credit tipped off CNA, when CNA attempted to draw on the letters of credit, Bank of the West and United California, the banks that purportedly issued the letters of credit at issue, informed CNA that they had no record of such letters of credit.  TT at 339, 347-48; PX 966. In all, sixteen letters of credit totaling in excess of $44 million were rejected as fraudulent.  TT at 339-40; PX 966.  These sixteen bogus letters of credit represent the only fraudulent letters of credit that William Romashko, a 38-year employee with CNA, is aware of that have ever been provided by policy holders to CNA.  TT at 350.

81.     In late 2003, CNA sued Midwest, Certified, and Huff personally regarding the bogus letters of credit.  TT at 951-52; *see also* D.E. 200-3 at 15.

82.     While this Court does not find that Huff had actual, definitive knowledge that the letters of credit were fraudulent, Huff's lack of concrete knowledge resulted solely from Huff's deliberate ignorance or, at best, severe recklessness.  First, Huff knew something was wrong when the logo of United California Bank on the letterhead fell off.  Indeed, that was the reason why he and McCartha called Leyton.   Second, Huff was certainly aware that if he learned that the letters of credit supporting the CNA policy were, in fact, fraudulent, CNA would have to be advised, and the letters of credit would have to be replaced – no easy feat.   Third, instead of contacting the purportedly issuing bank, the obvious source for ascertaining the validity of literally millions of dollars' worth of letters of credit, Huff called Leyton, who plainly had reason to lie regarding the legitimacy of the letters of credit, since he was paid to obtain them in the first place.  Fourth, even

after Leyton offered the flimsy, non-sequitur-of-an-excuse that the letterhead fell off because the letter of credit was a "sample," Huff did nothing to investigate the situation any further, even though a simple telephone call to the purportedly-issuing bank would have quickly resolved the entire multi-million-dollar matter.  Indeed, even Huff effectively acknowledged in his testimony that CNA should have been called.  *See* TT at 1405.

**The Risk Allocation Agreement**

83.     Meanwhile, sometime after February 13, 2003, Certified and Midwest executed the Risk Allocation Agreement ("RAA").  *See* DX 14.  Although the RAA indicates in its language that it was "made this 1ˢᵗ [d]ay of January 2002," DX 14, in reality, the parties did not execute the RAA until some time after February 13, 2003.  PX 115; D.E. 214-17 at 70; *see also* TT at 867-69.  In fact, Anthony Russo, who signed the agreement for Certified as an executive officer did not become a member of Certified's board of directors until April 27, 2002, and did not become the chief financial officer and chief executive officer of the company until August 7, 2002.  PX 831 at 49 (Business Experience).  Moreover, the first time that Certified referred to the RAA was in its 2002 10-KSB, filed March 31, 2003.  *See* PX 831 at 4-5 (Risk Management Agreement).

84.     Because the RAA was not executed until at least February 2003, at the time that Certified and Midwest executed the RAA, CNA was providing Certified's workers' compensation insurance coverage, and Certified was subject to a $1 million-per-occurrence deductible.  The RAA purported to bind Midwest to procure workers' compensation insurance and to provide workers' compensation claims administration and management in exchange for a service fee to be paid by Certified.  *Id.*  The service fee varied at different times during the relationship between 3.5% and 4.2% of the gross payroll of Certified's clients.  TT at 1307-08; *see also* DX 14.

85.     Russo signed the RAA on behalf of Certified, and Brown signed the RAA on behalf of Midwest.  As Brown did not sign any documents for Midwest unless Huff authorized her to do so, D.E. 214-17 at 14, Brown's signature on the RAA demonstrates that Huff was well aware of the contents of the RAA and had approved the agreement prior to Brown's having signed it in 2003.

86.     According to the terms of the RAA, Midwest was to, among other tasks, "retain and service Workers Compensation Insurance coverage . . . at its sole cost and expense . . . [and] assume responsibility for and promptly make all required payments in excess of the applicable deductibles." DX 14.  Nothing in the RAA bound Midwest to make any workers' compensation insurance or claims payments other than procurement and premium costs and amounts above the deductible.  *See generally* DX 14; *see also* TT at 855-59.  Because Certified was bound by the RAA to pay Midwest a service fee that greatly exceeded the cost of the insurance, *see* TT at 860-64, 1308; DX 14, however, Midwest's payment of Certified's premiums and claims cost Midwest nothing.  Instead, under the RAA Midwest could collect premiums and claims payments from Certified and pay that money to Certified's insurer on behalf of Certified.  *Id.* at 859, 864.  In fact, even if Certified failed to make its required insurance claim payments to CNA, Huff understood that under the RAA, Midwest would have no liability.  *Id.* at 859.  When Midwest collected money for insurance purposes from Certified or its subsidiaries, it had the obligation to use those monies to pay claims on behalf of Certified, its subsidiaries, and their clients.  *Id.* at 862.  In effect, Midwest essentially acted as a pass-through to the insurance companies.  On occasion, Midwest may have paid Certified's insurance premiums to the insurer and subsequently obtained repayment from Certified.  *Id.* at 859-60.

87.     Moreover, because the insurance companies were contractually bound to pay claims that exceeded the deductibles, despite the wording of the RAA, Midwest had no actual liability or risk for amounts beyond the deductible.  TT at 858-59; *see also* DX 14.  In addition, the RAA expressly provided that "Midwest's compensation . . . does not include the normal out-of-pocket expenses, including but not limited to long distance communication, airfare, hotel lodging and meals, transportation, express mail, etc., incurred by Midwest in performing the Services and carrying out its duties under the Agreement."  DX 14.  In other words, besides the fee that Midwest was to receive under the RAA, it was also to be reimbursed for any expenses incurred in conducting its alleged duties under the RAA.  In short, as the RAA was worded, it allowed Midwest to take a substantial amount of money from Certified and provide nothing of substance in return.  *See* TT at 863. Although Midwest drained a substantial amount of money from Certified under the RAA, Midwest did not take the full amount of the fee allowed under the agreement.  *Id.* at 863-64.

88.     Prior to the RAA's being put into place, Dobrin was provided with a copy of it to review and to comment upon.  TT at 117.  At the time, Dobrin was at Brentwood's offices in New York.  *Id.*

89.     Dobrin believed that Certified paid money to Midwest under the RAA to create a guaranteed-cost workers' compensation insurance program for Certified's operating companies (such as Cura), as opposed to continuing to have Certified obtain insurance coverage under a large-deductible policy as it had been from CNA.  TT at 89.  When Dobrin initially discussed the RAA with Huff, Huff advised Dobrin that the RAA involved a fixed, or guaranteed, cost program.  *Id.* at 90.  Under such a program, Certified would have paid Midwest the percentage required by the RAA, and in exchange, Certified's insurance costs would be fixed because Midwest would take care of

any costs outside of those provided by insurance, in exchange for the fee. *Id.* at 90-91. About a year or two later, however, Huff no longer considered the RAA a fixed program but, rather, viewed it simply as a method for facilitating payment of the risk-related services. *Id.* In contrast to a fixed program, this meant that despite paying Midwest a fee under the RAA, Certified remained liable for insurance costs that fell outside insurance coverage. *Id.*

90.     Certified faxed and Federal Expressed invoices to Midwest regarding premium and claim payments due the insurance carrier. TT at 523. Once Midwest received the invoices, Huff reviewed them and, in his sole discretion, determined whether the invoices would be approved. *Id.* at 524-25. On occasion, Huff refused to approve invoices. *Id.* at 525. When Huff did approve invoices, he then caused Midwest to pay them by check. *Id.* at 524-26. The money that Midwest used to pay the invoices came from Certified on a weekly basis. *Id.* at 526-27. Huff developed this program. *Id.* at 91-92, 129.

91.     With regard to duties that the RAA required Midwest to perform, Huff and Brown were the only individuals who had any substantive involvement in any such tasks. TT at 851-52.

**Brian Sly's Investments in Midwest and Brentwood**

92.     On February 1, 2002, Huff, as the sole signatory on behalf of Midwest, entered into a memorandum of understanding with Brian Sly, an investor. *See* PX 609. In this memorandum of understanding, Midwest, through Huff, promised to issue Sly convertible preferred stock in Midwest with a value of $12 million, in increments of $1.2 million per year for a ten-year period. *Id.* On the same day, Huff, as sole signatory on behalf of Midwest, entered into another agreement with Sly in which Midwest repurchased Sly's equity position in Midwest for $15,195,570. PX 576. Pursuant to

the terms of the agreement, Midwest guaranteed that it would pay the full amount in installments due over a ten-year period. *Id.*

93. On December 7, 2003, Sly sent Huff a proposed memorandum of understanding relating to discussions Huff and Sly had had regarding evenly splitting the assets, transactions, and fees of various entities. TT at 935-36. Although the agreement was never executed, TT at 1302, in the proposed memorandum of understanding, Sly identified numerous entities to be subject to the business proposition. *See* PX 575; TT at 936. According to Huff, Sly obtained the list of entities set forth in the proposed memorandum of understanding from Huff or Spinelli. TT at 936-38. One of the entities listed in the proposed memorandum of understanding includes "Anthony Huff and/or Brentwood Capital and/or Midwest Management LLC and/or Midwest Merger Management LLC and/or Brentwood International Group and/or Brentwood Financial Corp[.] and/or Brentwood Realty Inc. and/or any other affiliated, related or controlled entity of Anthony Huff or [S]heri Huff . . . ." PX 575; *see also* TT at 939-40. Another included Certified Services. PX 575; *see also* TT at 940.

94. On November 14, 2004, Huff, as the sole signatory on behalf of Midwest, entered into a memorandum of understanding with Sly in which the parties noted that previously, Sly had obtained from Midwest the option to purchase 2 million shares of Certified's common stock. PX 652; TT at 929-30. In the memorandum of understanding, Midwest, through Huff, granted Sly the option of converting any of his Certified shares into any other stock, note, financial asset, or ownership interest of Midwest of "any of its related entities or that of Anthony Huff and/or any of his related entities," for a period expiring on November 15, 2015. PX 652; TT at 929-30.

95.     On December 7, 2004, Huff, as the sole signatory on behalf of Midwest, assigned 350,000 common shares of Certified and 350 shares of Series B Convertible Preferred Certified stock to Sly as collateral for Sly's investments in Midwest, after Harmon Burns, a client of Sly, no longer required them as collateral in connection with the establishment of a letter of credit by Burns. *See* PX 643; PX 639; TT at 924-28.

96.     Sly also invested other monies in Midwest.  On these occasions, Huff similarly signed memoranda of understanding with Sly, committing Midwest to make repayment in full, plus interest.  TT at 897-901, 907-10; PX 548; PX 608; PX 636; PX 647.  Besides the monies noted previously, Sly's investments included additional amounts of $300,000, $750,000, $250,000, $120,000, and $500,000.  TT at 897-901; *see also* PX 548; PX 608; PX 636; PX 647.  When Huff entered into these agreements with Sly, he had the authority to do so, even though no written document bestowed such authority upon Huff.  TT at 899-901.

97.     In addition to investing in Midwest, Sly also invested in Brentwood.  TT at 910-11.  On the memoranda of understanding reflecting Sly's investments in Brentwood, Huff signed on behalf of Brentwood.  *Id.*; *see also* PX 612; PX 630; PX 631; PX 632.  Sly's investments in Brentwood concerned amounts including $2.2 million, $410,000, $90,000, and $10,000.  TT at 910-14; PX 612; PX 630; PX 631; PX 632.  As with the other memoranda of understanding memorializing Sly's investments in Brentwood, Huff signed on behalf of Brentwood as the sole signatory.  TT at 912-14; PX 630; PX 631; PX 632.

**Personal Expenditures of Corporate Funds**

98.     Once the money came under Midwest's control, Huff caused it to be spent, in substantial amounts for his own personal benefit and for the benefit of his family members.

99.     Between March 2003 and April 2004, Huff caused more than $240,000 in Midwest checks to be issued to Sterling Development in connection with the building of his residences and other personal matters.  TT at 961-62; PX 578.  Similarly, from May through September 2003, Huff caused approximately $136,000 in Midwest checks to be issued to Beth Baker Interior Design for services rendered with regard to the Huffs' 313 Longview Park Place residence.  TT at 966; PX 585.

100.    Huff likewise caused approximately $16,000 in Midwest checks to be issued to Future Designs, Inc., in July and August, 2003.  PX 584; TT at 967.  Huff explains these checks as possibly having been issued for the purpose of developing properties for Brentwood Realty.  TT at 964-65, 967.  The Court does not believe Huff.  Not only did Huff fail to tell the truth regarding other material matters in this case, these checks were also issued during the time frame in which the Huffs were decorating their 313 Longview Park Place residence and checks payable to Beth Baker Interior Design were issued.  Additional checks that Huff caused Midwest to issue to Brentwood Realty between January and June 2004 totaled more than $42,000.  PX 588; TT at 967.

101.    Between July and October 2003, Huff caused approximately $158,000 in Midwest checks to be issued to a company called Admiral's Anchor.  *See* PX 583; TT at 963-64.  These monies were for the purchase of various seacraft.  TT at 963-64.  The relevant marine vessels were purchased in the names of Sheri Huff and Midwest.  *Id.*

102.    Additionally, Huff Farms, a company unrelated to Certified but owned by the Huffs, *see* TT at 980; *see also* D.E. 214-17 at 27, received approximately $2,765,525 from Midwest.  *See* PX 564 - PX 566; PX 930 - PX 931.  In Midwest's QuickBooks records, however, many of the checks issued to Huff Farms were inexplicably reclassified as having been paid back through unrelated transactions that did not, in fact, repay the debt.  More specifically, in Midwest's

QuickBooks records, a register entitled "NOTE REC - HUFF FARM" captured Midwest checks paid for the benefit of Huff Farms.  *See* PX 566.  As the balance adds up over time, entries appear in the records effectively erasing the balance on the note receivable.  For example, on December 31, 2002, a $33,845.27 balance is zeroed out following a credit for "[f]acilities [m]aintenance."  *Id.* at 1. The balance on the note receivable then restarts at $0.  Again, it increases, this time hitting $991,519.98 before being negated with an entry dated December 31, 2003, identified as "NOTE PAY - Brian Sl[y]."  *Id.* at 11.  Because the entry is for slightly more than the outstanding balance, this time the new balance begins at -$6,159.52.  *Id.*  Once again, it continues to increase, reaching $968,599.87, when, on December 31, 2004, it is zeroed out with an entry reading "NOTE PAY - Brian Sl[y]."  *Id.* at 19.  In 2004 the balance then increases to $300,841.59 before being zeroed out on December 31, 2005, with an entry reading "NOTE PAY - Brentwo[od]."  *Id.* at 20.

103.    Although Huff claimed at trial that the "adjusting" entries were appropriate because Sly was Huff's "investor and lender" for Huff Farms, he told a different story in his deposition testimony.  *See* TT at 1108-13.  At that time, Huff gave the following testimony in response to the questions asked below:

> Q:    Some of the accounting we have seen from the QuickBooks shows balance will accrue on accounts, a note receivable from Huff Farms, and then it will be reclassified as a write-off to Brian Sly.  Does that make any sense to you?
>
> A:    [Witness shaking head in the negative].  I, I, I think you are correct, that Tony Russo made some general entries and adjustments that might not be correct.  But, you know, we are in the process, as soon as all of this is resolved, Midwest will be audited from front to back, and any of those, you know, entries will be corrected.

TT at 1110.  Consequently, The Court finds that Huff's latest version of the facts is not credible and that the QuickBooks records incorrectly characterize more than $2 million in monies that Huff Farms received from Certified through Midwest as having been paid back by Huff.

**Checks to Cash on Midwest's Bank Accounts**

104.    Huff directed Brown to cash checks made out to cash on Midwest's bank accounts and provide the money to Huff.  TT at 946-47.  When Huff received the money, Huff – and only Huff – stored it in a safe at his house.  *Id.* at 947, 957-58; D.E. 214-2 at 32.  These withdrawals began in approximately April 2002 and continued until roughly July 2004, with the frequency increasing to repeated times weekly  beginning in October 2002.  *See* PX 560; PX 562.  Often, the withdrawals totaled between $7,000 and $8,000 daily.   TT at 946-47.   In all, Huff caused approximately $2.6 million of Midwest's monies to be withdrawn in this way.  *Id.* at 948.

105.    Although Huff claims that he directed this activity to avoid the consequences of any asset freeze order that a court might impose in connection with litigation in which Huff was involved, *see* TT at 948-50, this Court does not find this explanation to be credible.  First, cash can also be subject to an asset freeze.

105.    Second, and more significantly, Huff's proffered explanation makes no sense.  Huff expressed concern that if a court suddenly imposed an asset freeze, the $2.6 to $2.7 million that Sly had invested might be at risk.  *Id.* at 948-49, 953, 957-58.  Thus, Huff explained, he wished to protect Sly's investment.  *Id.*  Although Huff contended that he feared being subjected to a sudden asset freeze without any notice and losing the entirety of Sly's $2.6 to $2.7 million investment, *see* TT at 948-49, he, nevertheless, spent more than two years systematically withdrawing money in amounts almost always under $10,000.  Had a desire to safeguard Sly's money from a hypothetical

sudden asset freeze really motivated Huff, this Court would have expected to see evidence that Huff took action all at once with respect to the entire $2.6 to $2.7 million in order to protect Sly's investment – or at least that Huff would not move a $2.6 million haystack of money straw by straw over more than a two-year period.

106.     Third, Huff's explanation regarding preserving Sly's investment is also inconsistent with what he told Pixler when Pixler questioned Huff about the stacks of cash in his safe.  More specifically, Huff told Pixler that he was keeping the money there for "emergency business purposes."  D.E. 214-2 at 32.

107.     Thus, this Court concludes that Huff caused the removal of the cash from Midwest in piecemeal fashion in an effort to disguise the fact that he was taking money out of Midwest for his own benefit.  The trial evidence shows that Huff was living an expensive lifestyle.  Among other such evidence, Roxann Pixler testified that the Huffs were spending a lot of money, purchasing luxury cars and diamonds.  TT at 178-79.  In addition, the Huffs had more than one residence and their own farm.

108.     Finally, this Court also finds suspicious the amounts of money removed per day.  In generally keeping the amounts to approximately $7,000 to $8,000 and under, Huff appears to have intended to avoid currency transaction-reporting requirements applying to aggregate transactions involving more than $10,000 in a single day.  *See* 31 U.S.C. § 5313; 31 CFR § 103.22.  During his testimony, Huff admitted some knowledge of currency transaction-reporting requirements.  *See* TT at 952-53.  These facts further support the proposition that Huff was attempting to hide his removal of the money.

**The Cura and Certified Credit Cards**

109.    Besides the Certified/Cura monies transferred to Midwest in connection with the RAA, Huff also expended Certified/Cura monies directly from Certified/Cura.

110.    In the summer of 2002, Danny Pixler approached Dobrin and told Dobrin that "it would be good if [he] could get a[] [Cura Group] American Express card for [Pixler] and [Huff]." TT at 95.  Pixler explained to Dobrin that when he and Huff had been affiliated with U.S. Trucking, he and Huff had had a problem with American Express whereby American Express had effectively barred them from obtaining an American Express card.  *Id.* at 96.  Consequently, Dobrin obtained the requested American Express cards for Pixler and Huff.  *Id.*  Later, Huff obtained another credit card in his own name on the account of Certified HR Services.  TT at 992-94; PX 866.  Between July 2000 and January 2006, Huff made approximately $280,000's worth of charges on these American Express cards.  TT at 741.

111.    The purpose of the Cura and Certified American Express cards that Dobrin obtained for Pixler and Huff was to charge company expenses.  *Id.* at 96.  It was not for personal expenditures.  *Id.* at 97.  Cura/Certified's American Express card bills from Pixler and Huff were paid using Certified funds.  *See* PX 591.

112.    Nevertheless, Huff made numerous personal or non-Cura/Certified-related charges on the Cura American Express card.  *See* PX 724, PX 725; TT at 969-91; *see also* TT at 742-49 (identifying questionable charges).  Although Huff claims that he understood that the expenditures that he charged on the American Express card would be charged back to him or his other entities, he admits that he has no knowledge of that ever happening.  TT at 969-72, 991.  Nor does any other evidence in the record suggest that Huff ever reimbursed Cura/Certified for these charges.

113.    While Huff suggested during his testimony that many of the apparently personal expenses he charged on the Cura card could have been business-related (albeit mostly non-Cura/Certified business-related), this Court does not find Huff's testimony to be credible.  First, even Huff himself was somewhat equivocal in this testimony.

114.    Second, Huff could point to no records to support his suppositions that the contested charges were not personal, even though according to Huff's testimony, it was his responsibility to reimburse Cura/Certified for any personal expenditures on the card.  If even Huff purported not to know whether charges were personal based on the American Express record entries, this Court cannot fathom how Cura/Certified was supposed to have known without the submission by Huff of receipts or other records indicating the personal nature of expenses.  Yet nothing in the record suggests that Huff ever provided Cura with any such documentation or reimbursed Cura/Certified for the amounts charged.  To the contrary, as indicated above, Huff conceded that he had no knowledge of actually having been charged back by Cura/Certified for his personal expenditures on that company's American Express card.

115.    Third, the record in this case demonstrates that Huff has a history of disguising his actions.  He has repeatedly arranged for others to act as front people while he has pulled the strings.  For example, in the case of Midwest, Huff did not identify himself as having any interest or office in the company until 2005 – after he had been running the company on a day-to-day basis for at least four years.

116.    Similarly, although Huff allegedly served as a consultant to Brentwood, he directed that his wife receive his salary in her name.  Likewise, as noted above, to this day Huff also does not admit that he controlled Certified, yet the evidence firmly establishes that he did.  Besides these

examples of the lengths to which Huff has gone to disguise his actions, as discussed above, Huff also directed the systematic withdrawal of approximately $2.6 million in cash from Midwest in increments of under $10,000 over a two-year period.  In short, the illustrations of Huff's efforts to hide the true nature of his actions abound in the record, and they support the conclusion that Huff testified less than truthfully when he believed that doing so would inure to his best interests, such as with regard to his personal charges on the Cura/Certified American Express cards.

117.    Fourth, as the evidence in this case demonstrates, Huff has testified less than credibly with respect to other material matters in this case, including each of the matters just discussed.  In fact, this Court concludes that Huff has testified in the manner he calculates to be most likely to benefit him at the particular time.  For example, in an apparent effort to lay a foundation for the admission of DX 7, a consulting agreement between Midwest and Certified that is dated January 1, 2003, Huff claimed at trial to have seen the document at or about the time it was executed.  TT at 1278-79, 1300-01, 1409-10.  On prior occasions in 2005 (SEC investigative testimony) and 2008 (deposition testimony in another lawsuit), however, Huff testified under oath that he had "never seen" the document before.[12]  *Id.* at 1409-12.

118.    Similarly, although Huff had no problem identifying the signatures of Brown and Pixler on DX 7 and the RAA (DX 14) at trial when he needed to establish a foundation for the admission of these documents, *see* TT at 1273-75, 1278-79, 1300-01, 1409-10, on prior occasions when adverse parties have asked Huff to identify Brown's signature and Pixler's signature, he has refused to do so, stating that he had "no idea" of whether a signature was Brown's or Pixler's, he

---

[12]Because Brown did not sign agreements on behalf of Midwest unless Huff so authorized her, meaning that Huff must have seen the agreement prior to its execution, Huff was likely lying with respect to this issue during his deposition.

was "definitely not a handwriting expert," and "I'm not good at this. I don't know. I don't pay any attention to that." TT at 1412-14.

**Total Financial Benefit from Certified to Huff and His Entities**

119.    As a result of the RAA, more than $130 million of Certified's funds were transferred to Midwest. TT at 1002-1051; PX 600; PX 875; PX 879; PX 932; PX 886; PX 879B; PX 879B2; PX 879B4; PX 879B5; PX 879B7; PX 879B8; PX 879B10; PX 879B11; PX 879B13; PX 879B15; PX 879B17; PX 879B19; PX 879C; PX 886A3; PX 886A6; PX 886A10; PX 886A14; PX 886A32. Although Huff contends that the actual amount flowing from Certified to Midwest was $123,054,635, *see* TT at 1002-03, 1302-26, this Court finds Huff's testimony to be unreliable.

120.    The Court arrives at the $130 million figure by adding several smaller sums. First, the Court begins with $123,054,634.61, the amount of money that Huff concedes Midwest received from Certified. *See* TT at 1002-03; PX 908 at 4, 71. This amount, however, fails to capture all Certified monies that Midwest obtained, as it was derived from Midwest's QuickBooks records, which were inaccurate and omitted deposits from America's PEO, a subsidiary of Certified; deposits from Certified into Midwest's "Surplus" bank account; a $2 million wire transfer by Brown from a Certified account into a Midwest savings account; and deposits by Certified into a Midwest bank account held at Signature Bank. TT at 1000-54; PX 553; PX 600; PX 875; PX 877; PX 879; PX 879B; PX 879C; PX 886A; PX 908; PX 932; *see also* PX 994 *in relation to* TT 1102-07.

121.    Significantly, although the deposits from Certified into the three Midwest accounts identified above were left out of Huff's proposed total funds that Midwest received from Certified, Huff, nonetheless, asks the Court to credit Midwest for monies it paid for the benefit of Certified, coming out of these accounts. *See* DX 159; DX 160; DX 161. The defense cannot have it both

ways, and this Court concludes that the deposits described above must be included in the total amount of money that Midwest received from Certified.  When added to the $123,054,634.61 figure that Huff supports, the total exceeds $130 million of funds that went from Certified to Midwest.

122.    As for the monies that Midwest expended for the benefit of Certified, Huff directs the Court to DX 159 and DX 160 (p. strat 000003 of DX 23, which Defendants submitted to the Court prior to trial but did not seek to admit at trial as DX 23),[13] along with the documentation submitted after trial in support of these exhibits.  *See* D.E. 275 - D.E. 288.  During the trial, Huff testified on direct examination regarding monies that Midwest received from Certified and monies Midwest spent for the benefit of Certified and its subsidiaries and successors.  *See* TT at 1302-32.

123.    To assist in his testimony, Huff referred to a chart prepared by R. Wayne Stratton ("Stratton"), an accountant Defendant hired who did not testify at trial.  *See id.*  At trial, however, Defendant submitted no documentation to show how the numbers on the one-page summary chart were developed.  *See id.*  Moreover, when Huff claimed to have reviewed the underlying bank records in working with Stratton to prepare the chart, the SEC protested that Huff had failed to produce the documents to the SEC, although required to do so under Rule 1006, Fed. R. Evid., when seeking to admit summary evidence.  *Id.* at 1321-23. Although counsel for Huff initially suggested that Huff had, in fact, produced the documentation,[14] the SEC noted that Stratton had testified in the summer of 2009 – after Huff had already made all of his document productions to the SEC in this

---

[13]For clarification purposes, the Court notes that the CM/ECF exhibit descriptions mistakenly identify a number of the supporting documents as supporting "Exhibit 169."  The Court understands that, in fact, these documents support DX 159 and DX 160.

[14]Ultimately, counsel for Huff candidly conceded that he did not know whether Defendant had produced the underlying documentation.  TT at 1332.

case – that he had not yet received the underlying documents necessary to perform his analysis.  TT at 1322-23.  Consequently, the SEC reasoned, Huff could not have produced the underlying records to the SEC.  *Id.*

124.    Alternatively, Huff argued that the SEC had obtained the underlying records directly from the banks on its own initiative.  TT at 1323-24.  The SEC did not contest this assertion, but noted that even if the SEC had the documents, no evidence existed to demonstrate that Huff did.  *Id.*  Based on the fact that the SEC had obtained the underlying documentation, the Court allowed the summary chart in.  *Id.* at 1324-25.  Nevertheless, the Court cautioned that it was wary of giving the exhibit any weight at all because the record provided no indication of any supporting documentation for the numbers in DX 160, and further, the evidence tended to suggest that, contrary to Huff's testimony at that time, he could not have reviewed any underlying records about which he was testifying.  *Id.* at 1320-26.

125.    Huff therefore requested the opportunity to submit the documentation underlying the calculations appearing in DX 160 after trial, as well as to provide an explanation of them at that time.  TT at 1332-33.  The Court explained,

> Here's my concern.  Right now, we have Mr. Huff here.  He's on the witness stand; he can be cross-examined.  I can't enable the SEC to cross-examine a piece of paper.  While I have no problem with the underlying records which the SEC has a copy of anyway, although they have obtained them in a separate way, . . . . I would have concerns about representations that would come up afterwards because they would not be subject to cross-examination.  So I would ask that any kind of representations that you would expect to be making or have Mr. Huff making, actually, that he make them at this time so that the SEC has [an] opportunity to cross-examine him.  I think that's only fair.

TT at 1333.   The SEC had no objection to the post-trial filing of the underlying documentation, so the Court authorized it, but expressly instructed Defendant and Relief Defendants that it should contain nothing but the underlying documentation itself.   *Id.* at 1334-35.   The Court further cautioned Defendant and Relief Defendants that they would need to present during trial any other information necessary to understand DX 160 and the manner in which the documentation relates to it so that the SEC could conduct cross-examination on such matters.   *Id.*   After the Court advised Defendant of this condition, defense counsel announced that he had no further questions for Defendnat.   *Id.* at 1335.

126.    Cross-examination then revealed that Huff had no real understanding of how the numbers appearing on the summary chart were derived.[15]   *See* TT at 1335-96.   For example, with regard to monies allegedly paid by Midwest for the benefit of Certified, the summary chart in DX 160 has a line identified as "Adjustments for additional revenue due Midwest[:] $114,706,417."   The defense represented that the payments contained in these amounts accounted for monies that Midwest spent for the benefit of Certified and therefore deducted this amount (as well as others) from the monies that the defense contended that Midwest received from Certified.   The number $114,706,417, urged by the defense, is derived from adding $108,696,858.63 and $6,009,558.57.   TT at 1320.

127.    The number $108,696,858.63, in turn, comes from D.E. 287-3 at 38-50 (first 13 pages of 35-page Vendor QuickReport) and D.E. 286-13 at 32-54 (last 22 pages of 35-page Vendor

---

[15]Despite Huff's lack of competency to testify to the materials contained in DX 159, DX 160, and D.E. 275 - D.E. 278, the Court, nonetheless, has carefully reviewed each and every page of the thousands of pages of filings to see whether the underlying documents actually support the numbers contained in the DX 160 summary chart.   They do not, as demonstrated in these Findings of Fact and Conclusions of Law.

QuickReport), and the number $6,009,558.57 comes from DX 159 at strat 000123 - strat 000160 (in what Defendant and Relief Defendants submitted pre-trial as DX 25 but did not seek to admit it under that number at trial, instead choosing to incorporate it into DX 159).  First, Huff admitted that he had not even read the entire exhibit.  TT at 1336.  Furthermore, he showed a lack of understanding of what it contained.  More specifically, because the defense deducted the $114,706,417 as monies that Midwest spent for the benefit of Certified, from the amount that the defense contended that Midwest received from Certified, to the extent that any amounts aggregated into the total of $114,706,417 actually were not spent by Midwest for the benefit of Certified, they should not have been included in this number.

128.    Huff did not seem to understand this concept, instead insisting that if expenditures he admitted on cross-examination were not for the benefit of Certified were excluded from the $114,706,417 that the defense argued that Midwest had spent for the benefit of Certified, the bankruptcy settlement with the Certified trustee would no longer be valid.  TT at 1342.  The settlement with the Certified trustee, however, has nothing to do with the accuracy of the defense's own exhibit purporting to show how much money Midwest spent for the benefit of Certified.  The two matters are simply unrelated.  Moreover, the $114,706,417 number was derived from the information in Midwest's QuickBooks records, which, as noted previously, were incorrect and unreliable.

129.    Most significantly, cross-examination revealed that the numbers comprising the $114,706,417 included numerous expenditures by Midwest that did *not* benefit Certified, even by Huff's own admission.  Among these, for example, Huff conceded that monies Midwest paid related to U.S. Trucking, or LMRI, were not for Certified's benefit.  TT at 1338-41, 1353-54; *see also* TT at

211-12 (Spinelli's testimony that LMRI had no connection with Certified).  Included in this group

were certain payments to the following: (1) Eric Gruber; (2) Scott Zoppoth; (3) Monarch; (4) Wells

Fargo; (5) Nelligan Tarpley, *et al.*;[16] and (6) All States World Cargo; *id.* at 1338-41, 1353-54; *see*

*also* TT at 212-14 (Spinelli's testimony that payments to Wells Fargo, Monarch, All States World

Cargo, and Nelligan Tarpley would not benefit Certified).  In addition, Huff agreed that payments to

the following that were included in the $114,706,417 did not benefit Certified: (1) Edgarfiling.net,

TT at 1340; *see also id.* at 212 (Spinelli's testimony that payments to Edgarfiling.net would not

benefit Certified); (2) Momentum Holdings, *id.* at 1341; (3) Eugene Cronin, *id.* at 1348-52; (4)

Marvin Kabori, *id.* at 1341-42; 1349-52; and (5) certain payments to Brian Sly,[17] *id.* at 1349-52.  Yet

payments by Midwest for the benefit of these entities and individuals or in connection with the

settlement of LMRI riddle the check detail showing how the defense arrived at its figures.  *See, e.g.,*

DX 159, *generally*, at strat 000091 - strat 000160 (straddling what the defense submitted pre-trial as

the second part of DX 24 and the first part of DX 25).

      130.    Huff also admitted that the report showing how the $108,696,858.63 was calculated

contained duplicate entries.  TT at 1356-57.  The reports further credit Midwest as having made

payments for the benefit of Certified, for more than $20 million it paid to Brentwood.  *See* DX 159

---

[16]Huff subsequently claimed that he did not know whether monies paid to Nelligan, Tarpley, *et al.*, related to LMRI.  *See* TT at 1359.  This Court finds Huff's assertion to be lacking in credibility.  Not only did he previously testify to the opposite, but also the memo lines on checks to Nelligan, Tarpley, *et al.*, clearly indicate that they pertain to "Logistics Management," the first two words for which "LMRI" stands.  *See, e.g.,* D.E. 287-1 at 50, 53, & 54.  Similarly, the check detail report identifies the payments to Nelligan, Tarpley, *et al.*, as being for "LMRI." *See, e.g.,* DX 25 at strat 000135.

[17]As previously reviewed, Sly invested with Midwest and Brentwood and did not invest directly with Certified.

at strat 000162 - strat 000167.  While the Court believes that at least some of the money Midwest paid to Brentwood did, in fact, benefit Certified, it has no way of knowing precisely how much. Moreover, this information would seem to be uniquely in the possession of Midwest and Brentwood (and, therefore, Huff).

131.    Not only does the Brentwood total fail to account for monies that Brentwood sent back to Midwest, TT at 1372-76, but also Spinelli testified credibly that he and Huff were partners in Brentwood, and Huff received monies from Brentwood.  *See* TT at 196-97, 293-26, 309. Consequently, paying Brentwood was like paying Huff.  As Spinelli explained, the relationship between Huff and Spinelli regarding their partnership as far as the use of Midwest and Brentwood's funds went was that "they were interchangeably used . . . ." *Id.* at 229-30.  Indeed, Spinelli testified that Brentwood paid bills for the personal benefit of Huff and, further, that it paid monies to Midwest.  *See id.* at 224-29, 260-63; PX 164, PX 167; PX 173; PX 178; PX 180.  According to Spinelli, "[I]t was a partnership and . . . if [Huff] requested money, [Brentwood] would accommodate it as we could."  TT at 226; *see also id.* at 263.  Yet the defense's numbers do not deduct from its calculation of monies spent for the benefit of Certified any amounts that Brentwood paid to Huff or for the benefit of Huff.

132.    Furthermore, although Brentwood received some payments from Midwest relating to potential workers' compensation claims, that program did not begin until June 30, 2003.  *Id.* at 215-16.  Thus, no payments to Brentwood before that date were related to workers' compensation claims.  *Id.*  Nevertheless, Defendant and Relief Defendants included pre-June 30, 2003, payments to Brentwood in their calculations of monies that Midwest paid for the benefit of Certified.  For these reasons, without any records at all from Brentwood (or any documents supporting the

contention that the amounts sent to Brentwood were all for the benefit of Certified), this Court declines to conclude that all $20 million that Midwest paid Brentwood – or even a substantial portion of that amount, in fact, benefitted Certified.

133.    Besides these errors in the calculations, Spinelli testified that payments to John Burcham for jet fuel and to Huff Farms did not inure to the benefit of Certified.  TT at 213-15.

134.    As for payments to Spinelli that the defense deducted as monies Midwest paid for the benefit of Certified, Spinelli testified credibly that he had no knowledge of how the $10,000 he received each week from Midwest benefitted Certified.  TT at 215.

135.    In addition to the deficiencies in methodology rendering the defense's $114,706,417 number unreliable, the DX 160 summary chart credits Midwest $10,290,000 for the "[p]urchase price of Certified/Cura from trustee."  In the Certified/Cura bankruptcy purchase transaction, O2HR, LLC ("O2HR")  purchased the bankruptcy estate of Certified/Cura.

136.    O2HR was a company over whose ownership Huff had "significant influence" and "significant control."  TT at 1201-02.  According to James Feltman, the Chapter 11 bankruptcy and liquidating trustee for the estate of Cura/Certified, the ownership structure of O2HR was "similar" to that of the other entities involved in the Cura/Certified bankruptcy settlement.  *See id.* at 1164-65, 1204-06.  These entities included Certified, Midwest, and Brentwood.  *See* D.E. 288-3 at 2.  More specifically, Feltman explained that for all of these entities, regardless of what the ownership structure looked like on paper, the actual owner, directly or indirectly, was Huff.  *Id.* at 1205-06.

137.    As a result of the Certified/Cura bankruptcy purchase transaction, O2HR acquired Certified/Cura, a "turnkey PEO business which included, most importantly, the [workers' compensation] insurance contract."  TT at 1200.  Trustee Feltman further explained, "It's not easy to

obtain a workers' comp policy that's configured the way the [policy that O2HR obtained as a result of the transaction] was.  Employees, a network, an operating business, a location, so that . . . the book of business . . . could move directly from one owner to another without interruption, or any disruption to worksite employers.  That was a critical issue for anyone in this business." *Id.* at 1200-01.

138.    In exchange for what O2HR received from the transaction, O2HR paid a little bit more than $11 million.  *See* D.E. 288-3 at 5; *see also* TT at 1193, 1199-1200.  Although the trustee required Huff to provide a personal guarantee for the $10,290,000 promissory note that O2HR was to pay in furtherance of the transaction, the bankruptcy estate received all of its payments on this note from O2HR; Huff made no direct payments on it.  TT at 1199-1200.

139.    As a result of the bankruptcy settlement, unsecured creditors of Certified will receive between $.15 and $.30 on each dollar Certified owed, and the Cerified/Cura estate will be left approximately $40 to $50 million under water.  TT at 1188-90, 1209.  Because Huff controls O2HR and he controlled Certified, Huff, effectively, was able to re-obtain Certified, along with its assets, while receiving a substantial break on Certified's liabilities.  In other words, Huff re-acquired the benefits of controlling Certified without having to continue to be responsible for significant debts that Certified, when Huff had previously controlled it, had incurred.  This Court fails to see how these monies tendered in the O2HR bankruptcy transaction were paid for the benefit of Certified; rather, they were paid for the benefit of Huff.

140.    In short, although Huff and the Relief Defendants assert that Midwest expended more money for the benefit of Certified than Certified obtained from Midwest under the RAA, this Court does not agree with this assessment.  Not only, as explained previously, are the numbers that

Defendant and Relief Defendants used on both sides of the equation deficient, but even the bankruptcy trustee, who Defendant and Relief Defendants urge this Court to rely upon, found that Midwest took more from Certified than it received.  TT at 1201.

### C.  The Certified SEC Filings

141.    From at 1996 through 2005, Certified's common stock was registered with the SEC and its stock was publicly traded.  *See* PX 832 at Part II, Item 5.  In 2002, the stock price ranged from $.38 - $1.80.  *Id.*  In 2003, the stock price ranged from $.52 - $1.55.  PX 823 at 21; PX 822 at 21.

142.    During this time, Certified filed quarterly reports and amended quarterly reports, as well as annual reports and amended annual reports, with the SEC.  *See* D.E. 217 at 6-8.  Certified failed, however, to file its 2004 Form 10-K and subsequent quarterly Form 10-Qs and 10-Ks.  TT at 1191.  In 2005 Certified filed for bankruptcy.  *Id.*; *see also* D.E. 288-3.

143.    As of February 28, 2003, the value of stock of non-affiliated holders of Certified's common stock was $4,036,439.  DX 831 at 2.  By March 17, 2004, the value of stock of non-affiliated holders of Certified's common stock had grown to $5,482,811.  DX 822 at 2.  In bankruptcy, however, only a $100,000 fund was created for the shareholders' benefit.  TT at 1180.  In addition, Certified's estate was left with between $40 and $50 million of unpaid claims.  TT at 1188-90.  Although the bankruptcy trustee testified that as of the time of trial, no claims had been made on the $100,000 fund created for the shareholders' benefit, all of the $40 to $50 million in unpaid claims would have to be paid before Certified's shareholders could receive anything above the $100,000 fund.  *Id.*

144.    While Huff did not sign Certified's public filings, he, nonetheless, was aware of their contents and approved them.  Spinelli sent drafts of filings and the actual filings to Huff for him to "sign off" on them.  *See* TT at 201-02.  Moreover, Dobrin had conversations with Huff about the SEC filings.  TT at 122-23. In addition, on one occasion, Dobrin was present at Brentwood and Certified's offices in New York when Huff and Pixler met with Frank LaForgia, an outside auditor from a firm called Rosenberg Rich, regarding one of the upcoming filings.  *Id.* at 124, 130-32. During this meeting, the conversation became heated.  *Id.*  Spinelli further testified that an assistant of LaForgia had conversations with Huff and Pixler about Certified's financial statements.  *Id.* at 201.

145.    Documentary evidence further supports the finding that Huff was aware of and had input into the public SEC filings.  PX 464 is a facsimile transmittal addressed to Huff and Spinelli from Pixler.  It notes that following the cover sheet are the "[w]orkers' compensation agreement between [Midwest] and The Cura Group, Inc.";[18] a [m]emo of accounting principles (GAAP) that apply to the workers compensation agreement"; a "[s]chedule of potential related party transactions"; and a memo to Bankers Insurance Group "outlining the strong improvement to the Shareholders' Equity section of the [Certified] 10-QSB for the third quarter ended September 30, 2002."  PX 464.  The facsimile cover sheet further notes, "I look forward to your thoughts and suggestions regarding these documents."  *Id.*

---

[18]The Court understands this to be a reference to what ultimately became the RAA.  The fact that on January 28, 2003, Pixler was sending it to Huff and Spinelli for "thoughts and suggestions regarding these documents" further demonstrates that the RAA had not been entered into as of January 1, 2002, despite the RAA's claim to the contrary.

146.    The content of the SEC filings, including the content of audited financial statements appearing in the SEC filings, was the responsibility of the management of the filing company.  *See, e.g.*, PX 831 at Independent Auditors' Report (dated Mar. 21, 2003) & at Certifications.

**Certified's Third-Quarter 2002 10-QSB Report**

147.    On November 14, 2002, Certified filed its third-quarter 2002 10-QSB report.  *See* PX 832.  This report contained materially misleading and false statements.  As a result, the manner in which certain items were accounted for created the false impression that Certified's shareholders enjoyed $12 million in equity, when, in fact, Certified was insolvent and shareholders' equity was negative.

148.    In support of this fact, the SEC presented the expert testimony of R. David Wallace ("Wallace").  Wallace has been licensed as a certified public accountant ("CPA") for the past 44 years.  TT at 581.  Additionally, he spent approximately 19 years (16 while a CPA) working for Deloitte.  *Id.* at 581-82.  While at Deloitte, Wallace served as an audit partner for eleven years.  *Id.* He also held the position of national director of banking at Deloitte, an accounting firm.  *Id.*  In his capacity as an engagement partner with Deloitte, Wallace was ultimately responsible for the conduct and outcome of an audit performed in accordance with generally accepted accounting principles ("GAAP").  *Id.* at 582.

149.    Wallace's experience also includes having served as the chief financial officer of a $135 million company.  *Id.* at 582-83.  In that role, Wallace was involved in all aspects of the company's financial and accounting reporting.  *Id.*  He further bore the responsibility of preparing the company's financial statements in accordance with GAAP so that they could be included in the company's filings with the SEC.  *Id.* at 583-84.  Since leaving Deloitte, Wallace has worked as a

litigation and forensic accounting consultant.  *Id.* at 584-85.  This Court finds Wallace's testimony to be reliable on accounting issues.  Defendant and Relief Defendant have not offered a contradictory expert (or any expert, although they retained an expert who was present in the courtroom during the trial, *see* TT at 1335-36).  Nor have they otherwise shown Wallace's testimony, as relied upon by this Court in these Findings of Fact and Conclusions of Law, not to be trustworthy.

150.    Wallace testified that the assets on the financial statement of Certified's 2002 third-quarter 10-QSB were overstated by approximately $9 million.  TT at 614-20.  In particular, Certified recorded $9 million of "[s]ecurity deposits" as assets.  *Id.*; *see also* PX 831 at 3.  These so-called "security deposits," however, referred to the total face value of the fraudulent letters of credit.  TT at 614-20.  The inclusion of the face value of these letters of credit is problematic for two reasons: first, the letters of credit were fraudulent, so no assets supported them.  TT at 617-20.

151.    Second, even had they not been, letters of credit do not constitute an asset.  *Id.* at 614-20.  Under GAAP, equity must be paid for.  *Id.* at 615.  Letters of credit, however, are not "a thing owned;" they cannot be converted to cash.  *Id.* at 615-16.  They have no value until they are drawn upon by the beneficiary – in this case, CNA, not even Certified.  *Id.* at 614-21.  In his 46 years of accounting, Wallace had never seen letters of credit recorded as an asset.  TT at 587.  Nor had any of the other four or five PEO businesses whose filings Wallace reviewed recorded them as such.  *Id.* at 780-84. Indeed, even Huff conceded that if CNA drew against the letters of credit, Certified would be liable in those amounts.  *See* TT at 866.  Thus, the letters of credit did not constitute assets, and, as a result, the assets on the financial statements were overvalued by approximately $9 million.

152.    On the other side of the equation, the liabilities were undervalued by about the same amount.  More specifically, the liabilities did not account for Certified's responsibility to pay workers' compensation claims under the deductible.  TT at 620-27; *see also* PX 832 at 3.  As Certified remained responsible for paying all continuing workers' compensation claims under the deductible and the face value of the letters of credit represents the insurer's estimate of the value of those liabilities, *see* TT at 335, Certified had an approximate $9 million liability for continuing workers' compensation claims, or the claims tail.  That liability should have been accounted for in Certified's financial statements.  *Id.* at 620-27.  It was not, even though other PEO businesses financial statements recorded this exposure as a liability.  *See id.* at 780-84.  As a result of Certified's failure to include its claims liability on its financial statements, the financial statements understated Certified's liabilities by $9 million.  *Id.* at 620-27.

153.    The net effect of the overvaluation of the assets and the undervaluation of the liabilities yielded an $18 million difference in the actual shareholders' value.  TT at 633-36. Consequently, instead of having $12 million in shareholders' equity, Certified was actually insolvent and had a negative shareholders' equity of -$6 million.  *Id.*

154.    Obviously, the difference between having $12 million in shareholders' equity and being insolvent – and not just insolvent, but having a negative shareholders' value of -$6 million – is a material one, and the misstatements and omissions in the 2002 third-quarter 10-QSB that masked Certified's actual financial condition are, therefore, necessarily material as well.

**Certified's 2002 10-KSB Report**

155.    Certified filed its 2002 10-KSB on March 31, 2003.  *See* PX 831.  This document mentioned the RAA for the first time.  *See id.* at 4-5 (Risk Management Agreement).  Its description

of the RAA, however, was materially misleading and false.  First, the report noted that Certified had entered into the RAA with Midwest, which was the principal and controlling stockholder of Certified.  *See id.*  The description of Midwest, as well as a later discussion of Midwest, *see* DX 831 at 10 (The Registrant is Economically Dependent Upon Its Principal and Controlling Stockholder), omits crucial facts that make it materially misleading for purposes of this annual report.  More specifically, the report fails to disclose that Huff controlled Midwest.  Nor could a stockholder discover such information through public filings because Huff hid his ownership and control of Midwest by making his wife, his secretary, and Roxann Pixler the owners and officers of the company on paper.  This fact is critical, in view of the fact that Huff's control of Certified is not identified elsewhere in the report and in light of the fact that Huff controlled both Certified and Midwest, meaning that under the RAA, Certified was making payments to a control person of Certified.

156.     Second, the report described Midwest as having assumed responsibility in the RAA for and promptly paying all required workers' compensation claims *below* the deductibles.  *See* PX 831 at 4-5.  Indeed, the filing stated that Midwest "agreed to assume all responsibility for managing the cost of workplace accidents that occur during the five[-]year term of the Agreement."  PX 831 at Note 13.  In fact, the RAA committed Midwest to do no such thing, and Midwest did not assume responsibility for claims below the deductibles.  For at least half of the period that this report covered, Certified had a $1 million-per-occurrence deductible.  Thus, the fact that Certified remained liable for any claims arising under that deductible had the significant potential to impact Certified's bottom line substantially.  Yet shareholders reading the report would incorrectly believe that Certified had no liability for claims under the deductibles.

157.    Third, as with Certified's third-quarter 2002 10-QSB, Certified's 2002 10-KSB overstated Certified's assets by recording the fraudulent letters of credit as approximately $18.7 million of "[i]nsurance deposits," thereby artificially inflating Certified's assets.  *See* PX 831 at Item 7. Financial Statements; TT at 653-59.  Similarly, Certified's 2002 10-KSB left out approximately $18.7 million in liabilities in the form of workers' compensation claims.  *See* PX 831 at Item 7. Financial Statements; TT at 659-60.  As a result of these misrepresentations, the 2002 10-KSB overstated the shareholders' equity by approximately $37 million.  Thus, instead of having $22.8 million in shareholders' equity, Certified shareholders had negative equity.

158.    Fourth, the report stated that the loss of Midwest's "services" in arranging for the placing of letters of credit and under the RAA would have a "material adverse effect" upon Certified's ability to continue in business.   PX 831 at Note 21, Contingencies - Economic Dependency on Majority Shareholder.  This statement created the false impression that Midwest was providing substantial benefit to Certified and that, but for Midwest and the RAA, Certified might go out of business.  In fact, precisely the opposite was true:  Midwest was providing no real value under the RAA and instead was using the RAA to loot Certified for the personal benefit of Huff and to the detriment of Certified.  Nor were the letters of credit that Midwest arranged for Certified of any value.  To the contrary, as previously discussed, the purported letters of credit were fraudulent and caused Certified to be sued.  *See* TT at 318.

159.    Fifth, the report failed to disclose Huff as a controlling person of Certified.  *See* PX 831 at Part III, Item 9.  Moreover, although the 2002 10-KSB included lengthy biographies of the disclosed officers and directors of Certified, it contained no biography about Huff, even though he was a controlling person of Certified.  *See id.*  Consequently, the report failed to reveal material

negative information about Huff, including his prior conviction for three counts of mail fraud relating to insurance, and his insurance debarment, both of which took on particular relevance in light of the fact that Huff was so involved in attempting to obtain Certified's workers' compensation insurance and in dealing with the insurance companies, including making and approving payments to the insurance companies through Midwest.  Obviously, the facts that Huff had recently been convicted of federal wire fraud relating to his dealings with insurance companies and had also recently been barred from acting as an insurance agent in Kentucky profoundly reflect upon Huff's qualifications to take on the role of dealing with the insurance companies on behalf of Certified. Moreover, the lack of inclusion regarding Huff's role in Certified created the false impression that Russo and Pixler were single-handedly running the company, when, in fact, Huff was actually controlling Certified.

160.    This Court finds all of these misrepresentations and omissions to be material in that a reasonable investor would review each such fact – and, certainly, all of them in combination – as significantly altering the total mix of information available concerning the value of Certified's stock. In addition, the Court concludes that Huff knew of each and every one of these facts and knew that failure to reveal the true facts would likely mislead investors in many ways.

161.    First, with regard to the failure to disclose Huff as a control person of either Certified or Midwest, as noted previously in these Findings of Fact and Conclusions of Law, Huff knew that officers, directors, and control persons had to be disclosed, as he, himself, had previously disclosed his affiliation with U.S. Trucking and Professional Transportation Group, Ltd., in their filings, and Huff had served as one of only two members of U.S. Trucking's Audit and Compensation Committee.  Huff also was well aware of the fact that when a report includes positive biographical

information, it must likewise contain any material negative biographical facts.  Indeed, Huff had disclosed such negative information regarding his 1994 bankruptcy in the U.S. Trucking filings.  At least in part in order to avoid disclosing the negative information pertaining to Huff's indictment, conviction, and insurance debarment, Huff schemed to control matters from behind the scenes and purposely attempted to make things appear on paper as though he had nothing to do with Certified.  That Huff went to such lengths to avoid disclosure of the fact that he controlled Certified (not to mention Midwest) further demonstrates that he understood the materiality of the information not disclosed.

162.    Second, as discussed previously, Huff was well aware of the contents of the RAA.  Moreover, as Huff – and only Huff – controlled Midwest, which used the RAA as a mechanism for looting Certified, Huff similarly knew full well that under the RAA, Midwest provided nothing of substance to Certified but instead employed the agreement to drain Certified of its resources.  He also understood that under the RAA Midwest was neither liable for Certified's insurance premiums and its insurance claims under the deductible nor for Certified's insurance claims over the deductible.  By falsely describing the potential loss of Midwest's role under the RAA as "a material adverse effect upon [Certified's] ability to continue in business," the 10-KSB implicitly acknowledges the materiality of the statements relating to the RAA.  Furthermore, Huff obviously knew that the disclosure of the true state of affairs – that the RAA was being used to provide a pretext for Midwest's removal of Certified's monies for the benefit of Midwest and Huff without providing anything real of value in return – would have significantly and materially adversely affected the interest of a potential shareholder in investing in Certified.

163.    Indeed, as it relates to the materiality of the issues discussed above, Rosenberg Rich

Baker, a firm that served as Certified's auditors, TT at 995, advised Certified in October 2004,

> [I]t would be necessary to expand significantly in the scope of our audit.   Specifically, [Certified] was advised that it would be necessary to audit, at a minimum, the books and records of [Midwest] as they might relate to a certain [RAA] between Midwest and [Certified].  Due to our resignation, we did not so expand the scope of our audit.  Had we done so, such auditing procedures may have had a material impact on the fairness or reliability of previously issued audit and review reports.  Further, as a result of an ongoing investigation being conducted by the SEC, certain matters may come to our attention that might lead us to believe that it might be appropriate to restate previously issued financial statements of [Certified].  Due to our resignation, we did not conduct such further investigation.

PX 231a.  Midwest was never audited.  TT at 996.  Instead, Rosenberg Rich Baker resigned as

Certified's auditors.

164.    Third, as this Court has already noted, misrepresentations regarding the assets and

liabilities of Certified are certainly material when, as here, they create the false impression that a

company has millions of dollars in shareholders' equity, even though the reality is that the

shareholders have negative equity, and the company is underwater.

165.    Finally, although the Court has already addressed Huff's knowledge of the contents

of the SEC filings, the Court emphasizes the significance of the contents of the facsimile transmittal

to Huff from Pixler regarding the 2002 SEC filings [PX 464].  The fact that the facsimile transmittal

focused on "a [m]emo of accounting principles (GAAP) that apply to the [RAA]"; a "[s]chedule of

potential related party transactions"; and a memo to Bankers Insurance Group "outlining the strong

improvement to the Shareholders' Equity section of the [Certified] 10-QSB for the third quarter

ended September 30, 2002," further demonstrates that Huff understood the materiality of these

issues in the SEC filings and that these matters represented substantial issues to Huff. Indeed, this facsimile transmittal also suggests that Certified attempted to use the misstated financial information as leverage with Bankers Insurance Group, thus further underscoring Huff's understanding of the importance of the false financial information. In addition, the facsimile transmittal demonstrates that Huff was aware of and considered the application of GAAP in preparation of Certified's SEC filings. Huff's heated discussion with LaForgia, whose function was to audit Certified's financials, also provides evidence of Huff's involvement in the process of reviewing and approving Certified's SEC filings.

### Certified's 2002 10-KSB/A

166. Certified filed its 2002 10-KSB/A on April 10, 2003, and attached the RAA to it. *See* D.E. 830. As noted previously, the attached RAA provided that "Midwest shall . . . assume responsibility for and promptly make all required payments [for workers' compensation claims] in excess of the applicable deductibles." D.E. 830 at RAA (Exhibit 10(a), ¶2.(iii)). This statement gave the false impression that Midwest was responsible for paying claims in excess of the deductible when, in fact, Certified's insurance carrier, not Midwest, bore the responsibility for paying claims beyond the deductible, thus creating the false notion that Midwest was actually providing something of real value in exchange for the monies Certified paid to it. For the same reasons that misrepresentations about the RAA and the value of Midwest's services were material in Certified's 2002 10-KSB, this misrepresentation was material.

### Certified's First-Quarter 2003 10-QSB

167. Certified filed its first-quarter 2003 10-QSB on April 30, 2003. *See* D.E. 829. Like Certified's 2002 10-KSB, Certified's first-quarter 2003 10-QSB overstated Certified's assets by

recording the letters of credit as approximately $18.7 million of "[i]nsurance deposits," thereby artificially inflating Certified's assets and relying upon fraudulent letters of credit. *See* PX 830 at Item 1. Financial Statements; TT at 667-69. Similarly, Certified's first-quarter 2003 10-QSB left out approximately $18.7 million in liabilities in the form of workers' compensation claims. *See* PX 830 at Item 1. Financial Statements; TT at 669. As a result of these misrepresentations, the first-quarter 2003 10-QSB overstated shareholders' equity by approximately $37 million. Thus, instead of having shareholders' equity of $23.6 million, Certified's shareholders actually had negative equity. For the same reasons that misrepresentations about these issues were material in Certified's 2002 10-KSB, these misrepresentations were material.

**Certified's Second-Quarter 2003 10-QSB**

168.    On August 15, 2003, Certified filed its second-quarter 2003 10-QSB. *See* PX 827. Once again, the report overstated Certified's assets and understated its liabilities. More specifically, the report credited Certified's assets with approximately $47.5 million in "[i]nsurance deposits," which, in reality, were the fraudulent letters of credit. *See* PX 827 at Item 1. Financial Statements; *see also* TT at 669-71. Similarly, the second-quarter 2003 10-QSB failed to record as liabilities the corresponding approximately $47.5 million in workers' compensation claims liabilities for which Certified had provided the letters of credit. *See* PX 827 at Item 1. Financial Statements; *see also* TT at 671-72. As a result of these misrepresentations, the second-quarter 2003 10-QSB overstated the shareholders' equity by approximately $95 million. *See* PX 827 at Item 1. Financial Statements. Thus, instead of having $43.3 million in shareholders' equity, Certified shareholders actually had negative equity. For the same reasons that misrepresentations about these issues were material in Certified's 2002 10-KSB, these misrepresentations were material.

**Certified's Third-Quarter 2003 10-QSB**

169.    On November 18, 2003, Certified filed its third-quarter 2003 10-QSB.  *See* PX 824. In this report Certified revealed that it had been served on October 9, 2003, with a complaint by CNA regarding approximately $38 million in letters of credit that CNA alleged were "not authentic."  *Id.* at Note 3 - Insurance Deposits.  Additionally, another part of the report discloses that "the entire carrying value of the letters of credit of $45,640,000 was written off."  *Id.* at Supplemental Schedule of Non-Cash Investing and Financing Activities.  More than a year after the pre-September 16, 2002, incident where the bank logo fell off the letterhead and should have alerted Huff that the letters of credit were fraudulent, this report provided the first notice of the fraudulent letters of credit that Certified provided in a public filing.  As a result of these developments, Certified explained in its 2003 third-quarter 10-QSB, "the carrying value of the underlying insurance deposits ha[d] been written down to zero at September 30, 2003."  *Id.* at  at Note 3 - Insurance Deposits.

170.    Despite noting that the letters of credit were "not authentic," Certified's third-quarter 2003 10-QSB restated Certified's financial statements for the three months ended September 30, 2002, in setting forth a side-by-side comparison of them to Certified's financial statements for the three months ended September 30, 2003, and continued in the September 30, 2002, numbers to include the fraudulent letters of credit as assets.  *See id.* at Consolidated Statements of Operations.

171.    Although the third-quarter 2003 10-QSB did not include the letters of credit in Certified's statement of assets, it also failed to account for the corresponding approximately $46 million in worker's compensation liabilities, thereby significantly deflating the statement of Certified's liabilities.  *See id. & id.* at Supplemental Schedule of Non-Cash Investing and Financing

Activities (making reference to the fact that the insurers had required Certified and its subsidiaries to provide $45.6 million in letters of credit to cover the risk of non-payment of anticipated liabilities on the workers' compensation claims); *see also* TT at 675.  As a result, instead of having $6 million in shareholders' equity, Certified shareholders actually had negative equity.  For the same reasons that misrepresentations about these issues were material in Certified's 2002 10-KSB, these misrepresentations were material.

**Certified's 2003 10-K**

172.    Certified filed its 2003 10-K on March 30, 2004.  *See* D.E. 823.  As in the third-quarter 2003 10-QSB, although Certified knew that the letters of credit accounted for as assets in the year-end December 31, 2002, financial statements were fraudulent, in setting forth Certified's year-end financial statements for 2003 and 2002, Certified, nonetheless, continued to include the fraudulent letters of credit as an asset in the 2002 financial statements.  *See id.* at Certified Services, Inc., and Subsidiaries Consolidated Balance Sheets.

173.    Second, the 2003 10-KSB also recorded newly obtained letters of credit as assets, even though they should not have been recorded as such.  *See id.* at 27, 29, 31; *see also* TT at 681-83.  As a result, the assets were overstated by at least $3.5 million.

174.    Third, the 2003 10-KSB further contained material misrepresentations and omissions at Note 13-Related Party Transactions and Item 13-Certain Relationships and Related Transactions.  *Id.* at 40 & 56.  More specifically, the report noted that Certified had entered into the RAA with Midwest, which was the principal and controlling stockholder of Certified.  *See id.*  As discussed previously, the description of Midwest omits crucial facts that make it materially misleading for purposes of this annual report.  In particular, the report fails to disclose that Huff controlled

Midwest. Nor could a stockholder discover such information through public filings because Huff hid his ownership and control of Midwest by making his wife, his secretary, and Roxann Pixler the owners and officers of the company on paper. This fact is critical, in view of the fact that Huff's control of Certified is not identified elsewhere in the report and in light of the fact that Huff controlled both Certified and Midwest meant that Certified was making payments to a control person of Certified.

175. Fourth, these sections of the report also described Midwest as having assumed responsibility in the RAA for and promptly paying all required workers' compensation claims *below* the deductibles. *See* PX 823 at 56. Indeed, the filing stated that Midwest "agreed to assume all responsibility for managing the cost of workplace accidents that occur during the five[-]year term of the Agreement." *Id*. In fact, the RAA committed Midwest to do no such thing, and Midwest did not assume responsibility for claims below the deductibles. For at least half of the period that this report covered, Certified had a $1 million-per-occurrence deductible. Thus, the fact that Certified remained liable for any claims arising under that deductible had the significant potential to impact Certified's bottom line substantially. Yet shareholders reading the report would incorrectly believe that Certified had no liability for claims under the deductibles.

176. Fifth, the report failed to account for approximately $45.6 million in workers' compensation liabilities. *See* TT at 691-92; *see also* PX 824 at Supplemental Schedule of Non-Cash Investing and Financing Activities (making reference to the fact that the insurers had required Certified and its subsidiaries to provide $45.6 million in letters of credit to cover the risk of non-payment of anticipated liabilities on the workers' compensation claims). Although the figure for these liabilities comes from Certified's third-quarter 2003 10-QSB, nothing in Certified's 2003 10-

KSB suggests that the workers' compensation liabilities decreased between the filing of the reports. To the contrary, Romashko testified that because the letters of credit turned out to be fraudulent, CNA has had to pay out approximately $66 million in claims stemming from Certified's policy with CNA that expired at the end of June 2003. *See* TT at 342. Because of the failure to include the insurance claim liabilities in its financial statements, Certified's year-end 2003 balance sheets incorrectly represented that shareholders enjoyed equity of nearly $15 million, when, in fact, shareholder equity was actually negative by approximately $30 million.

177.   Sixth, the report failed to disclose Huff as a controlling person of Certified. *See* PX 823 at 47. Moreover, although the 2003 10-KSB included biographies of the disclosed officers and directors of Certified, it contained no biography about Huff, even though he was a controlling person of Certified. *See id.* at 48-49. Consequently, the report failed to reveal material negative information about Huff, including his prior conviction for three counts of mail fraud and his insurance debarment, which took on particular relevance in light of the fact that the 10-KSB falsely claimed that Midwest, another company Huff controlled, bore a significant amount of responsibility for providing Certified's workers' compensation insurance. For the same reasons that misrepresentations about these issues were material in Certified's 2002 10-KSB, these misrepresentations were material.

**Certified's First-Quarter 2004 10-Q**

178.   On May 12, 2004, Certified filed its first-quarter 2004 10-Q report. *See* PX 820. This report contained an entry for approximately $9.5 million for "[i]nsurance deposits" under assets. *See id.* at Part I - Financial Information. Of that amount, at least approximately $4.7 million was for letters of credit, which are not considered assets. *See* TT at 695-97; *see also* PX 820 at 7,

Note 3. In addition, the report failed to disclose a liability for workers' compensation claims other than $1.25 million that was already on the books of a company that Certified acquired. *See* PX 820 at 7, Note 5; *see also* TT at 696-99. As of the filing of Certified's third-quarter 2003 10-QSB, however, Certified's insurer had required $45.6 million in letters of credit to protect against the risk of non-payment of anticipated claims, and ultimately, CNA paid out approximately $66 million in claims stemming from Certified's policy with CNA that expired at the end of June 2003. *See* TT at 342. Nor does anything in Certified's first-quarter 2004 10-Q report suggest that these claims decreased significantly during the reporting period. Consequently, the report significantly undervalues liabilities and falsely reflects total shareholders' equity of approximately $17.1 million, when, in fact, shareholders' equity was negative. For the same reasons that misrepresentations about these issues were material in Certified's 2002 10-KSB, these misrepresentations were material.

**Certified's Second-Quarter 2004 10-Q**

179. On August 12, 2004, Certified filed its second-quarter 2004 10-Q. *See* PX 816. This report improperly booked letters of credit as assets under the heading "[i]nsurance deposits" and failed to account for Certified's continuing liability for insurance claims. *See id.*; *see also* TT at 700-06. For the same reasons that misrepresentations about these issues were material in Certified's 2002 10-KSB, these misrepresentations were material.

**Certified's Third-Quarter 2004 10-Q**

180. On November 18, 2004, Certified filed its third-quarter 2004 10-Q. *See* PX 814. This report again improperly booked letters of credit as assets under the heading "[i]nsurance deposits" and failed to account for Certified's continuing liability for insurance claims. *See id.*; *see*

*also* TT at 706-13.  For the same reasons that misrepresentations about these issues were material in Certified's 2002 10-KSB, these misrepresentations were material.

**Certified's Form 3**

181.    On June 23, 2004, Certified filed its Amendment Number 1 to Form S-3 Registration Statement.  *See* PX 816.  Certified filed its Amendment Number 2 to Form S-3 Registration Statement on June 24, 2004.  *See* PX 817.  The Forms S-3 both incorporated by reference, among other reports, Certified's 2004 first-quarter 10-Q, 2003 10-K, 2003 third-quarter 10-QSB, and 2003 second-quarter 10-QSB.  *See* PX 817 at 33; PX 818 at 33.  By incorporating these documents by reference, Certified re-issued the materially false statements contained in the respective reports and described previously.  For the same reasons that misrepresentations about these issues were material in the Certified filings incorporated into Certified's Form 3, these misrepresentations were material in Certified's Form 3.

### III.  Conclusions of Law[19]

#### *A.  Parties and Jurisdiction*

In this SEC enforcement action, the Court has jurisdiction over the subject matter and the parties pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, and Sections 21(d), 21(e), and 27 of the Exchange Act.  The parties do not dispute that venue properly lies in the Southern District of Florida, and the Court finds that to be the case.

#### *B.  The SEC's Claims*

---

[19]To the extent that any Conclusions of Law constitute Findings of Fact, they are adopted as such.

The Amended Complaint charges Defendant Huff with five counts of securities law violations. Count I alleges that Huff employed devices, schemes, or artifices to defraud in the offer of securities, in violation of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1). D.E. 15 at 23-24. Count II also asserts a violation of the Securities Act but contends that Huff, in the offer of securities, obtained money or property by means of false statements of material facts and omissions of material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and courses of business that are operating and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities, in violation of 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3). D.E. 15 at 24.

In Counts III through V, the SEC sets forth causes of action under the Exchange Act, 15 U.S.C. § 78a, *et seq.* Count III avers that Defendant Huff violated 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5 by, in connection with the purchase or sale of securities, employing devices, schemes, or artifices to defraud; making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaging in acts, practices, and courses of business that have operated as a fraud on the purchasers of such securities. D.E. 15 at 25. Similarly, Count IV asserts that Huff aided and abetted Certified, Russo, Pixler, and McCartha in committing the violations of the Exchange Act already described in Count III. D.E. 15 at 25-26. Finally, in Count V, the SEC alleges that Huff is a control person of Certified, and, as such, is jointly and severally liable with and to the same extent as Certified for its violations of Section 10(b) and Rule 10b-5 of the Exchange Act. D.E. 15 at 26-27.

*C.  Statute of Limitations*

Before reviewing the elements of each of the causes of action charged and considering the applicable burden of proof, the Court first addresses Defendant and Relief Defendants' argument that the statute of limitations precludes some of the relief that the SEC seeks. More specifically, Defendant contends that the statute of limitations precludes the SEC from obtaining any punitive relief against Defendant.[20]  D.E. 265 at 36.  In particular, Defendant notes that civil money penalties, an officer and director bar, and a penny stock industry bar all constitute "penalties" that are subject to the five-year statute of limitations on claims by the federal government under 28 U.S.C. § 2462. *Id.*  Observing that the SEC did not file its Complaint in this action until March 6, 2008, Defendant reasons that "all conduct for which punitive relief is sought against Anthony Huff must have first occurred after March 6, 2003[.]  [O]therwise it is barred by 28 U.S.C. § 2462 from consideration by the Court in imposing a penalty."  *Id.* at 37.

To resolve this issue, the Court turns first to the Securities Act and to the Exchange Act. Neither of these statutes, however, contains a statute-of-limitations provision that applies to enforcement actions by the SEC.  Nor do any other statutes expressly purport to establish a statute of limitations pertaining to the Securities Act or the Exchange Act.

Consequently, the Court considers Title 28, United States Code, Section 2462, which provides,

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless

---

[20]Defendant and Relief Defendants do not suggest, and the law does not support, the proposition that any statute of limitations bars the SEC's pursuit of injunctive relief against Defendant in this case.

commenced within five years from the date when the claim first
accrued if, within the same period, the offender is found within the
United States in order that proper service may be made thereon.

The Eleventh Circuit has noted that Section 2462, by its terms, "is generally applicable to

'proceeding[s] for the enforcement of any civil fine[, penalty, or forfeiture].'" *Trawinski v. United*

*Technologies*, 313 F.3d 1295, 1298 (11th Cir. 2002). Furthermore, numerous other courts have

applied Section 2462's statute of limitations to the penalty provisions of the Securities Act and the

Exchange Act. *See, e.g., SEC v. Koenig*, 557 F.3d 736, 739 (7th Cir. 2009); *SEC v. Quinlan*, 2010

WL 1565473, *5-*6 (6th Cir. Apr. 21, 2010); *SEC v. Leffers*, 289 F. App'x 449, 451 (2d Cir. 2008);

*Johnson v. SEC*, 87 F.3d 484, 485 (D.C. Cir. 1996); *SEC v. Miller*, 2006 WL 2189697, *7 (N.D. Ga.

July 31, 2006);[21] *United States SEC v. Kearns*, 691 F. Supp. 2d 601, 609-10 (D.N.J. 2010). Taking

into account the maxim that "'where 'the language Congress chose to express its intent is clear and

unambiguous, that is as far as we go to ascertain its intent because we must presume that Congress

said what it meant and meant what it said,'" *United States v. Browne*, 505 F.3d 1229, 1250 (11th Cir.

2007) (citation omitted), this Court agrees that the sweeping and mandatory language of Section

---

[21] Although this case applied Section 2462, it noted that the Eleventh Circuit "has issued
two cases that arguably suggest that no statute of limitations applies to a claim for civil penalties
brought by the SEC under 15 U.S.C. § 77t(d)." 2006 WL 2189697 at *8 n.9 (citing *SEC v.
Calvo*, 378 F.3d 1211 (11th Cir. 2004) and *SEC v. Diversified Corporate Consulting Group*, 378
F.3d 1219 (11th Cir. 2004) ("*Diversified*")). The Eleventh Circuit's holdings in this regard in
*Calvo* and *Diversified*, however, appear not to take into account the Eleventh Circuit's earlier
precedents, *Coghlan v. NTSB*, 470 F.3d 1300, 1305-06 ("According to its own terms, § 2462
applies to 'an action, suit or proceeding for the enforcement of any civil fine, penalty, or
forfeiture, pecuniary or otherwise,' except where Congress has otherwise provided. . . . Section
2462 encompasses . . . judicial proceedings . . . ."), and *Trawinski*, 313 F.3d at 1298. "Where
there are inconsistent panel decisions, 'the earliest panel opinion resolving the issue in question
binds this circuit until the court resolves the issue en banc.'" *Combs v. Plantation Patterns*, 106
F.3d 1519, 1532 (11th Cir. 1997) (citations omitted). Consequently, this Court finds that
*Coghlan* and *Trawinski* control and elects to follow those decisions.

2462 renders it applicable to proceedings seeking civil penalties under the Securities Act and the Exchange Act.

Thus, for purposes of evaluating whether any violations are subject to civil penalties, the Court must consider when the SEC's causes of action accrued in the instant case.  The Eleventh Circuit has held that an agency's enforcement action accrues at the time of the violation, and not upon discovery of the harm.  *Trawinski*, 313 F.3d at 1298.  In reaching this conclusion, the Eleventh Circuit implicitly rejected the so-called "discovery rule," which provides that a cause of action accrues "when 'the plaintiff learns, or should have learned through the exercise of ordinary diligence in the protection of one's legal rights, enough facts to enable him[,] by such further investigation as the facts would induce in a reasonable person[,] to sue.'" *SEC v. Buntrock*, 2004 WL 1179423, *12 (N.D. Ill. May 25, 2004) (quoting *Fujisawa Pharm. Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1334 (7th Cir. 1997) (citations omitted)).

Although the discovery rule does not affect the accrual date of the statutory period under Section 2462, in the appropriate circumstances, the doctrine of equitable tolling may toll the statutory period.  The doctrine of equitable tolling does not have an impact on the date of accrual of an action but rather tolls the statutory period once the accrual date has passed, when, "despite the exercise of due diligence, a [plaintiff] fails to timely bring an . . . action due to fraud or extraordinary circumstances beyond the [plaintiff's] control . . . ."  *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 700 (11th Cir. 2005) (citation omitted).

As the Eleventh Circuit has explained, "[W]hile this doctrine is not applicable to the time limitation imposed by every federal statute, it does apply to all federal statutes where the time limits are in the character of a true statute of limitations." *Id.* at 701 (citations omitted).  The time limits of

Section 2462 can fairly be characterized as a true statute of limitations, as the entire nature of the statute is directed at restricting the period within which certain types of actions may be brought. Indeed, the statute is entitled, "Time for commencing proceedings." It is therefore not surprising that several courts have concluded that Section 2462 is subject to equitable tolling. *See, e.g., Koenig*, 557 F.3d at 739-40; *Fed. Election Comm'n v. Williams*, 104 F.3d 237, 240 (9th Cir. 1996); *United States v. Core Labs., Inc.*, 759 F.2d 480, 484 (5th Cir. 1985); *Kearns*, 691 F. Supp. 2d at 610-11; *Penn. Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*, 2008 WL 4960090, *4 (W.D. Pa. Nov. 18, 2008); *United States ex rel. Tilson v. Lockheed Martin Energy Sys., Inc.*, 2004 WL 2403114, *22 (W.D. Ky. Sept. 30, 2004); *United States v. Firestone Tire & Rubber Co.*, 518 F. Supp. 1021, 1036 (N.D. Ohio 1981). This Court agrees with those courts and finds that Section 2462 is subject to equitable tolling. In the context of a bankruptcy case, the Eleventh Circuit has further explained that two types of cases generally support application of equitable tolling principles:

> First, when the fraud goes undiscovered because the defendant has taken positive steps after the commission of the fraud to keep it concealed, then the statute of limitations is tolled until the plaintiff actually discovers the fraud. . . . "Fraudulent concealment must consist of affirmative acts or representations which are calculated to, and in fact do, prevent the discovery of the cause of action." [*In re*] *Lyons*, 130 B.R. [272,] . . . 280. The identity of the party concealing the fraud is immaterial, the critical factor is whether any of the parties involved concealed property of the estate. *Id.* The second instance is the more mundane circumstance where the defendant has not actively concealed the fraud, and the plaintiff must then exercise due diligence in an attempt to discovery the fraud. *Id.* The limitations clock starts ticking when the plaintiff obtains – or should have obtained – knowledge of the underlying fraud. *Id.* . . . .

*In re Int'l Admin. Servs., Inc.*, 408 F.3d at 701.

Besides the equitable tolling doctrine, the SEC urges the Court to take into account the "continuing violations" doctrine. When the violation at issue continues to occur within the

limitations period, the "continuing violations" doctrine tolls the statute of limitations for a claim that otherwise would be time-barred. *Nat'l Parks & Conservation Ass'n v. Tenn. Valley Auth.*, 502 F.3d 1316, 1322 (11th Cir. 2007) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982) ("*Havens Realty*")).

In *Havens Realty*, for example, the plaintiffs included, among others, three individuals: Coles, an African American who attempted to rent a unit in one of the defendant Havens Realty's apartments in 1978; Coleman, an African-American "tester" who subsequently inquired on more than one occasion about renting at the defendant's properties and was denied; and Willis, a white "tester" who asked about renting on repeated occasions at the defendant's properties after Coles was denied, who was told that vacancies existed. Under the applicable statute of limitations, a claim for discriminatory housing practices had to be brought within 180 days of the violation. Yet only the last incident, which involved only Coles, had occurred within 180 days of the filing of the lawsuit. The Supreme Court, nonetheless, found all five incidents to constitute part and parcel of a single continuing violation. *Havens Realty*, 455 U.S. at 380. In explaining the basis for its decision, the Supreme Court stated, "Petitioners' wooden application of § 812(a), which ignores the continuing nature of the alleged violation, only undermines the broad remedial intent of Congress embodied in the [Fair Housing] Act . . . ." *Id.* (citations omitted).

Some courts have questioned whether the continuing violation doctrine applies to SEC enforcement actions. *See, e.g.*, *SEC v. Jones*, 2006 WL 1084276, *4 (S.D.N.Y. Apr. 25, 2006). The later decisions simply cite to the first opinion, however, which does not articulate any basis for hesitation in applying the continuing violation doctrine to SEC enforcement actions. *See, e.g.*, *Jones*, 2006 WL 1084276 at *4 (citing *de la Fuente v. DCI Telecom, Inc.*, 206 F.R.D. 369, 385-86

(S.D.N.Y. 2002); *SEC v. Caserta*, 75 F. Supp. 2d 79, 80 (E.D.N.Y. 1999); *SEC v. Schiffer*, 1998 WL

226101, *3 (S.D.N.Y. May 5, 1998)).

Other courts have relied upon the continuing violation doctrine to hold that enforcement

actions by the SEC fall within the statutory period.  *See, e.g.*, *SEC v. Ogle*, 2000 WL 45260 (N.D.

Ill. Jan. 11, 2000).  In reaching this conclusion, the Northern District of Illinois reasoned that

although the Seventh Circuit had not at that time applied the continuing violation doctrine to a

securities enforcement action, its basis for invoking the doctrine in other contexts applied with equal

force to the securities enforcement area. *Ogle*, 2000 WL 45260 at *4.  As the court explained,

> [The Seventh Circuit] noted, "[T]he earlier discrimination may only
> be recognized as actionable in light of 'events that occurred later,
> within the period of the statute of limitations.'" [*Hardin v. S.C.
> Johnson & Son, Inc.*, 167 F.3d 340 (7th Cir. 1999)].  Here, the SEC
> suffered from a similar inability to detect discrete violations until the
> alleged scheme was well underway and had created suspicious
> variations in Exsorbet's market.  Exsorbet's initial transactions likely
> did not raise red flags.  Moreover, the initial distributions in 1993
> allegedly occurred off the public record.  Ogle's resignation in 1996
> may have been the first indication of a problem.  At that point, the
> SEC had to piece together events of the previous four years in order
> to determine whether violations had in fact occurred.  Only when a
> more detailed picture of a long-term market manipulation scheme
> emerged would the SEC be able to state concrete violations of the
> securities laws.

*Ogle*, 2000 WL 45260 at *4.

This Court agrees with the Northern District of Illinois that, where the appropriate facts

exist, the "continuing violations" doctrine may apply to the statute of limitations in SEC

enforcement actions.  Looking to the purpose of the Securities Act and the Exchange Act, "[i]t is

very clear from the legislative history of these Acts that they were passed to protect the investor."

*Lincoln Nat'l Bank v. Herber*, 604 F.2d 1038, 1041 (7th Cir. 1979) (citing S. Rep. No. 47, 73d Cong.,

1st Sess., to accompany S. 875, Apr. 27, 1933; H.R. Rep. No. 85, 73d Cong., 1st Sess., to accompany

H.R. 5480, May 4, 1933; 77 Cong. Rec. 2983 (1933) (statement of Sen. Fletcher, who introduced

the bill)).  Indeed, the Senate Report accompanying the bill that, with changes, ultimately became

the Securities Act explained,

> The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion; to restore the confidence of the prospective investor in his ability to select sound securities; to bring into productive channels of industry and development capital which has grown timid to the point of hoarding; and to aid in providing employment and restoring buying and consuming power.

S. Rep. No. 47, 73d Cong., 1st Sess., to accompany S. 875, Apr. 27, 1933.

In view of *Havens Realty*'s example in applying the "continuing violations" doctrine to

effectuate congressional intent, this Court concludes that not applying the doctrine in the SEC

enforcement context could frustrate congressional purpose in enacting the Securities Act and the

Exchange Act in that the nature of certain types of securities violations is such that they necessarily

take time to detect.  While time passes, however, such violations can inflict significant harm on the

investing public.  If wrongdoers may continue to reap the benefit of their continuing violations with

no threat of punitive enforcement actions, then, for some, the possibility that they may eventually

merely have to return what may be left of their ill-gotten gains may become simply a cost of doing

business.  Such an outcome conflicts with congressional intent to prevent securities fraud.

Consequently, this Court finds that the "continuing violations" doctrine may apply where the

appropriate facts exist.

In determining whether facts justifying use of this doctrine exist, a court must "distinguish between the 'present consequences of a one-time violation,' which do not extend the limitations period, and 'a continuation of a violation into the present,' which does." *Id.* (quoting *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 658 (11th Cir. 1993), and citing *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006)).

In this case, under either the equitable tolling doctrine or the continuing violation doctrine, all of the violations alleged by the SEC fall within the period that the statute of limitations prescribes. The SEC filed the present action on March 6, 2008. *See* D.E. 1. And, with the exception of Certified's filing of its 10-QSB on November 14, 2002, *see* PX 832, every filing violation that the SEC charges in this case occurred on March 31, 2003, or later. *See* PX 831; PX 830; PX 829; PX 827; PX 826; PX 825; PX 824; PX 823; PX 820; PX 816; PX 814. Consequently, each of those filing violations falls within the five-year statutory period, without even considering the operation of the equitable tolling doctrine or the continuing violation doctrine.

As for the filing of Certified's third-quarter 2002 Form 10-QSB, filed on November 14, 2002, the material false statements involved Certified's assets, liabilities, and shareholders' equity. In this regard, the third-quarter 2002 10-QSB counted fraudulent letters of credit among Certified's assets. The fraudulent nature of these letters of credit was not revealed until Certified filed its third-quarter 2003 10-QSB on November 18, 2003. Thus, under the equitable tolling doctrine, the statute of limitations was tolled from November 14, 2002, through November 18, 2003, resulting in the expiration of the statutory period on November 18, 2008, well after the SEC filed its action in this case.

Alternatively, under the continuing violation doctrine, between November 14, 2002, when Certified filed its third-quarter 2002 10-QSB, and November 18, 2003, when Certified disclosed that the letters of credit were fraudulent, Certified made additional filings relying on the fraudulent letters of credit as assets. During the time that these filings were active (*i.e.*, from November 14, 2003, through November 18, 2003, when the 2003 third-quarter 10-QSB superseded them), the alleged violation continued. Thus, as with the equitable tolling doctrine, the statutory period did not expire under the continuing violation doctrine until November 18, 2008. As a result, all of the alleged securities violations occurred within the statutory period.

### D.  Burden of Proof

The SEC bears the burden of proof by a preponderance of the evidence on each of the counts that it brings under the Securities Act and under the Exchange Act and the SEC's supplementary rules. *See SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 & n.30 (1983); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 355 (1943). In seeking to satisfy its burden, the SEC may rely upon direct or circumstantial evidence. *Ginsburg*, 362 F.3d at 1298. "Circumstantial evidence has no less weight than direct evidence as long as it reasonably establishes that fact rather than anything else." *Id.* (quoting *Burrell v. Bd. of Trustees of Ga. Military College*, 970 F.2d 785, 788 (11th Cir. 1992)) (additional quotation marks omitted).

### E.  The Elements of the SEC's Charges

As noted previously, the Amended Complaint alleges that Defendant Huff violated Sections 17(a)(1), (2), and (3) of the Securities Act, Section 10(b) of the Exchange Act, and SEC Rule 10b-5. To establish a violation of Section 10(b) and Rule 10b-5, the SEC (as opposed to a private litigant)

must prove by a preponderance of the evidence that Huff made "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter."  *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 & 766 n.17 (11th Cir. 2007) (citing *Aaron v. SEC*, 446 U.S. 680, 695 (1980) & *SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002)). While proof of a violation of Section 17(a)(1) through (3) requires "[e]ssentially the same elements" in connection with the offer or sale of a security, a showing of scienter is not required for the SEC to obtain an injunction under Section 17(a)(2) or (3).  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (citing *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) (citing *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980))); *see also Merchant Capital*, 483 F.3d at 766 (citing *Aaron*, 446 U.S. at 697, 702).

All of these violations also require proof of an interstate commerce or mails element.  More specifically, under the Exchange Act, the SEC must demonstrate that Huff used the mails, an instrumentality of interstate commerce, or the facility of a national securities exchange in connection with the violation.  *See* 15 U.S.C. § 78j(b).  Similarly, the Securities Act contains as an element a requirement that a defendant have employed the mails or an instrumentality of interstate commerce in connection with the violation.  *See* 15 U.S.C. § 77q(a).

## Controlling Person Liability

For purposes of assessing the elements of the causes of action articulated in the Amended Complaint, the Court first considers Count V, which alleges that Defendant W. Anthony Huff is liable under Section 20(a) of the Exchange Act as a "controlling person" for alleged violations of Section 10(b) of the Exchange Act and of Rule 10b-5.  Section 20(a) of the Exchange Act provides,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation

> thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  In the Eleventh Circuit, a defendant is liable as a controlling person where the controlled person violated the securities laws, if the defendant "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability."  *Brown v. The Enstar Group, Inc.*, 84 F.3d 393, 397 (11th Cir. 1996) (citation and quotation marks omitted).  The Eleventh Circuit has expressly held that neither Section 20(a) nor the SEC regulation defining "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person," 17 C.F.R. § 230.405 (1995), appears to require participation in the wrongful transaction to establish liability. *Brown*, 84 F.3d at 397 n.5.  Nevertheless, the court has left open the question as to whether "power to control the general affairs of the entity primarily liable" means simply abstract power to control or instead refers to actual exercise of the power to control.  *Id.* at 397 n.6.

Although the Eleventh Circuit has not further opined on the meaning of "power to control the general affairs of the entity primarily liable," it has explored the congressional intent behind Section 20(a), finding,

> The legislative purpose in enacting a control person liability provision was to prevent people and entities from using straw parties, subsidiaries, or other agents acting on their behalf to accomplish ends that would be forbidden directly by the securities laws. [H.R. Rep. No. 73-152, at 12 (1933); *see generally* William O. Douglas, *Directors Who Do Not Direct*, 47 Harv. L. Rev. 1305 (1934); Loftus C. Carson II, *The Liability of Controlling Persons Under the Federal Securities Acts*, 72 Notre Dame L. Rev. 263, 266 (1997)].   In

> congressional hearings preceding the passage of the Act, Congress
> referred to correcting the "dangerous and unreliable system of
> depending upon dummy directors" that lacked any accountability or
> responsibility.  [S. Rep. No. 73-47, at 5-6 (1933); H.R. Rep. No. 73-
> 152, at 12 (1933); *see also* H.R. Rep. No. 73-152, at 12 (1933); *Stock
> Exchange Practices: Hearing on S. Res. 84 (72d Cong.) and S. Res.
> 56 and 97 (73d Cong.) Before the Senate Comm. on Banking and
> Currency*, 73d Cong., 1st Sess. 6556 (1934) (remark of Sen.
> Barkley)].  The House of Representatives Report accompanying the
> Act summarized section 20(a) and clarified that Congress intended to
> achieve its purpose by making "a person who controls a person
> subject to the act . . . liable *to the same extent* as the person controlled
> unless the controlling person acted in good faith." [H.R. Rep. No. 73-
> 1383, at 26 (1934) (emphasis added by *Laperriere* Court)].

*Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008).  Thus, the Court is not

without guidance in determining the meaning of "power to control the general affairs of the entity

primarily liable."

In the case at hand, the Court need not resolve whether "power to control the general affairs

of the entity primarily liable" means simply abstract power to control or instead refers to actual

exercise of the power to control because, regardless of the definition chosen, the evidence

establishes that Defendant W. Anthony Huff acted in a manner to which Congress intended to attach

liability under Section 20(a).  Indeed, although the descriptions from the legislative history set forth

above pre-date Huff's existence, they nonetheless, sound as though the speakers had Huff in mind

when they made these statements.

All of those who have worked with Huff at some point have uniformly described his

dominant personality and controlling behavior.  They have described Huff and his relationship with

Certified in the following ways:

> 1.   Dobrin: Dobrin described Huff as the "puppet master" of
>       Certified.  TT at 114.  Huff told Dobrin that Huff "would
>       always be the king maker rather than the king and felt much

more comfortable, at least in his life at that point in time, controlling things from the background rather than being the man who was in charge by name." *Id.* at 115-16. With regard to who controlled Certified, Dobrin stated, "There was no question, as I said before, there was no question in my mind that Anthony Huff was the man who was running the operation. Not on a day to day basis but overall, he's the one who made all the big decisions." *Id.* at 113.

2.   Spinelli: "I don't think there's any doubt that Mr. Huff controlled Certified and Midwest and to a large extent Brentwood. Whatever he wanted to have occur occurred in those three enterprises." *Id.* at 318.

3.   Pixler: "Well, Anthony Huff certainly hadn't reported to me or anybody in his lifetime. And I guess maybe a little bit in retrospect, maybe I was reporting to him more than I thought." D.E. 214-3 at 13.

4.   Baumgardner: Baumgardner described Huff, Spinelli, Pixler, those with whom they worked, and the various entities as being "a very tight group of people," with Huff at the "dead center" of the relationship. D.E. 214-11 at 13. Baumgardner further explained, "[W]ho was Brentwood on a day, who was Huff on a day, who was Pixler on a day, it depended on the circumstances and the need. And that covers the whole time I knew them." *Id.*; *see also id.* at 65 ("At the center of the hub would have been Pixler, Spinelli, one inch out Campitiello, Huff at the middle.").

5.   Thomas Cunningham, the chief financial officer of Certified: Pixler "answered to" Huff. D.E. 214-5 at 9, 21.

6.   Adam Dobrin: McCartha, Pixler, and (Ivan) Dobrin "deferred to Mr. Huff." TT at 517-18.

Besides what others who worked with Huff had to say, Huff's activities with regard to Certified independently demonstrate his control of the entity. All of Certified's acquisitions of PEOs went through Midwest, which Huff controlled. *See* TT at 73-74, 198-99, 513. Huff also controlled Certified's cash flow, authorizing or declining to authorize payments, and discussing with

Pixler, among other issues, general payables (fixed costs), parent payables (attorney fees), internal and day-to-day payables (variable operating expenses), payroll categories, and millions of dollars' worth of legal issues, predominantly for Certified.  *See id.* at 92-92, 129, 523-27; D.E. 214-3 at 222-26.  In these regards, Certified sent invoices directed to it to Midwest, and Huff had the power and authority to approve or disapprove the payment of such invoices.  TT at 523-24.  Once the invoices went to Midwest, Huff had the sole power and authority to determine whether to approve or disapprove the payments.  *Id.*

In addition, Huff appointed Certified's board members.  *See* TT at 83-84.  Although Huff did not sit on the board, Dobrin testified that board meetings were relatively few, decisions were made in advance of board meetings, and the board merely "rubber-stamped" those determinations.  *Id.* at 83-86.  Similarly, while Cunningham was appointed as a member of the board, he never attended a single meeting, was never asked to sign any documents, and received no guidance as to any responsibilities he might have had as a board member.  D.E. 214-5 at 21.  Two other members of Certified's board of directors included individuals who, at some point, served as Huff's personal lawyers.  *See* TT at 838, 900-01; PX 831 at Part III, Item 9.

And Huff participated in all crucial aspects of Certified's business.  Notably, Certified entered into the RAA with Midwest, which Huff controlled.  As the RAA offered Certified nothing of substance and allowed Huff to loot Certified, no valid business purpose for it existed, and Certified's agreement to the RAA, in and of itself, demonstrates that Huff controlled Certified.

Huff was also involved in attempting to obtain an extension of Certified's workers' compensation insurance policy with CNA and other insurance issues.  TT at 111-12, 255.  Dobrin testified that he had conversations with Huff regarding insurance usually several times weekly.  *Id.*

at 112. Dobrin also discussed cash management, loss control, claims managements, and other issues that did not specifically relate to the RAA.  *Id.* at 119-20.  Besides these issues, Dobrin talked to Huff several times weekly regarding sales and other aspects of Certified.  *Id.* at 77; *see also* D.E. 214-15 at 10.  In fact, when sales were down, Huff went to Certified's sales force meetings and gave a "pep talk."  TT at 515.

Likewise, Adam Dobrin sent Huff various weekly reports regarding Certified's business. *See id.* at 508-09.  Moreover, as discussed previously, Huff frequently called Pixler regarding Certified's business, interrupting him several times daily for long periods of time.

Besides these activities, as previously discussed, Huff reviewed and approved Certified's public filings.  He was also so involved in Certified's business that he even suggested to Dobrin that Dobrin not take a planned vacation because Certified needed him there at the time.  *Id.* at 81.

Huff also obtained financing for Certified and participated in marketing Certified's securities.  *See* D.E. 214-15 at 9.  Moreover, in obtaining a letter of credit for Certified through Sly and his client Burns, Huff – by himself, made Certified Services liable jointly and severally for the repayment of $500,000.  *See* PX 505.

Huff's control of Certified from the background is also consistent with his *modus operandi*. As discussed above, Huff similarly controlled Midwest and Brentwood, even though he held no position with either company until at least 2005.  He also took his Brentwood salary in Sheri Huff's name, although she had nothing to do with the company.  Likewise, Huff has "significant influence" and "significant control" over O2HR, the company that succeeded to Certified's bankruptcy estate, although Huff is not listed as an officer or director of the company.  TT at 1201-02.  For all of these

88

reasons, the Court concludes that Huff was a control person with regard to Certified and that he exercised actual control.

**Material Misrepresentation, Material Omission, or Fraudulent Device**

With regard to the elements of the causes of action espoused in the Amended Complaint, the Court begins with that of materiality.  For a misrepresentation or omission to be "material," a substantial likelihood must exist that the true, disclosed fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 983 (1988).  As the Eleventh Circuit has explained, "The test for materiality in the securities fraud context is 'whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.'" *Merchant Capital*, 483 F.3d at 766 (quoting *SEC v. Carriba Air*, 681 F.2d 1318, 1323 (11th Cir. 1982) (citation omitted)). Thus, the test embodies an objective standard.

These Findings of Fact and Conclusions of Law have already discussed at length the numerous material misrepresentations and omissions in Certified's SEC filings.  For ease of reference, however, the Court summarizes them once again below:

1.  The filings referred to millions of dollars' worth of letters of credit as assets and elsewhere in the filings, even though the letters of credit were fraudulent and worth nothing;

2.  The filings falsely counted letters of credit as assets and failed to include workers' compensation claims as liabilities, resulting in material false statements regarding shareholders' equity;

3.  The 10-KSB and 10-K filings failed to disclose Huff as a control person of Certified and did not set forth negative background information concerning Huff, including his prior indictment and conviction for wire fraud relating to insurance

companies and his insurance debarment by the state of Kentucky;[22]

4.  The 2002 10-KSB and 2003 10-K falsely described the RAA as making Midwest responsible for the payment of all workers' compensation claims below the deductible, when, in actuality, Certified remained responsible for such payments, and the RAA (also falsely) indicated that Midwest was responsible for claims payments "in excess of" the deductible;

5.  The 2002 10-KSB/A suggested, by attaching a copy of the RAA, that Midwest was responsible for the payment of workers' compensation claims in excess of the deductible, when, in actuality, the insurance company was responsible for such payments; and

6.  The filings failed to disclose that payments to Midwest under the RAA were the equivalent of payments by Certified to Huff, a control person of Certified, and the filings falsely stated that the loss of Midwest's "services" would have a "material adverse effect" on Certified's ability to remain in business, when, in actuality, Huff, through Midwest, was using the RAA to loot Certified.

Each one of these misrepresentations and omissions in its own right satisfies the materiality standard because a reasonable person would have attached significance to each true fact in making a decision regarding whether to invest in Certified.  Moreover, although each misrepresentation and omission independently is material, the combination of them together is likewise material.   These

---

[22]These Findings of Fact and Conclusions of Law need not address whether, at the time that Certified filed its 2003 10-K, it was subject to S-B or S-K regulations because, regardless, the 2003 10-K set forth the backgrounds of the named officers of Certified.  Because Huff was a control person of Certified and the backgrounds of the named officers were disclosed, Huff's background had to be disclosed to make the other disclosures not materially misleading, particularly in view of the considerations noted above.  Otherwise, readers of the filings would come away with the impression that the individuals for whom biographical information was provided were controlling Certified, when, in reality, Huff was in control.

misrepresentations and omissions significantly alter the "total mix" of information available to an investor.

Huff also engaged in a scheme or artifice to defraud as it regards Certified's potential stockholders.  More specifically, Huff deliberately decided to control Certified from the background and not to take a named official position with Certified so he would not have to disclose his prior criminal insurance dealings and debarment.  Similarly, he schemed to allow his looting of Certified to go undetected by accessing Certified's coffers through the RAA, in the name of Midwest, again not identifying himself as an officer of Midwest, even though he was solely controlling it. Meanwhile, Certified's official filings made no mention of Huff or his involvement in Certified and falsely reflected substantial shareholder equity (based in large part on letters of credit, the bogus nature of which Huff deliberately and severely recklessly ignored), thereby attracting investments in the company, which was doomed to fail, at least in significant part, because Huff was using Certified's coffers as his own personal piggy bank.  The execution of the RAA and each of the material omissions and misrepresentations discussed above represent acts in which Huff engaged in furtherance of the scheme or artifice to defraud.

## Scienter

Within the context of Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a)(1) of the Securities Act, satisfying the element of scienter depends on "a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 (11th Cir. 1999)).  The Eleventh Circuit defines "severe recklessness" as follows:

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even

> inexcusable negligence, but an extreme departure from the standards
> of ordinary care, and that present a danger of misleading buyers or
> sellers which is either known to the defendant or is so obvious that
> the defendant must have been aware of it.

*Id.* (quoting *Bryant*, 187 F.3d at 1282 n.18 (quotation marks omitted by *Mizzaro* Court)).

Huff asserts that he was neither involved in nor knew about Certified's filings before Certified made them, so he could not have had the requisite scienter to sustain a finding of violations of Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a)(1) of the Securities Act.  He further argues that, regardless, all of Certified's SEC filings were subject to legal review by Certified's lawyers and Certified's outside accounting firm of Rosenberg Rich, which audited some of the financial statements and gave Certified's filings a clean bill.

This Court has been unable to find any Eleventh Circuit cases considering the defense of reliance on the advice of a professional such as an accountant or attorney, in the context of a civil enforcement action by the SEC.  The Eleventh Circuit, however, has discussed such a defense in the context of criminal cases, including a criminal mail fraud case involving securities.  In *United States v. Parker*, the Eleventh Circuit stated, "To succeed with a defense of good faith reliance on the advice of counsel, the defendant must show that 1) he fully disclosed all relevant facts to his counsel and 2) he relied in good faith on his counsel's advice."  839 F.2d 1473, 1482 n.6 (11th Cir. 1988) (citing *United States v. Johnson*, 730 F.2d 683, 686 (11th Cir.), *cert. denied*, 469 U.S. 867 (1984)).  The case on which *Parker* relied in setting forth this standard, in turn, explained, "The defense of good faith reliance on expert advice is 'designed to refute the government's proof that the defendant intended to commit the offense.'" *Johnson*, 730 F.3d at 686 (citation omitted).  In other words, this defense addresses scienter.

Other courts outside of the Eleventh Circuit have considered the reliance-on-professional-advice defense within the context of an SEC enforcement case and have reached similar formulations of the doctrine. *See, e.g., Markowski v. SEC*, 34 F.3d 99 (2d Cir. 1994); *SEC v. Savoy Inds., Inc.*, 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981); *SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 467 (9th Cir. 1985); *SEC v. Johnson*, 174 F. App'x 111, 114-15 (3d Cir. 2006).  In *Markowski* for example, the Second Circuit recognized the concept, noting that the person attempting to invoke it must show "that he has made complete disclosure to counsel, sought advice as to the legality of his conduct, received advice that his conduct was legal, and relied on that advice in good faith." *Markowski*, 34 F.3d at 104-05 (citing *Savoy Inds., Inc.*, 665 F.2d at 1314 n.28).  The court further explained, however, "Even where these prerequisites are satisfied, such reliance is not a complete defense, but only one factor for consideration." *Id.* (citing *Savoy Inds., Inc.*, 665 F.2d at 1314 n.28).

Moreover, under this formulation of the doctrine, where a responsible defendant knows that financial statements are materially false or misleading but files them anyway, "the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance." *Goldfield Deep Mines Co.*, 758 F.2d at 467 (quoting *United States v. Erickson*, 601 F.2d 296, 305 (7th Cir.), *cert. denied*, 444 U.S. 979 (1979) (quotation marks omitted)).  This is so because "[i]t is [the defendant's state of mind that is relevant to establishing the defense of reliance on professionals and scienter." *SEC v. Retail Pro, Inc.*, 2010 WL 1444993, *6 (S.D. Cal. Apr. 9, 2010) (citing *Goldfield Deep Mines Co.*, 758 F.2d at 467).  Indeed, "the question is ultimately one of honesty and good faith." *Erickson*, 601 F.2d at 305.

Turning to the material misrepresentations and omissions at issue in this case, the Court has already found that Huff was aware of and participated in reviewing and discussing SEC filings prior to their filing.  In this regard, Huff received drafts of filings and actual filings and "signed off" on them.  *See* TT at 201-02; *see also* PX 464.  He further received documents relating to the contents of the proposed SEC filings, including discussions of GAAP principles.  *See* PX 464.  In addition, Huff had conversations with Dobrin, the auditor LaForgia, Pixler, and one of LaForgia's assistants regarding Certified's financial statements, including at least one heated discussion with LaForgia.  TT at 122-24, 130-32, 201.  The heated nature of the conversation indicates that Huff and LaForgia disagreed over the handling of at least some matter pertaining to the financial statements, which, in turn, further shows that Huff actually reviewed draft filings and had input into final filings.

Thus, the Court must consider whether, in allowing the six categories of material misrepresentations and omissions identified above to exist in Certified's SEC filings, Huff intended to deceive or was severely reckless, on the one hand, or whether he acted in good faith, on the other.  With regard to the first material misrepresentation, the filings' reference to millions of dollars' worth of fraudulent letters of credit, the Court finds no evidence that Huff actually knew for sure that the letters of credit were fraudulent.  Nevertheless, the reason that he did not know resulted from his own deliberate and severely reckless ignorance.

As previously discussed, the existence of letters of credit was absolutely critical to Certified's ability to obtain workers' compensation insurance, which was necessary for Certified to continue in business.  Moreover, CNA required millions and millions of dollars' worth of letters of credit – at one point exceeding $40 million.  As Certified was paying thousands of dollars for these "letters of credit" and the viability of Certified's business depended upon Certified's ability to obtain

94

letters of credit, Certified – and Huff as a control person of Certified – should have had extremely good reason to ensure the legitimacy of the letters of credit it obtained, particularly when the letterhead fell off one of the purported letters of credit.  The fact that Huff called Leyton to inquire about letters of credit following this incident underscores the importance of the letters of credit.  Yet Huff did nothing more to ensure their legitimacy than to accept Leyton's "explanation" that the letter of credit provided was merely a sample.  Quite simply, this explanation makes no sense.  Banks do not cut and paste their letterhead onto "sample" letters.

Furthermore, since Leyton was the individual providing the purported letters of credit, he had an interest in continuing to attempt to keep up the charade.  Yet Huff did nothing to inquire further into the matter, even though a simple telephone call to the ostensibly-issuing bank would have revealed the entire scheme.  This Court finds that Huff took no additional action although Leyton's explanation made no sense and Leyton had reason to lie, because Huff was looking for what he deemed to be a cover story; he was not actually attempting to determine whether the letters of credit were legitimate.  This type of deliberate ignorance involving Certified's ability to obtain its lifeblood of workers' compensation insurance was severely reckless and satisfies the scienter element.  Indeed, Huff's actions evidence an extreme departure from the standard of ordinary care and thus were severely reckless.

Nor can Huff rely upon the defense of reliance on professional advice with regard to this material misrepresentation.  He, Spinelli, and McCartha never advised Certified's lawyers or accountants of the incident where the letterhead fell off the page nor of Leyton's senseless explanation.  Accordingly, Huff cannot rely on advice of counsel as a defense since he did not disclose all relevant facts to counsel.

As for the second category of material misrepresentations and omissions involving the accounting for letters of credit and workers' compensation claims liabilities (setting aside the fraudulent nature of the letters of credit), Huff asserts the defense of reliance on professional advice, as Certified's auditors signed off on many of the financial statements that include these material misrepresentations and omissions. Plaintiff's Exhibit 464 provides some support for Huff's argument because it shows that Huff obtained memoranda of GAAP accounting principles as they relate to at least some issues involving the financial statements. Moreover, the auditor LaForgia did not testify, even though he was under the SEC's control.

On the other side of the coin, however, Plaintiff's Exhibit 464 also suggests that Certified was very conscious of the fact that its financial statements reflected "strong improvement to the Shareholders' Equity section of the [Certified] 10-QSB for the third quarter ended September 30, 2002," and it attempted to use that circumstance not just in the publicly filed SEC documents, but also to its advantage with the Bankers' Insurance Group. Thus, the issue boils down to one of actual intent.

Ultimately, the Court concludes that the SEC has not established scienter with regard to the accounting of the shareholders' equity misrepresentations and omissions. Although this issue is very close, the auditors were clearly aware of the fact that they were counting letters of credit as assets and that Certified had workers' compensation claims liabilities, making this issue different from the preceding one where the auditors had no knowledge of the fraudulent nature of the letters of credit. Second, the presentation of the accounting relating to the shareholders' equity should depend upon GAAP principles, and, while the Court concludes that the auditors in this case did not make this aspect of the financial statements GAAP-compliant, they nevertheless "blessed" the

accounting treatment of the shareholders' equity as being in compliance with GAAP.  Where a company provides its auditors with all of the information necessary for the auditors to make a determination regarding an acceptable way in which to treat the information under GAAP, the company should be able to rely upon the auditors' advice, as long as the company did not conspire with the auditors in an effort to deceive.  Here, the SEC has not presented evidence that the auditors were involved in the scheme to defraud, although the auditor LaForgia was under the SEC's control and could have testified had the SEC wished to call him.  Under these circumstances, the Court does not find the requisite scienter with regard to the material misrepresentations and omissions involving the accounting treatment of the shareholders' equity.

The Court cannot reach the same conclusion, however, with respect to the material omissions relating to Huff's control of Certified and his background, as well as those relating to Huff's use of the RAA to deplete funds from Certified through Midwest.  No evidence suggests that Huff disclosed to auditors or lawyers the full extent of his involvement in and control over the dealings of Certified.  Similarly, the auditors never reviewed Midwest's books and records before offering their opinions and instead eventually resigned, noting that in order to continue as Certified's auditors, they would have needed to undertake a complete audit of Midwest's records.  Huff's non-disclosure as a control person was by his own design; he purposely set up the company without assigning himself a named role.  That way, he hoped to avoid the disclosure requirement.  As a result, Huff did not reveal his damaging background information, including his insurance-related wire fraud indictment and conviction and his insurance debarment.  Perhaps even more significantly, the lack of control-person disclosure in the SEC filings also provided no indication that Huff was able to use the RAA to siphon money from Certified, which he controlled, to himself

through Midwest, which he also controlled.  For these reasons, the Court concludes that these material misrepresentations and omissions demonstrate Huff's intent to deceive, and Huff acted with scienter with regard to them.

As for the material misrepresentations falsely indicating that Midwest was responsible for the payment of workers' compensation claims below and above the deductible, the Court likewise finds that Huff acted with scienter.  These misrepresentations helped create the false impression that Midwest was actually providing a valuable service to Certified, when, in fact, it was simply using the RAA as a vehicle to drain Certified.  Moreover, Huff was certainly well aware of the contents of the RAA, having authorized Michele Brown to sign it on behalf of Midwest and having used the document to his benefit to provide a basis for taking Certified's money.  And, with respect to the misrepresentation that Midwest was responsible for insurance claims payments below the deductible, the filings did not even accurately portray what was on the face of the RAA, instead stating precisely the opposite of the language in the RAA.  It is difficult to conceive of how anyone could have thought that such a description accurately represented the RAA, even if a lawyer had approved it.  Furthermore, Huff presented no credible evidence that he sought the approval of an attorney before agreeing to the wording of these parts of the SEC filings.[23]  In view of these facts and the integral role that Certified's misrepresentations of the RAA played in allowing Huff to raid Certified's coffers, the Court finds that Huff acted with scienter in making these misrepresentations

---

[23]To the extent that Huff's argument may be construed as relying on advice from Spinelli, Spinelli ceased functioning as an attorney in 2002.  Moreover, he admits that he knowingly participated in the wrongdoing and that he and Huff engaged in such conduct as "leasing assets" for Brentwood's balance sheet and not advising accountants of this circumstance.  Thus, this Court concludes that to the extent that Huff contends that he relied on Spinelli's advice, he did not seek or rely on that advice in good faith.

and omissions.  Once again, Huff's actions provide evidence of his intent to deceive, manipulate, or defraud.

**The "In Connection With" Requirement**

As discussed previously, with regard to its causes of action under Section 17(a) of the Securities Act, the SEC must also demonstrate that Huff's conduct occurred in the offer or sale of securities, and, as it pertains to Section 10(b) of the Exchange Act and Rule 10b-5, in connection with the purchase or sale of securities.  In SEC enforcement actions, courts broadly construe the "in connection with" language to effectuate the securities statutes' remedial purposes and to protect investors.  *SEC v. Zandford*, 535 U.S. 813, 819 (2002); *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993).  "[W]henever assertions are made . . . in a manner reasonably calculated to influence the investing public," the "in connection with" requirement is satisfied.  *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (*en banc*), *cert. denied*, 394 U.S. 976 (1969).  Thus, if the material misrepresentation or omission occurred in the context of "public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." *Rana Research*, 8 F.3d at 1362; *see also SEC v. Benson*, 657 F. Supp. 1122, 1131 (S.D.N.Y. 1987) (registration statements and annual and quarterly reports are "clearly documents that an investor would rely on in deciding whether to purchase . . . securities," and thus, satisfy the "in connection with" requirement); *cf. Basic, Inc.,* 485 U.S. at 246 ("Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations").

By definition, SEC filings are publicly disseminated documents. Consequently, the inclusion of the material misrepresentations and omissions in these documents upon which investors rely satisfies the "in connection with" component.

**The Interstate Commerce Connection**

Under the Exchange Act, the SEC must demonstrate that Huff used the mails, an instrumentality of interstate commerce, or the facility of a national securities exchange in connection with the violation. *See* 15 U.S.C. § 78j(b). Similarly, the Securities Act contains as an element a requirement that a defendant have employed the mails or an instrumentality of interstate commerce in connection with the violation. *See* 15 U.S.C. § 77q(a). The evidence adduced at trial satisfies these requirements.

First, Certified was publicly traded. Second, evidence abounds of Huff's employment of interstate telephone calls, facsimiles, and other means of interstate commerce in furtherance of the material misrepresentations, omissions, and scheme to defraud. Among others, for example, the records of Huff's use of the Certified/Cura American Express card reflect charges in commerce in various states, and the Court heard testimony that Huff incessantly called Pixler on the telephone while Pixler was in Fort Lauderdale and Huff was outside the state of Florida. In addition, the bank records reveal interstate wire transfers; facsimile transmittals show the transmission of documents over interstate communications facilities; and the canceled checks show that they were negotiated in various states. Thus, the SEC has met its burden to demonstrate the interstate commerce connection.

**Aiding and Abetting Violations**

Because the Court finds Huff liable as a controlling person on primary violations, the Court need not consider the aiding and abetting theory. Nevertheless, in the interest of completeness, the Court addresses it. For aiding-and-abetting liability under the federal securities laws, the SEC must establish the following three elements: (1) a primary or independent securities law violation was committed by a party other than the aiding-and-abetting party; (2) the aider and abettor was aware or knew this his role was part of an overall activity that was improper (scienter, as it relates to violations of Section 10(b) of the Exchange Act and Rule 10b-5); and (3) the aider and abettor knowingly and substantially assisted the conduct that constitutes the violation. *See Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1009-10 (11th Cir. 1985).

Here, even assuming, *arguendo*, that only Certified (or, for that matter, Pixler or Spinelli) committed the primary violations discussed above, for all of the reasons previously discussed, Huff certainly knew that his role was part of an overall activity that was improper and violated the securities laws. As demonstrated previously, he also substantially assisted the conduct constituting the violation. Thus, Huff is alternatively liable as an aider and abettor.

### *F.  Remedies*

**Injunctive Relief**

The Securities Act provides, in relevant part,

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices that constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, the Commission may, in its discretion, bring an action in any district court of the United States, . . . to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond. . . .

15 U.S.C. § 77t(b). The Exchange Act contains a similar provision authorizing injunctive relief. *See* 15 U.S.C. § 78u(d)(1). Numerous courts, including the Eleventh Circuit, have construed these statutory sections to authorize injunctions to prevent future securities laws violations. *See SEC v. Carriba Air, Inc.*, 681 F.2d 1318 (11th Cir. 1982); *see also SEC v. Globus Group, Inc.*, 117 F. Supp. 2d 1345, 1346 (S.D. Fla. 2000) (Jordan, J.).[24] Although, generally, "equity will not enjoin a crime," the Eleventh Circuit has explained, this is not an "ironclad rule." *Id.* at 1321. Rather, an exception for "public nuisances that [are] also crimes" exists. *Id.* (citing *Attorney Gen. v. Richards*, 145 Eng. Rep. 980 (1794)). Because the Eleventh Circuit has concluded that violations of the securities laws "are analogous to public nuisances," the Eleventh Circuit has held that courts may enjoin future securities laws violations. *Id.*

In this Circuit, the SEC "is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004) (citing *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 n.2 (11th Cir. 1999)). In determining the probability that a party will again engage in violations of the securities laws, a court should consider the "egregiousness of

_____

[24]*But see SEC v. Sky Way Global, LLC*, ___ F. Supp. 2d ___, 2010 WL 1626395 (M.D. Fla. Apr. 22, 2010). Building on *dicta* from a footnote in *SEC v. Smyth*, 420 F.3d 1225 (11th Cir. 2005), the *Sky Way Global* Court concludes that injunctions to prevent future securities violations are neither authorized by the cited statutory provisions nor constitutional unless they are drafted narrowly to preclude specific, foreseeable violations (*e.g.*, violations of the securities provisions as they relate to a particular company that is the subject of the underlying action). As the *Sky Way Global* Court recognizes, however, "a panel [of the Eleventh Circuit] cannot overrule a prior one's holding even though convinced it is wrong." *Id.* (quoting *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998); *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1072 (11th Cir. 2000)). And a district court, of course, cannot overrule a panel's holding, either, even where, as in *Sky Way Global*, the district court views the panel's decision as having "inadequately analyze[d]" the issue and as not "merit[ing] adherence." *See Sky Way Global*, 2010 WL 1626395 at *15.

the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of the conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *Id.* (quoting *Carriba Air,* 681 F.2d at 1322 (quotation marks and internal citations omitted)).

In considering these factors, the Court concludes that the facts of this case require injunctive relief. First, the scheme that Huff orchestrated was far-reaching. Not only did it bankrupt Certified, causing the value of shareholders' holdings effectively to cease to exist, but it resulted in more than $60 million in losses to CNA; losses to others such as Baumgardner, who sold Certified his company; and exposure of Certified's clients' workers to potential non-payment of claims – all so Huff and his friends could enjoy the high life.

Second, this is not the first time that Huff has engaged in such a scheme. Indeed, in the U.S. Trucking matter, he pled guilty to wire fraud charges stemming from a similar scheme in which Huff defrauded insurance companies. He also remains involved in O2HR, effectively the successor corporation to Certified, where he continues his less-than-aboveboard ways. For example, Roxann Pixler testified that Huff refused to memorialize her investment in O2HR on paper and barred her from shareholder meetings when she requested such written documentation, calling Roxann Pixler a "trouble-maker" and directing her to "shut up." TT at 181-82. Moreover, although Huff continues to exercise control over the corporation, he once again holds no official position with it. *See id.* at 1205-06.

Third, as explained in the discussion of scienter set forth earlier in these Findings of Fact and Conclusions of Law, these violations involved a substantial degree of scienter. Fourth, to this day,

Huff has completely failed to acknowledge any aspect of his wrongful conduct.  To the contrary, he has lied about it.  Correspondingly, Huff has provided no assurances – sincere or not – against future violations.

Finally, Huff's present occupation allows Huff to continue his past pattern of committing violations.  Not only does Huff continue to use Midwest as a vehicle for exercising control over other companies, but also, he remains highly involved in O2HR, exercising control over the company.  O2HR has succeeded to Certified's business, except with significantly reduced debts as a result of the bankruptcy settlement.  Consequently, Huff has the same opportunities with regard to O2HR as he did with respect to Certified.  And, for at least the third time, he is involved in a business with a significant insurance component.  For all of these reasons, this case demands injunctive relief.

**Officer-and-Director Bar**

In addition to the injunctive relief described above, the SEC seeks an officer-and-director bar against Huff.  Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), and Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), authorize courts to "prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated section 77q(a)(1) [or Section 10(b) of the Exchange Act]. . . from acting as an officer or director of an issuer of [registered securities]. . . if the person's conduct demonstrates unfitness to serve as an officer or director . . . ."  15 U.S.C. § 77t(e); 15 U.S.C. § 78u(d)(2).  Alternatively and additionally, a court may impose an officer-and-director bar under its inherent equitable powers.  *See SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998); *SEC v. Posner*, 16 F.3d 520, 521 (2d Cir. 1994).

In determining whether to impose an officer-and-director bar, a court may consider the following factors:

(1)     the "egregiousness" of the underlying securities law violation;

(2)     the defendant's "repeat offender" status;

(3)     the defendant's "role" or position when he engaged in the fraud;

(4)     the defendant's degree of scienter;

(5)     the defendant's economic stake in the violation; and

(6)     the likelihood that misconduct will recur.

*First Pac. Bancorp*, 142 F.3d at 1193 (quoting *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995). Whether the person considered for injunction has held the precise position of an officer or director in name matters not; rather, "the critical issue is whether the injunction restrains acts 'of the same type or class' or that 'may fairly be anticipated from the defendant's conduct in the past." *SEC v. Sprecher*, 81 F.3d 1147 (table), 1996 WL 175216, *4 (D.C. Cir. Apr. 9, 1996) (quoting *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435 (1941)).

Applying this framework to the instant matter, the Court concludes that Huff should be barred from serving as an officer or director of a publicly traded company.  As previously discussed, Huff's violations were egregious and his degree of scienter, substantial.  He purposely chose to control Certified from the background at least in part to avoid disclosing his negative history and to obscure his involvement with the company to facilitate his looting of Certified through the RAA. The scheme went on for more than two years, and he was able to obtain more than $10 million for himself and his family through his wrongdoing.  Indeed, the RAA device went to the heart of

Certified in that it was the vehicle that allowed Certified to be bled dry. In addition to deceiving investors through the SEC filings and causing them to invest under false pretenses, Huff's actions resulted in losses to CNA of more than $60 million and exposed the workers of Certified's clients to potential workers' compensation coverage gaps.

Nor is this Huff's first foray into fraud in publicly traded companies. In connection with U.S. Trucking/LMRI, Huff pled guilty to three counts of wire fraud stemming from a fraud similar to the artifice Huff executed in this case. In the U.S. Trucking/LMRI matter, Huff obtained financing for insurance and used it for his own benefit and that of his family. Here, Huff used the RAA to obtain monies from Certified, which he then used for his personal benefit and that of his family members. In addition, Huff is centrally involved in O2HR, another publicly traded PEO company. In connection with that company, as in this case, Huff has acted as a control person, although he has hidden his involvement in the company by not serving in name as an officer or director. As Roxann Pixler's testimony demonstrates, Huff has further refused to provide written documentation of investment in the company. Huff's past history of violations, the extent of Huff's scienter exhibited in the pending case, and the concrete examples from the O2HR matter all provide substantial indication that, if not enjoined, Huff will continue his violations in the future, and many others will fall victim. For all of these reasons, the Court agrees that Huff should be barred from serving as an officer or director of a publicly traded company.

With regard to the appropriate length of the bar order, this Court recognizes that a permanent bar is a very significant penalty and does not consider it lightly. Nevertheless, Huff's prior conduct, the extent of his role in the Certified-related violations, and his current involvement in O2HR warrant a permanent bar. In cases where, unlike here, a defendant has had no past track

record of violations, courts have imposed up to twenty-year bans. *See, e.g., SEC v. Save The World Air, Inc.*, 2005 WL 3077514 (S.D.N.Y. Nov. 15, 2005) (imposing a twenty-year bar where the defendant conducted a one-and-one-half year scheme to defraud but had no prior record of securities fraud in the United States); *see also SEC v. Pallais*, 2010 WL 2772329, *10 (S.D.N.Y. July 9, 2010) (imposing a ten-year bar where the defendant conducted a one-and-one-half year scheme to defraud but had no prior record of securities fraud violations).  Here, where Huff has demonstrated his willingness and ability to repeat his transgressions, along with no recognition of his wrongdoing, nothing less than a lifetime bar will protect investors from Huff.  Consequently, the Court imposes such a bar.

**Penny Stock Bar**

The SEC also seeks a penny stock bar against Huff.  Under the Securities Act and the Exchange Act, a court may prohibit any person who, at the time of the alleged misconduct, was participating in an offering of penny stock, from participating in an offering of penny stock.  *See* 15 U.S.C. § 77t(g); 15 U.S.C. § 78u(d)(6).  Penny stocks include any equity security with a price of less than $5.00, except as exempted under Rule 3a51-1 under the Exchange Act.  *SEC v. McNamee*, 481 F.3d 451, 453 (7th Cir. 2007) (citing 17 C.F.R. § 240.3a51-1).  Before a court may enter a penny stock bar, the SEC must demonstrate that the stock at issue in the violations under review is, in fact, a penny stock.  *See SEC v. Becker*, 2010 WL 2165083, *4 (S.D.N.Y. May 28, 2010); *Pallais*, 2010 WL 2772329 at *11.

In this case, Certified's SEC filings for 2002 and 2003 reflect that its stock price never exceeded $1.80 as of December 31, 2003.  Beyond that date, the Court has not been able to find

evidence of Certified's stock price in the record.  Through December 31, 2003, however, Certified meets the initial requirement of a penny stock, as its price always was less than $5.00.

Nevertheless, Defendant Huff suggests that Certified did not qualify as a penny stock under Rule 3(a)(51)(g)(2), which exempts companies with "[a]verage revenue of at least $6,000,000 for the last three years."  In its SEC filings, Certified reported the following revenue:

2000:  $75,000

2001:  $13,711,112

2002:  $40,406,261

2003:  $78,510,210

2004:  $66,906,295 (as of third quarter)

*See* PX 814 at 4; PX 823 at 28.  The SEC did not submit contradictory evidence.  Beginning with 2002, the first year where three years of prior revenues existed and the first real year of operations for Certified under the control of Huff, average revenues exceeded $6 million, based on the SEC filings.  Similarly, in the years that followed, revenues also surpassed $6 million.  In view of this unrebutted evidence, the Court agrees with Huff that the SEC has not satisfied its burden to demonstrate that Certified met the definition of a "penny stock" during the requisite time period.  Consequently, the Court declines to impose a penny stock bar.

**<u>Disgorgement</u>**

Disgorgement is an equitable remedy that anticipates depriving "the wrongdoer of his ill-gotten gain."  *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 n.6 & 735 (11th Cir. 2005) (internal quotation marks omitted).  As the Second Circuit has described disgorgement, "The effective enforcement of the federal securities laws requires that the SEC be able to make violations

unprofitable.  The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits."  *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972).

While this rationale allows for broad consideration of all of a defendant's wrongful conduct in violation of the securities laws,[25] the court must limit any disgorgement remedy to "ill-gotten gain."  Because disgorgement is remedial and not punitive, a court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing.  *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978).  In the court's determination of this amount, the SEC bears the burden of producing a reasonable approximation of the defendant's "ill-gotten gain."  *Calvo*, 378 F.3d at 1217 (citations omitted).  Then the burden shifts to the defendant to show that the approximation is not reasonable.  *Id.* (citation omitted).

In this analysis, "[e]xactitude is not a requirement; [s]o long as the measurement of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.'"  *Id.* (quoting *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998), and citing *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231-32 (D.C. Cir. 1989)).  Indeed, "where a defendant's record-keeping or lack thereof has so obscured matters that calculating the exact amount of illicit gains cannot be accomplished without incurring inordinate expense, it is well within the district court's discretion to rule that the amount of disgorgement will be the more readily

---

[25]*See SEC v. Cross Fin. Servs.*, 908 F. Supp. 718, 734 (C.D. Cal. 1995) (disgorgement should include "all gains flowing from the illegal activities); *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93-94 (2d Cir.), *cert. denied*, 479 U.S. 853 (1986) (where the fraud is pervasive, the defendant should disgorge all profits stemming from the scheme).

measurable proceeds received from the unlawful transactions." *Id.*, 378 F.3d at 1217-18 (citations omitted).

In this case disgorgement is appropriate to ensure that Huff does not enjoy any benefits of his violations. While the SEC suggests as its primary position that the Court should disgorge $120.9 million from Huff, *See* D.E. 292 at 34, this Court concludes that the SEC has not demonstrated that that number reasonably approximates Huff's net gain from his wrongdoing because it does not account for all payments made for the benefit of Certified. For example, that number includes all transfers to Brentwood, even though some of the transfers appear to have been used for payments relating to insurance. Alternatively, the SEC proposes that the Court order Huff to disgorge $10.017 million, calculated in the following way:

| | |
|---|---|
| Monies to Sheri Huff from Brentwood and Midwest | $1.2 million |
| Cash to Huff | $2.6 million |
| Huff Farms | $2.75 million |
| Money to Huff directly from Midwest | $272,000 |
| Money paid towards Huff's settlement costs | $885,000 |
| Monies paid towards U.S. Trucking/LMRI liabilities and expenses | $600,000 |
| Financial service costs | $1.43 million |
| Monies that Certified/Cura paid for Huff's charges on the Certified/Cura American Express card | $280,000 |
| **TOTAL** | $10.017 million |

While the actual amount by which Defendant Huff was unjustly enriched as a result of his wrongdoing is probably greater $10.017 million, the Court finds that this analysis sets forth a reasonable approximation. Defendant Huff suggests no alternative reasonable approximation. Thus, the Court requires Huff to disgorge $10.017 million.

*i. Disgorgement Liability of the Relief Defendants*

The SEC seeks to disgorge monies from Relief Defendants Sheri Huff, Midwest, and Roxann Pixler. Equitable relief from a relief defendant (sometimes referred to as a nominal party[26]) against whom no wrongdoing is alleged may be appropriate where the SEC establishes that the non-party possesses illegally obtained profits but has no legitimate claim to them. *SEC v. Cherif*, 933 F.2d 403, 414 n.11 (7th Cir. 1991). In *SEC v. Hickey*, 322 F.3d 1123, 1130-32 (9th Cir. 2003), for example, the court upheld the district court's exercise of jurisdiction over a corporation owned in name by the defendant's mother but used by the defendant to channel proceeds of his securities law violations. *See also SEC v. Ross*, 504 F.3d 1130, 1141-42 (9th Cir. 2007) (disgorgement can be imposed against "persons who are in possession of funds to which they have no rightful claim, such as money that has been fraudulently transferred by the defendant . . ."); *SEC v. Lane*, 2010 WL 98992, *2 (M.D. Fla. Jan. 6, 2010); *SEC v. Chemical Trust*, 2000 WL 33231600, *11 (S.D. Fla. 2000).

In this case the Court finds that Relief Defendants Sheri Huff and Midwest should be subject to disgorgement. Sheri Huff received Defendant Huff's "salary" in her name and nominally owned Midwest. Additionally, she received other monies that were Certified's without providing any benefit to Certified and without any other legitimate right to the monies. Similarly, Huff used

---

[26] *See SEC v. Cavanagh*, 445 F.3d 105, 110 n. 7 (2d Cir. 2006) (citation omitted).

Midwest as the vehicle for draining monies from Certified for Huff's own personal benefit and for the benefit of his family.  Any Certified monies transferred to Midwest that were not used for the benefit of Midwest must be disgorged.

As all monies that Huff received from Certified traveled through Midwest at some point, disgorgement of the full $10.017 million from Midwest is also appropriate.  As for Sheri Huff, she received $1.2 million in her name from Brentwood and Midwest for no legitimate reason.  In addition, she and Defendant Huff own Huff Farms, which received $2.6 million.  Because Sheri Huff was unjustly enriched by $3.8 million, she must disgorge that amount.

The Court declines, however, to impose the remedy of disgorgement against Roxann Pixler. Although Roxann Pixler received $60,379.98 from Midwest Merger in 2004, TT at 177; PX 683 at 6, she used the money to pay taxes related to Midwest for that year.  TT at 177.  The $60,379.98 is the only money that Roxann Pixler ever received from Midwest.  *Id.*; *see also* PX 683.  Because Roxann Pixler paid the money she received from Midwest to the federal government in taxes without enjoying a corresponding income or other benefit from Midwest, the Court concludes that disgorgement is not appropriate.  Although, in a vacuum, payment of tax liabilities, of course, constitutes a benefit, in this specific case, Roxann Pixler did not enjoy the benefit of the monies on which she was taxed.  Consequently, under these limited circumstances, the Court finds that, as a practical matter, Roxann Pixler was not unjustly enriched, and disgorgement should be denied with respect to her.

*ii.  Joint and Several Liability*

Next, the SEC asks the Court to hold Defendant Huff and Relief Defendants Sheri Huff and Midwest jointly and severally liable for the entire amount that they are collectively ordered to

disgorge.  In support of its position, the SEC relies upon *SEC v. JT Wallenbrock & Associates*, 440 F.3d 1109 (9th Cir. 2006); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997); *SEC v. Berger*, 244 F. Supp. 2d 180 (S.D.N.Y. 2001); and *SEC v. K.W. Brown and Co.*, 555 F. Supp. 2d 1275, 1313 (S.D. Fla. 2007).  These cases stand essentially for the proposition that "where two or more individuals collaborate or have a close relationship in engaging in the violations of the securities laws, they [may be] held jointly and severally liable for the disgorgement of illegally obtained proceeds."  *JT Wallenbrock*, 440 F.3d at 1117 (quoting *SEC v. First. Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998), and citing *Hateley v. SEC*, 8 F.3d 653, 655 (9th Cir. 1993)).

Joint and several liability for the entirety of the disgorgement amount, however, is not appropriate where the SEC has not charged the relief defendants with wrongdoing.  Imposing joint and several liability on a relief defendant beyond those monies for which a relief defendant has no rightful claim is punitive and violates due process because the relief defendant has had no notice or opportunity to defend against charges of wrongdoing.  Indeed, even when more than one defendant has collaborated in the illegal conduct, courts have declined to impose joint and several liability where the defendants have differing levels of culpability.  *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 330 (S.D.N.Y. 2007) (citing *Platinum Inv. Corp.*, 2006 WL 2707319, *4 (S.D.N.Y. Sept. 20, 2006); *SEC v. Falbo*, 14 F. Supp. 2d 508, 527 (S.D.N.Y. 1998); *SEC v. Downe*, 969 F. Supp. 149, 158 (S.D.N.Y. 1997)).  As the Amended Complaint does not charge Midwest or Sheri Huff with violations of law, the Court declines to award joint and several liability for the amounts to be disgorged from Midwest and Sheri Huff.[27]

---

[27]This decision does not constitute a finding by the Court that Midwest or Sheri Huff did not violate securities laws.  Instead, it simply recognizes that the Amended Complaint does not charge them with having done so.  As a practical matter, however, the decision not to make

Huff, however, is a different matter.  The Court finds Huff solely liable for disgorging his entire ill-gotten gain and jointly and severally liable for the amounts to be disgorged by Midwest and Sheri Huff.  To the extent that those individuals disgorge the amounts that they realized on those amounts, Huff's disgorgement amount will be correspondingly reduced.

## Prejudgment Interest

Whether to award prejudgment interest and, if so, at what rate, constitute matters falling within the Court's discretion.  *See SEC v. Carillo*, 325 F.3d 1268, 1273 (11th Cir. 2003) (citing *Indus. Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH*, 141 F.3d 1434, 1447 (11th Cir. 1998)).  Courts impose prejudgment interest to prevent those found liable under the securities laws from enjoying any benefit accrued from the use of the ill-gotten gain.  *SEC v. Yun*, 148 F. Supp. 2d 1287, 1293 (M.D. Fla. 2001) (citing *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998)).  Although "[w]hether to award prejudgment interest is a question of fairness," *SEC v. GMC Holding Corp.*, 2009 WL 506872, *6 (M.D. Fla. Feb. 27, 2009) (citing *Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1536 (11th Cir. 1987)), proof of a defendant's scienter justifies such an award.  *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1313 (S.D. Fla. 2007) (citing *Rolf v. Blyth*, 637 F.2d 77, 87 (2d Cir. 1980)).

Based on these considerations, the Court imposes a requirement upon Defendant Huff to pay prejudgment interest.  As discussed previously, Huff acted with scienter in devising and executing his scheme and artifice to defraud in this case and in allowing Certified to make filings containing material misrepresentations and omissions of fact with the SEC.  The interest on the monies that

---

Midwest jointly and severally liable has no effect, as Midwest has no legitimate claim to the entirety of the $10.017 million and must disgorge that amount as a relief defendant.

Midwest obtained from Certified under the subterfuge of the RAA should have been substantial, considering the total amount that went from Certified to Midwest (roughly $130 million). Under these circumstances, the Court requires Huff to pay prejudgment interest on the $10.017 million to be disgorged.

Sheri Huff and Midwest, however, are not subject to the payment of prejudgment interest. By charging Sheri Huff and Midwest as Relief Defendants, the SEC chose not to allege legal wrongdoing on their parts. Consequently, considering whether Sheri Huff and Midwest acted with scienter at this stage would violate due process principles. Accordingly, the Court concludes that an award of prejudgment interest against Sheri Huff and Midwest is not appropriate and declines to make such an award.

As for the amount of the prejudgment interest that Huff must pay, courts employ different methodologies in determining prejudgment interest. *Yun*, 148 F. Supp. 2d 1293. Nevertheless, "courts have adopted the underpayment rate without controversy." *Id.* (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996); *SEC v. Farrell*, 1996 WL 788367, *1 (W.D.N.Y. Nov. 6, 1996)); *see also SEC v. Aleksey*, 2007 WL 1789113, *2 (M.D. Fla. June 19, 2007). "That rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from [his] fraud." *Aleksey*, 2007 WL 1789113 at *2 (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d at 1476). The IRS underpayment rate is comprised of the Federal Reserve short-term interest rate plus three percentage points. 26 U.S.C. § 6621(a)(2). Assessed quarterly from January 1, 2006, through February 28, 2010, application of this rate to funds that Huff and others on his behalf received by no later than December 31, 2005, results in a total prejudgment rate of 29.95% as of the time of trial in this

matter.  On disgorgement of $10.017 million, using this rate, the prejudgment interest amounts to approximately $3 million.

**Civil Penalties**

The SEC also seeks the imposition of civil penalties against Defendant Huff.  Monetary penalties serve the dual functions of punishment and deterrence.  *See K.W. Brown & Co.*, 555 F. Supp. 2d at 1314 (quoting *SEC v. Lybrand*, 281 F. Supp. 2d 726, 729-30 (S.D.N.Y. 2003) (citations omitted)).  Courts have looked to the following general factors when imposing penalties under the civil penalty provisions of the securities laws:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*United States v. Abellan*, 674 F. Supp. 2d 1213, 1222 (W.D. Wash. 2009) (quoting *SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003) (collecting cases)).

The Court has previously discussed many of these factors in connection of its analysis of the appropriateness of injunctive relief and will not belabor these Findings of Fact and Conclusions of Law by repeating that discussion here.  As for the factors not previously addressed, this Court concludes that Defendant Huff's conduct created both substantial losses to other persons and the risk of substantial losses to other persons.  CNA, Baumgardner, and investors who purchased Certified stock and held it until Certified's demise all experienced losses.  In CNA's case, the loss amounted to more than $60 million.  As for the losses to shareholders, the evidence shows that as of February 28, 2003, the value of stock of non-affiliated holders of Certified's common stock was $4,036,439.

116

DX 831 at 2.  By March 17, 2004, the value of stock of non-affiliated holders of Certified's common stock had grown to $5,482,811.  DX 822 at 2.  When Certified declared bankruptcy, however, the value of the stock became virtually worthless.  Moreover, even setting aside actual losses, Huff's scheme to defraud and Certified's false SEC filings created a very real risk of substantial losses to other persons.

Under the first six factors, therefore, this Court finds that Huff's conduct warrants the imposition of civil penalties.  As for Huff's financial condition, Huff did not present any evidence to show that his financial condition is such that it should affect the Court's determination of the amount of such civil penalties.

The Court therefore considers the appropriate amount of penalties to impose.  Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), which establish basically the same framework, set forth three tiers of penalties.  Under the first tier, "[f]or each violation," a court may impose the greater of up to a $5,000[28] penalty for a natural person or the gross amount of pecuniary gain that the defendant obtained as a result of the violation.  The second tier authorizes the assessment of the greater of up to a $50,000 penalty per violation or the gross amount of pecuniary gain that the defendant obtained as a result of the

---

[28]The Debt Collection Improvement Act of 1996 required the maximum amounts of all civil monetary penalties under the Securities Exchange Act of 1934, among other statutes, to be adjusted for inflation.  *See* 17 C.F.R. § 201.1002.  Consequently, for violations occurring after February 2, 2001, and before February 14, 2005, the first-tier maximum penalties were adjusted to $6,500 and $60,000 for a natural person and for any other person, respectively; the second-tier maximum penalties were increased to $60,000 and $300,000 for a natural person and for any other person, respectively; and the third-tier maximum penalties were augmented to $120,000 and $600,000 for a natural person and for any other person, respectively.  For violations occurring from February 14, 2005, through 20090, the statutory adjustment for inflation amounted to thirty percent.  *See* 17 C.F.R. pt. 201, §§ 201.1001-1002, subpt. E, tbl. II;  66 F.R. 8761 at *8662-63.

violation, where a court concludes that the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.  Finally, under the third tier, a court may impose the greater of up to a $100,000 penalty for a natural person or the gross amount of pecuniary gain that the defendant obtained as a result of the violation, where the violation involved both fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement and the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

The statutory language referring to "the gross amount of pecuniary *gain to such defendant as a result of the violation*" focuses not on any loss that an investor or other potential victim might have sustained, but rather, on the gain that a defendant enjoys as a result of a violation of the Exchange Act.  *See* 15 U.S.C. 78u(d)(2)(B) (emphasis added).  Indeed, the quoted portions of the statutes never mentions an investor or victim, and they does not refer to such a person by description.  Instead, the statutory language ties the potential maximum penalty to the *gain* that a defendant would otherwise enjoy as a result of transgressions of the securities laws.  Consequently, the quoted language neither requires nor even permits consideration of investors' losses in determining the potential maximum penalty that a court may impose.  As the language leaves no room for alternative interpretations, the Court does not consider the legislative history.

Nevertheless, the inquiry does not end with consideration of the parts of the statutes directing the Court to look to the "gain" to a defendant.  In this regard, the remainder of the phrase qualifies the gain that the Court should consider: "pecuniary gain to such defendant *as a result of the violation*."  *See* 15 U.S.C. 78u(d)(2)(B) (emphasis added).  In other words, under the plain language of the statute, a court must tie the potential maximum penalty to financial gain that the

defendant enjoyed because of the violation that the penalizing court found him to have committed. Consequently, to obtain a penalty under the quoted portion of the tiers, the SEC must demonstrate not loss causation, but, for lack of a better descriptive term, gain causation.[29]

Nor does the plain language of the penalty provisions require the SEC to show that any investor actually experienced any loss in order for a court to consider imposing third-tier penalties. A court may enter third-tier penalties under Subsection 78u(d)(3)(B)(iii)(bb) when it finds that a defendant has committed a violation that has merely "created a significant risk of substantial losses to other persons," although no person has actually incurred a loss. *See* 15 U.S.C. 78u(d)(3)(B)(iii)(bb); *see also SEC v. Aragon Capital Management, LLC*, 672 F. Supp. 2d 421, 451 (S.D.N.Y. 2009). Thus, even under subsection 78u(d)(3)(B)(iii)(bb), the SEC need not prove that any investor lost money in order for a court to consider imposing third-tier penalties. Rather, the SEC must show only that a defendant "created a significant risk of substantial losses to other persons" in order to render a defendant eligible for the imposition of third-tier penalties.

Here, as previously discussed in this section, the Court finds that Huff, through his scheme and artifice to defraud and through Certified's false SEC filings, did, in fact, engage in fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement and did create a

---

[29]Some might suggest that describing the necessary showing as "gain causation" instead of "loss causation" may be an exercise in sophistry because whenever a gain occurs, a loss must happen somewhere. As a practical matter, however, proof of "gain causation" may differ substantially from proof of "loss causation." Indeed, it may frequently be easier and more efficient for the SEC to demonstrate that a defendant incurred gains as a result of a violation than it may be for the SEC to show that specific investors suffered losses because of a defendant's violation. Proving gains requires the SEC to focus on a single defendant or group of defendants, whereas proving losses may demand that the SEC present evidence of losses to thousands of victims. Thus, the statutory focus on gain causation arguably presents a more efficient method to encourage compliance with the Securities Act and the Exchange Act.

significant risk of substantial losses to other persons.   Consequently, third-tier penalties are appropriate.

Although the SEC suggests that the Court should impose civil penalties based on the pecuniary gain to Huff as a result of each violation, this Court instead finds, under the circumstances of this case, a civil penalty of $100,000 per violation will suffice to penalize Huff and to deter similar conduct by others.   In this case, the Court considers each of the following filings to constitute third-tier violations for which a civil penalty of $100,000 should be imposed:

1. Certified's 2002 third-quarter 10-QSB;

2. Certified's 2002 10-KSB;

3. Certified's 2002 10-KSB/A;

4. Certified's 2003 first-quarter 10-QSB;

5. Certified's second-quarter 10-QSB; and

6. Certified's 2003 10-K.

Thus, the Court imposes total civil penalties of $600,000 against Defendant Huff.

## IV.  Final Conclusions

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Plaintiff SEC is entitled to judgment in its favor and against Defendant Huff on Counts I through V of the Amended Complaint, as Huff violated the federal securities laws;

2.  Defendant Huff shall be permanently enjoined from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, as set forth in the separate Judgment in this case;

3.  Defendant Huff shall be barred indefinitely from serving as an officer or director of a publicly traded company.  The scope of this Order shall be set forth more fully in the separate Judgment in this case;

4.  Defendant Huff is liable for disgorgement in the amount of $10.017 million, representing ill-gotten gains from Huff's wrongdoing alleged in this matter, along with prejudgment interest thereon in the amount of $3 million, and a civil penalty of $600,000, pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.  The scope of this Order shall be set forth more fully in the separate Judgment in this case;

5.  Relief Defendant Sheri Huff shall disgorge $3.8 million, representing illegally obtained monies to which Relief Defendant Sheri Huff is not entitled.  Defendant Huff shall be jointly and severally liable for this amount.  To the extent that Sheri Huff disgorges this money, Huff's disgorgement amount will be correspondingly reduced.  The scope of this Order shall be set forth more fully in the separate Judgment in this case;

6.  Relief Defendant Midwest shall disgorge $10.017 million, representing illegally obtained monies to which Relief Defendant Midwest is not entitled.  Defendant Huff shall be jointly and severally liable for this amount.   To the extent that Midwest disgorges this money, Huff's disgorgement amount will be correspondingly reduced.  The scope of this Order shall be set forth more fully in the separate Judgment in this case;

7.  Final Judgment will be entered by separate order, in accordance with Rule 58, Fed. R.

Civ. P.

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 30th day of September 2010.

_____

ROBIN S. ROSENBAUM

UNITED STATES MAGISTRATE JUDGE

cc:     Counsel of Record