UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-60315-CIV-ROSENBAUM

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

W. ANTHONY HUFF,

        Defendant,

and

SHERI HUFF, ROXANN PIXLER, and
MIDWEST MERGER MANAGEMENT, LLC,[1]

        Relief Defendants.
_____/

**ORDER**

        This matter comes before the Court upon Relief Defendant Roxann Pixler's Verified Application for an Award of Legal Fees and Expenses [D.E. 321]. The Court has reviewed Pixler's Motion, Plaintiff Securities and Exchange Commission's Opposition [D.E. 326], Pixler's Reply [D.E. 327], and the record, and is otherwise duly advised in the premises, and now denies Pixler's Motion for the reasons set forth below.

---

[1] The SEC also sued other Defendants and another Relief Defendant, but the case was resolved without a trial with respect to these other parties. Because matters pertaining to these other Defendants and the other Relief Defendant are not relevant to the pending Motion, this Order does not mention them beyond this footnote.

## *I. Background*

This Motion arises in the context of an enforcement action by the Securities and Exchange Commission ("SEC") against Defendant W. Anthony Huff ("Huff") and Relief Defendants Sheri Huff, Roxann Pixler ("Pixler"), and Midwest Merger Management, LLC ("Midwest"). Following a seven-day trial, the Court issued its Amended Findings of Fact and Conclusions of Law [D.E. 320] in which it made the following determinations that are relevant to Pixler's pending Motion:

Certified Services, Inc. ("Certified"), registered with the SEC and was subject to the disclosure and reporting provisions of the federal securities laws. As a company engaged in the professional employee leasing business, Certified agreed to provide its clients with, among other services, worker's compensation insurance coverage. For the purported purpose of retaining and servicing worker's compensation coverage for Certified, Midwest — a company owned in name by Sheri Huff, Pixler, and Defendant Huff's secretary Michelle Brown, but in actuality by Defendant Huff — entered into a contract called the Risk Allocation Agreement ("RAA") with Certified. Under the RAA, Certified agreed to pay Midwest a fee for the alleged services that Midwest was supposed to be providing. In conjunction with Certified and Midwest's efforts to obtain worker's compensation insurance, Certified had to provide its insurer with millions of dollars' worth of letters of credit as collateral against which the insurer could draw if Certified failed to pay its claims. As it turned out, Defendant Huff and others caused approximately sixteen fraudulent letters of credit totaling more than $44 million to be submitted and relied upon by Certified's insurer.

Meanwhile, Defendant Huff employed the RAA as a vehicle to allow Midwest to drain Certified of millions of dollars, which Huff then used for his personal benefit and for the benefit of his family and friends. All the while, Certified, which Huff controlled from behind the scenes, made

filings with the SEC containing material misrepresentations and material omissions of fact. Certified's filings indicated, for example, that the RAA constituted a vital agreement that allowed Certified to continue to function, when, in fact, the real effect of the RAA was to serve as a way for Huff to extract monies for himself from Certified. Other material misrepresentations and material omissions of fact related to the bogus nature of the letters of credit, which Certified falsely included as assets on its balance sheets.[2] Similarly, the filings failed to disclose Defendant Huff's involvement with Certified. Although Certified's filings identified Huff nowhere, in actuality, Huff, a convicted felon, controlled Certified. The inclusion of the material misrepresentations and the material omissions served as a subterfuge that enabled Certified to continue obtaining insurance and allowed Defendant Huff to continue extracting money from Certified over a period of years.

Based on these findings and others, the Court found Defendant Huff primarily liable for violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* ("Securities Act"), and Sections 10(b) and 20(a) and Rule 10b-5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* ("Exchange Act"). In addition or alternatively, the Court concluded that Huff had control-person liability and liability as an aider and abettor.

As for the Relief Defendants, the Court found that the SEC had established that Midwest and Sheri Huff possessed illegally obtained profits but had no legitimate claim to them. Accordingly, the Court required disgorgement of such monies.

---

[2] While Certified should not have included letters of credit in general as assets on its balance sheet, this Court did not find Certified's references to real letters of credit to constitute material misstatements of fact for which Defendant Huff should be held liable because accountants approved of the accounting method at the time. Under no circumstances, however, could Huff's knowing or reckless inclusion of bogus letters of credit as assets on Certified's balance sheets not be viewed as material misstatements of fact or material omissions of fact.

With respect to Relief Defendant Pixler, however, the Court entered judgment for Pixler and against the SEC. More specifically, the Court determined that although Pixler received $60,379.98 from Midwest in 2004, she used all of that money to pay taxes related to Midwest for that year. As the $60,379.98 was the only money that Pixler ever received from Midwest, and Pixler paid all of that money to the federal government in taxes without enjoying a corresponding income or other benefit from Midwest, the Court concluded that, as a practical matter, Pixler was not unjustly enriched, and disgorgement was not appropriate. Following the Court's entry of judgment for Pixler, Pixler filed the pending Motion seeking to recover her attorney's fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA").

## *II. Analysis*

The EAJA provides, in relevant part,

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action . . . , brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). As the Supreme Court has found, Congress intended in enacting the EAJA "to ensure that certain individuals, partnerships, corporations . . . or other organizations w[ould] not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved." *Scarborough v. Principi*, 541 U.S. 401, 407 (2004) (quoting H.R. Rep. No. 99-120, p.4) (internal quotation marks omitted).

Title 28, United States Code, Section 2412(d)(1)(B) sets forth the requirements of a party's fee application under the EAJA and demands that a party make its application within 30 days of the

filing of a final judgment.  *See id.*  The Supreme Court has concluded that under Section 2412(d)(1)(B), an application "shall include: (1) a showing that the applicant is a prevailing party; (2) a showing that the applicant is eligible to receive an award . . . ; (3) a statement of the amount sought together with an itemized account of time expended and rates charged[;] . . . [and (4)] [an allegation] that the position of the United States was not substantially justified."  *Scarborough*, 541 U.S. at 408.

### A.  Prevailing Party

In *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001) ("*Buckhannon*"), the Supreme Court addressed the meaning of the term "prevailing party," explaining that "a 'prevailing party' is one who has been awarded some relief by the court; *i.e.*, some court-ordered change in the legal relationship between the plaintiff and the defendant."  *Morillo-Cedron v. Dist. Dir. for the U.S. Citizenship and Immigration Services*, 452 F.3d 1254, 1257 (11th Cir. 2006) (citing *Buckhannon*, 532 U.S. at 604).  Although *Buckhannon* did not involve the EAJA, the Eleventh Circuit has since held that *Buckhannon*'s explanation of the definition of "prevailing party" applies equally to all fee-shifting statutes, including the EAJA.  *Morillo-Cedron*, 452 F.3d at 1258.

In this case, Pixler plainly satisfies the "prevailing party" requirement, as the Court entered judgment for her and against the SEC on the SEC's claim against Pixler.  The Court further notes that the SEC concedes that Pixler is a "prevailing party" for purposes of the EAJA analysis.

### B.  Eligibility to Receive an Award

As it relates to individuals, the EAJA limits eligibility for an award to persons whose net worth did not exceed $2 million at the time that the civil action was filed.  28 U.S.C. §

2412(d)(2)(B).  The Court has reviewed Pixler's financial affidavit dated the month after this case was filed [D.E. 321-1].  Standing by itself, the document that Pixler identifies in her Verified Application as her "financial affidavit" is not actually an affidavit.  It is merely a statement of net worth bearing no verification or signature.  Nevertheless, the "financial affidavit" constitutes an exhibit to Pixler's Verified Application, and Pixler swore and signed before a notary public that the contents of the Application were "true to the best of her knowledge and belief."  Moreover, the Verified Application claims the same net worth as the "financial affidavit," and the SEC does not challenge the lack of a signature on the "financial affidavit" or the accuracy of the contents of that document.  Accordingly, the Court considers Pixler's "financial affidavit" as evidence of her net worth at the time this case was filed.  Because the "financial affidavit" sets forth a net worth below $2 million, the Court finds that Pixler satisfies the second prong of the EAJA award entitlement.

**C.  Whether the Government Was "Substantially Justified"**

Pixler has also fulfilled the requirement of alleging that the SEC's position was not "substantially justified."  Therefore, the Court next considers whether the SEC has met its burden to demonstrate that its position in this litigation was, in fact, "substantially justified."  *See United States v. Jones*, 125 F.3d 1418, 1425 (11th Cir. 1997) ("The government bears the burden of showing that its position was substantially justified.") (citation omitted) (internal quotation marks omitted).

As the Supreme Court has acknowledged, the term "substantially justified" is susceptible to two "almost contrary" constructions:

> On the one hand, it can mean "[c]onsiderable in amount, value, or the like; large," . . . as, for example, in the statement, "He won the election by a substantial majority."  On the other hand, it can mean "[t]hat is such in substance or in the main," . . . as, for example, in the statement, "What he said was substantially true."

*Pierce v. Underwood*, 487 U.S. 552, 564 (1988).  Upon consideration of the possible meanings, the Supreme Court has concluded that as the phrase "substantially justified" as used in the EAJA refers to a position "not 'justified to a high degree,' but rather 'justified in substance or in the main' — that is, justified to a degree that could satisfy a reasonable person. [The meaning] is no different from the 'reasonable basis both in law and fact' formulation . . . ." *Id.*; *see also Bergen v. Comm'r of Soc. Sec.*, 454 F.3d 1273, 1277 (11th Cir. 2006) (quoting *Pierce*, 487 U.S. at 566 n.2, for the proposition that a position is "substantially justified" where it has "a reasonable basis in law and fact").

Further elaborating on the meaning of the "substantially justified" standard, the Supreme Court has explained, "To be 'substantially justified' means, of course, more than merely undeserving of sanctions for frivolousness . . . ." *Pierce*, 487 U.S. at 566.  Moreover, the fact that one other court may have agreed with a position does not necessarily establish that the position was "substantially justified."  Nor does the fact that one court may have disagreed with a position necessarily require a finding that the position was not "substantially justified." *Id.* at 569.  Yet "a string of losses can be indicative; and even more so a string of successes." *Id.*  Similarly, where a position involves an issue of first impression, although that fact, in and of itself, does not determine whether the espousing party's position was "substantially justified," it is one factor that a court may consider.  *See Ness v. Comm'r IRS*, 15 F.3d 1088, 1994 WL 35046, *2 (9th Cir. 1994).  In making this evaluation, a court must keep in mind that "a position can be justified even though it is not correct, and . . . it can be substantially . . . justified if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact." *Pierce*, 487 U.S. at 566 n.2.

Also figuring into the "substantially justified" framework is the fact that the non-prevailing party's position must have been "substantially justified" during all phases of the litigation.  Indeed,

even if the opposing party's position is "substantially justified" at the outset of the litigation, it may lose its status as such upon further developments in the litigation. *See Healey v. Leavitt*, 485 F.3d 63, 67 (2d Cir. 2007) (citations omitted). Likewise, where the non-prevailing party insists upon an unreasonable position at an early stage, for as long as that party persists in that position, the position is not "substantially justified" for purposes of the EAJA, even if that party later abandons the unreasonable position during the course of the litigation. *Envtl. Def. Fund v. Watt*, 722 F.2d 1081, 1086 (2d Cir. 1983) (citing *Ellis v. United States*, 711 F.2d 1571, 1576 (Fed. Cir. 1983)).

With these guidelines in mind, the Court considers whether the SEC's position in this case was "substantially justified." As previously summarized, the SEC sued Pixler as a Relief Defendant for the purpose of collecting $60,379.98 of the monies that Defendant Huff was ordered to disgorge but could not pay. Disgorgement is an equitable remedy that anticipates depriving "the wrongdoer of his ill-gotten gain." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 n.6 & 735 (11th Cir. 2005) (internal quotation marks omitted).

As a basis for seeking the $60,379.98 from Pixler, the SEC argued that Midwest served as the vehicle that Huff used wrongfully to extract millions of dollars from Certified for his personal benefit and for the benefit of his friends and family. Midwest, in turn, was owned in name by Pixler, among others. And in 2004, Midwest used $60,379.98 of the monies that it wrongfully obtained from Certified to pay taxes on behalf of Pixler, although Pixler personally received no corresponding income from Midwest on which Midwest paid the taxes.

Equitable relief from a relief defendant (sometimes referred to as a nominal party[3]) against whom no wrongdoing is alleged may be appropriate where the SEC establishes that the non-party

---

[3] *See SEC v. Cavanagh*, 445 F.3d 105, 110 n. 7 (2d Cir. 2006) (citation omitted).

possesses illegally obtained profits but has no legitimate claim to them. *SEC v. Cherif*, 933 F.2d 403, 414 n.11 (7th Cir. 1991). In *SEC v. Hickey*, 322 F.3d 1123, 1130-32 (9th Cir. 2003), for example, the court upheld the district court's exercise of jurisdiction over a corporation owned in name by the defendant's mother but used by the defendant to channel proceeds of his securities-law violations. *See also SEC v. Ross*, 504 F.3d 1130, 1141-42 (9th Cir. 2007) (disgorgement can be imposed against "persons who are in possession of funds to which they have no rightful claim, such as money that has been fraudulently transferred by the defendant . . ."); *SEC v. Lane*, 2010 WL 98992, *2 (M.D. Fla. Jan. 6, 2010); *SEC v. Chem. Trust*, 2000 WL 33231600, *11 (S.D. Fla. 2000).

Thus, in this case, the question was whether Midwest's payment of Pixler's taxes where Pixler enjoyed no corresponding income on which the taxes were paid amounted to "possession of funds to which [Pixler had] . . . no rightful claim." *Ross*, 504 F.3d at 1141-42. Relying on *SEC v. Koenig*, 532 F. Supp. 2d 987 (N.D. Ill. 2007), the SEC argued during the litigation that Midwest's payment of taxes for Pixler constituted such possession of funds. In *Koenig*, the defendant received bonus money that the court required to be disgorged. The court then considered whether the taxes that the defendant paid on the bonus monies should have been deducted from the bonus monies to be disgorged and concluded that they should not, noting that the disgorgement figure "is discretionary and need not be exact." *Id.* at 994; *see also SEC v. Aragon Capital Mgmt., LLC*, 672 F. Supp. 2d 421, 438-39 (S.D.N.Y. 2009); *SEC v. Zwick*, 2007 WL 831812, *24 (S.D.N.Y. Mar. 16, 2007) ("[T]he deduction from the disgorgement amount that Zwick seeks for general income taxes does not fall within the class of deductions occasionally allowed for transaction-specific costs."); *SEC v. Dibella*, 2008 WL 6965807, *3 (D. Conn. Mar. 13, 2008).

*Koenig* differs from the facts involving Pixler. First, Koenig was a defendant, not a relief defendant like Pixler. Thus, the court found that Koenig violated securities law before ordering disgorgement. As it pertains to Pixler, however, the SEC made no such allegation, and the Court similarly entered no findings that Pixler had violated securities law. Second, notably, Koenig was required to disgorge the monies on which he paid the income taxes. Indeed, it was that sum that was the subject of the court's disgorgement order; the court does not appear to have targeted directly for disgorgement the monies spent to pay taxes on the bonuses. Therefore, the question in *Koenig* related to whether Koenig should have received an offset in the disgorgement ordered, for income taxes paid on the bonuses he received.

Unlike in *Koenig*, where the court did not directly target for disgorgement the tax monies that Koenig paid on the income he wrongfully obtained, in this case, the only monies that the SEC sought to disgorge from Pixler included the $60,379.98 paid in income taxes for Pixler because Pixler personally received no monies upon which she incurred the $60,379.98 tax debt. Thus, unlike Koenig, Pixler obtained no corresponding benefit upon which the taxes were paid. For these reasons, the Court declined to enter judgment for the SEC on its claim against Pixler as a relief defendant.

But that does not end the inquiry. The Court notes that courts have also disgorged sums from defendants in amounts equal to ill-gotten gains used to pay income taxes. *See, e.g., SEC v. Utsick*, 2009 WL 1404726, *7 (S.D. Fla. May 19, 2009). The idea behind doing so comports with the premise of disgorgement not to allow an individual to enjoy ill-gotten gain in that where a person receives income, payment of the income tax on that income bestows a benefit upon the person who received the income: but for the use of the improperly-obtained monies to pay the tax

liability on the income, the person receiving the income would have had to have paid the taxes on the sum. In other words, it matters not how the ill-gotten gains were ultimately expended, so long as the spending of the ill-gotten gains bestowed a benefit on the person from whom the monies are to be disgorged.

In this case, the use of the ill-gotten gains to pay Pixler's tax liability attributable to Midwest arguably rendered a benefit to Pixler because, as far as the IRS was concerned, Pixler was liable for taxes on income from Midwest, even though, in actuality, Pixler did not receive income from Midwest corresponding to the $60,379.98 tax liability. While Pixler seeks to minimize this tax liability, describing the $60,379.98 payment as Pixler's "damages" for Midwest's filing of an "errant Form K-1," the fact remains that had Midwest not made the payment on Pixler's behalf, Pixler would have been legally responsible for doing so in the absence of a court judgment or other legal document excusing her from the obligation. This circumstance, particularly in view of the fact that this matter appears to have presented an issue of first impression, renders the SEC's position against Pixler "substantially justified" because it had a reasonable basis in both fact and law.

Nor, as Pixler suggests, was the SEC's position not substantially justified because of a failure to demonstrate a causal connection between Huff's violations and the $60,379.98 sought from Pixler. First, this Court has already found that Huff used Midwest as a vehicle for extracting money from Certified, and he was able to do so for as long as he did only as a result of the cover that the material misrepresentations and omissions of material fact in Certified's filings created. *See* D.E. 320 at 118-19. Moreover, Huff used Midwest to conduct a "systematic and pervasive fraud," rendering it permissible to require disgorgement of all monies that Midwest derived from Certified, even though the Court elected to order disgorgement of a smaller amount. *See id.* at 116-19 (citing

*CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93-94 (2d Cir. 1986)).  Finally, although the SEC did not allege violations of the securities laws against Pixler, in determining whether the SEC's position that a causal connection existed between Huff's violations and the $60,379.98 sought to be disgorged from Pixler was substantially justified, the Court cannot ignore the fact that Pixler served as a straw owner of Midwest for several years.  This circumstance helped to allow Huff to continue to hide his involvement in Midwest, and, ultimately, in Certified, from shareholders.  For all of these reasons, the SEC was substantially justified in taking the position that the money it sought to disgorge from Pixler as a relief defendant was causally connected to Huff's violations of the securities laws.

Pixler next suggests that even if the SEC had been substantially justified in its position at some point in the litigation, the SEC lost its substantial justification as a result of Pixler's alleged willingness to settle the litigation by paying the $60,379.98.  *See* D.E. 321 at 2.  The problem with Pixler's position stems from the lack of evidence supporting it.  Although Pixler's Verified Application asserts that Pixler "offered to pay the SEC the same amount of money paid to the [IRS]," *id.,* no evidence submitted with the Verified Application supports this contention.

Moreover, the SEC's Opposition contains evidence to the contrary.  More specifically, lead counsel for the SEC in this case submitted an affidavit in which he attested that "no settlement offer was ever made by . . . Pixler, at the mediation or otherwise, to pay 100% of the amount the [SEC] sought for her to disgorge." D.E. 326-1 at ¶ 15.  SEC counsel added that although Pixler's attorney had inquired about the possibility of obtaining a complete or partial disgorgement waiver based on her financial condition and that SEC counsel had forwarded the appropriate paperwork for

consideration of a waiver to counsel for Pixler, Pixler never returned the necessary paperwork. *Id.* As a result, the SEC could not consider authorizing a waiver. *Id.*

In further support of these representations, the SEC submitted a copy of an e-mail from SEC counsel to counsel for Pixler, which states, "Per our discussion, attached is the Sworn Financial Statement and Consent to Consumer Credit Report, which must be completed and executed by your client Roxann Pixler. Please have your client provide this financial information before the mediation scheduled for June 11, 2009." D.E. 326-1 at 6. In addition, the SEC filed a copy of an e-mail from the mediator responding to an e-mail from SEC counsel asking whether the mediator had any notes from the mediation indicating that Pixler had offered to pay 100% of the $60,279.98 that the SEC sought from her. *See* D.E. 326-1 at 17. The mediator replied, "I reviewed my notes and see no reference to [P]ixler offering to settle as you described." *Id.*

Nothing that Pixler submitted in support of her Reply contradicts this evidence. While counsel for Pixler filed affidavits stating that they discussed the issue of settlement with the SEC as settlement pertained to Pixler individually, *see* D.E. 327-1 at ¶¶ 4-6 & D.E. 327-2 at ¶¶ 3-4, conspicuously absent from Pixler's attorneys' affidavits is any statement that at any point in time Pixler offered to settle the case for the full $60,279.98 that the SEC sought from her or that Pixler prepared the paperwork necessary to obtain a full or partial waiver of disgorgement. Thus, the uncontested evidence of record does not allow this Court, as a matter of fact, to find that Pixler offered to settle with the SEC for the full amount of the payment to the IRS, or even to conclude that Pixler offered to settle for less than the $60,279.98, in light of Pixler's failure to file the paperwork necessary for the SEC to authorize a partial or full waiver of disclosure. As a result, the premise on which Pixler bases her argument that the SEC's substantial justification eroded as a result of Pixler's

willingness to settle is faulty, and this Court cannot rely upon it to find that the SEC's substantial justification disappeared as a result of settlement negotiations. Accordingly, this Court rejects Pixler's suggestion that the SEC lost its substantial justification during the litigation.

### D.  Remaining Issues

As noted previously, under the EAJA, a court would generally also consider whether special circumstances rendered an award of fees unjust, and, if not, a court would evaluate the prevailing party's statement of the amount sought and the itemized accounting of time expended and rates charged. In addition, in this case, the SEC has argued that Pixler did not "incur" attorney's fees under the EAJA because she did not pay for the defense — Huff did. The Court need not consider these issues because regardless of the Court's conclusions with respect to them, this Court's finding that the SEC's position was substantially justified as it relates to Pixler precludes an award for Pixler under the EAJA.

### *III.  Conclusion*

For the foregoing reasons, the Court **DENIES** Relief Defendant Roxann Pixler's Verified Application for an Award of Legal Fees and Expenses [D.E. 321].

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this 23rd day of March 2011.

*[signature]*
**ROBIN S. ROSENBAUM**
**UNITED STATES MAGISTRATE JUDGE**

cc:     Counsel of Record

**15**